**2024-1492, -1493**

# United States Court of Appeals for the Federal Circuit

CPC PATENT TECHNOLOGIES PTY LTD.,

*Appellant,*

– v. –

ASSA ABLOY AB, ASSA ABLOY INC., HID GLOBAL CORP., ASSA ABLOY GLOBAL SOLUTIONS, INC., MASTER LOCK COMPANY, LLC,

*Appellees.*

*Appeals from the United States Patent and Trademark Office, Patent Trial and Appeal Board in Nos. IPR2022-01093 and IPR2022-01094.*

## BRIEF FOR APPELLANT

STEVEN M. COYLE
NICHOLAS A. GEIGER
MICHAEL J. RYE, ESQ.
CANTOR COLBURN LLP
20 Church Street, 22nd Floor
Hartford, Connecticut 06103
(860) 286-2929
scoyle@cantorcolburn.com
ngeiger@cantorcolburn.com
mrye@cantorcolburn.com

*Counsel for Appellant*

May 28, 2024



## REPRESENTATIVE CLAIMS

Claim 1

[1pre]    A method of enrolling in a biometric card pointer system, the method comprising the steps of:

[1a]    receiving card information;

[1b]    receiving the biometric signature;

[1c]    defining, dependent upon the received card information, a memory location in a local memory external to the card;

[1d]    determining if the defined memory location is unoccupied; and

[1e]    storing, if the memory location is unoccupied, the biometric signature at the defined memory location.

Claim 3

[3pre]    A method of securing a process at a verification station, the method comprising the steps of:

[3a]※    providing card information from a card device to a card reader in the verification station;

[3b]    inputting a biometric signature of a user of the card device to a biometric reader in the verification station;

[3c]※    determining if the provided card information has been previously provided to the verification station;

[3d]    if the provided card information has not been previously provided to the verification station;

[3da]    storing the inputted biometric signature in a memory at a memory location defined by the provided card information; and

[3db]        performing the process dependent upon the received card information;

[3e]✲      if the provided card information has been previously provided to the verification station;

[3ea]✲    comparing the inputted biometric signature to the biometric signature stored in the memory at the memory location defined by the provided card information;

[3eb]      if the inputted biometric signature matches the stored biometric signature, performing the process dependent upon the received card information; and

[3ec]      if the inputted biometric signature does not match the stored biometric signature, not performing the process dependent upon the received card information.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CORRECTED CERTIFICATE OF INTEREST

**Case Number** 2024-1492; 2024-1493

**Short Case Caption** CPC Patent Technologies Pty Ltd. v. Assa Abloy AB et al

**Filing Party/Entity** CPC Patent Technologies Pty Ltd.

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 05/28/2024

Signature: /s/ Steven M. Coyle

Name: Steven M. Coyle

FORM 9. Certificate of Interest

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.  ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  ☐ None/Not Applicable |
| CPC Patent Technologies Pty Ltd. | | Charter Pacific Corporation Limited |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐  Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☑    None/Not Applicable              ☐    Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑   Yes (file separate notice; see below)    ☐   No    ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable              ☐    Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................. ii

STATEMENT OF RELATED CASES ................................................... iv

JURISDICTIONAL STATEMENT ...................................................... 1

INTRODUCTION ............................................................................... 1

STATEMENT OF THE ISSUES .......................................................... 3

STATEMENT OF THE CASE .............................................................. 4

    A.    The '039 Patent .......................................................... 4

           The Prior Art ............................................................. 7

                1.    Hsu ............................................................. 8

                2.    Other Prior Art ........................................... 10

    B.    Claim Construction ................................................... 10

                1.    "dependent upon" ....................................... 10

                2.    "defining, dependent upon the received card information, a memory location in a local memory external to the card" .......................... 10

    C.    Procedural Background .............................................. 11

SUMMARY OF ARGUMENT ............................................................ 13

ARGUMENT ................................................................................... 15

    I.    STANDARD OF REVIEW ............................................. 15

    II.    THE BOARD ERRED IN FINDING THE CHALLENGED CLAIMS OBVIOUS OVER THE PRIOR ART ................... 16

        A.    The Board Misconstrued or Misapplied the Construction of the Defining Limitation ................... 16

        B.    The Board's Finding That Hsu Discloses the Defining Limitation Is Not Supported By Substantial Evidence ......... 22

CONCLUSION ................................................................................. 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*D'Agostino v. MasterCard Int'l, Inc.*,
  844 F.3d 945 (Fed. Cir. 2016) ........................................................ 20, 21

*Graham v. John Deere* Co.,
  383 U.S. 1 (1966) ..............................................................................22

*In re Abbott Diabetes Care, Inc.*,
  696 F.3d 1142 (Fed. Cir. 2012) ........................................................20

*In re Am. Acad. Sci. Tech Ctr.*,
  367 F.3d 1359 (Fed. Cir. 2004) ........................................................15

*In re Lee*,
  277 F.3d 1338 (Fed. Cir. 2002) ........................................................15

*In re Van Os*,
  844 F.3d 1359 (Fed. Cir. 2017) ................................................... 15, 26

*In re Zurko*,
  258 F.3d 1379 (Fed. Cir. 2001) ................................................... 17, 26

*Koninklijke Philips N.V. v. Google LLC*,
  948 F.3d 1330 (Fed. Cir. 2020) ........................................................15

*KSR Int'l. Co. v. Teleflex Inc.*,
  550 U.S. 398 (2007) .................................................................... 22, 26

*OSI Pharms. LLC v. Apotex, Inc.*,
  939 F.3d 1375 ....................................................................................15

*PAR Pharm., Inc. v. TWI Pharms., Inc.*,
  773 F.3d 1186 (Fed. Cir. 2014) ........................................................15

*Randall Mfg. v. Rea*,
  733 F.3d 1355 (Fed. Cir. 2013) ........................................................26

**Statutes and Other Authorities:**

28 U.S.C. § 1295(a)(4)(A) ..........................................................1

35 U.S.C. § 103(a) ............................................................ 7, 22

35 U.S.C. § 141(c) ...............................................................1

37 C.F.R. § 42.65(a) ............................................................27

## <u>STATEMENT OF RELATED CASES</u>

Pursuant to Federal Circuit Rule 47.5, counsel for Appellant states that: (a) no other appeal in or from the same proceeding was previously before this or any other appellate court, whether under the same or similar title; and (b) the following cases will be directly impacted by this court's decision in the pending appeal:

*Apple Inc. v. CPC Patent Technologies PTY, LTD*., IPR2022-00600 (PTAB);

*ASSA ABLOY AB, et al. v. CPC Patent Technologies PTY, LTD.*, No. 3:22-cv-00694 (D. Conn.);

*CPC Patent Technologies PTY LTD. v. HID Global Corporation*, No. 6:22-cv-01170 (W.D. Tex.); and

*CPC Patent Technologies PTY, LTD. v. Apple Inc.*, No. 5:22-cv-02553 (N.D. Cal.).

Appeal No. 24-1365 is directed to IPR proceeding IPR2022-00600. That appeal is proceeding concurrently to the instant case.

## JURISDICTIONAL STATEMENT

On January 31, 2024, the United States Patent and Trademark Office Patent Trial and Appeal Board ("the Board") issued a final written decision ("FWD") in IPR2022-01093 ("the '093 IPR") determining claims 1, 2, 13, 14, 19, and 20 of U.S. Patent No. 8,620,039 ("the '039 Patent") to be unpatentable. Appx0001-0058. On the same date, the Board issued a FWD in IPR2022-01094 ("the '094 IPR") determining claims 3-12 and 15-18 of the '039 Patent to be unpatentable.[1] Appx0059-0125. CPC timely appealed from both FWDs on February 15, 2024. Appx3713-3720. This Court therefore has jurisdiction over this appeal pursuant to 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. § 141(c).

## INTRODUCTION

United States Patent No. 8,620,039, titled "Card Device Security Using Biometrics" ("the '039 Patent"), is directed to "a biometric card pointer (BCP) system intended to more efficiently and securely permit a user to store biometric information during a user enrollment phase…." Appx0004, Appx0062. Each of the claims-at-issue requires that the system receive "card information" and then,

---

[1] Generally, the claims at issue in the '094 IPR are directed to use of the claimed system or methods with a "verification station," while the claims at issue in the '093 IPR do not include a verification station requirement. This distinction is not material to the issues on appeal.

1

"dependent upon" that card information, define a memory location in a local database at which the user's biometric signature will be stored ("the Defining Limitation").[2] *See e.g.*, Appx0278 at Claim 1.  One advantage of the claimed invention is that upon entry of the biometric signal the system only needs to check a single memory address (*i.e.*, the specific address "defined" by the "card information") to enroll or verify a user.  As a result, "[t]here is no need to search the entire database 124 to see if there is a match.  Thus, the disclosed BCP system provides a particularly simple and fast biometric verification check…." Appx0276 at 8:34-41.

A central issue below was the construction of the Defining Limitation.  The Board properly construed this to mean that during an enrollment process, the card information "sets" or "establishes" where – *i.e.*, at what memory location or address – the system will store the biometric signature (such as fingerprint data). Appx0016, citing the Final Written Decision in IPR2022-00600 ("the Apple IPR") at Appx3766; Appx0075.  In finding the challenged claims unpatentable, however, the Board erred in effectively re-interpreting or misapplying its own construction

---

[2] As used herein, the "Defining Limitation" shall refer to the requirement of each challenged claim that the card information must "define" the memory location at which the biometric signature will be stored.  Each of the challenged claims includes the Defining Limitation, although the specific wording may vary from one claim to another.

when evaluating the prior art. As a result, the Board found that the Hsu prior art disclosed the Defining Limitation – that it met the "set" or "established" condition – even though it merely discloses storing card information (*e.g.*, an employee identification number) "*in association with*" the biometric signal. Appx0032-0039; Appx0091-0098. This finding was erroneous and was not supported by substantial evidence. In fact, Hsu is silent as to how the specific memory address for the biometric signature is "defined, "set," or "established." More particularly, there is no disclosure in Hsu that it is *the card information* that "defines," the particular address in the memory database where the biometric signature will be stored. As a result, the Board's Final Written Decisions should be reversed, and the patentability of the challenged claims should be upheld.

## STATEMENT OF THE ISSUES

1.      Whether the PTAB erred as a matter of law in re-construing or misapplying a claim construction that erroneously equated the card information "setting" or "establishing" the biometric signature's memory location with merely storing the card information and biometric signature "in association with" each other; and

3

2.    Whether the PTAB erred in finding the challenged claims obvious over combinations of Hsu and other prior art where the substantial evidence does not support a finding that Hsu discloses the Defining Limitation.

## STATEMENT OF THE CASE

### A. The '039 Patent

The '039 Patent issued on December 31, 2013 from an application claiming priority to August 12, 2005.  As the PTAB found, the '039 Patent is directed to "a biometric card pointer (BCP) system intended to more efficiently and securely permit a user to store biometric information during a user enrollment phase, and in future verification processes permits the user access [sic] their account using an identification (ID) card and biometric information such as a fingerprint." Appx004; Appx0062.  The '039 Patent inventions constitute an improvement over prior art card devices that required "cumbersome" central repositories of card information and biometric signatures, and which required "complex back-end database management" over a potentially insecure communications network, along with front-end biometric signature readers that need storage and processing capabilities, resulting in a "complex and expensive solution."  Appx0273 at 2:31-39.

4

The '039 Patent inventions improve upon the prior art, in part, by "automatically storing a card user's biometric signature in a local memory." Appx0273 at 2:54-55.  In particular, "[t]he biometric signature is stored at a memory address *defined by the (unique) card information* on the user's card…." Appx0273 at 2:64-67 (emphasis added).  Because the memory address for the biometric signature is defined by the card information, during verification the system "reads the contents stored at a single memory address defined by the card data 604 and checks these contents against the biometric signature received in the step 203.  There is no need to search the entire database 124 to see if there is a match.  Thus, the disclosed BCP arrangement provides a particularly simple and fast biometric verification check…"  Appx0276 at 8:36-41.

During enrollment, the user couples his card to the card reader and then inputs a biometric signature (such as a fingerprint).  "The card data 604 defines the location 607 in the memory 124 where their unique biometric signature is stored." Appx0276 at 7:43-50.  Thus, during enrollment it is the card data that defines the specific location in the database where the biometric signature will be stored.  In particular, "the card data 604 acts as the memory reference which points, as depicted by an arrow 608, to a particular memory location at an address 607 in the local database 124…" Appx0276 at 7:31-34.  Figure 4 demonstrates that it is the

5

user's card information 605 (specifically card data 604) (yellow) that defines (red arrow) the *specific memory address* 607 (blue) at which the user's biometric signature will be stored within a larger memory database 124 (green):



**Fig. 4**

Appx0269 at Fig. 4.

The claimed system is reflected in representative claim 1, which is directed to a method of enrolling in a biometric security system as follows:

| Preamble 1[P] | A method of enrolling in a biometric card pointer system, the method comprising the steps of: |
|---|---|
| 1[A] | receiving card information; |
| 1[B] | receiving the biometric signature; |
| 1[C] | defining, dependent upon the received card information, a memory location in a local memory external to the card; |
| 1[D] | determining if the defined memory location is unoccupied; and |

| 1[E] | storing, if the memory location is unoccupied, the biometric signature at the defined memory location. |

The parties disputed below whether the preamble of claim 1 was limiting, and more particularly whether the claims were directed to enrollment. *See e.g.*, Appx2767-2770; Appx3023-3024. Ultimately the Board did not formally decide this issue. Nevertheless, the Board properly held that "[w]e can agree that '[a] method of enrollment' provides antecedent basis for at least dependent claim 2 and that the preamble provides context to the recited method step limitations in the body of independent claim 1." Appx0013; *see also* Appx0072 ("Therefore, for purposes of this Decision, we will consider the limitations of claims 3, 15, and 18 to include, at least in part, an enrollment process."). The Board therefore considered the claim limitations – including the Defining Limitation – "within the context of an enrollment process." Appx0013.

**The Prior Art**

Petitioner alleged that the '039 patent was invalid as obvious under 35 U.S.C. § 103(a) on multiple grounds. Appx0289-0290; Appx0396-0398. Common to all grounds, however, is a reliance on the Hsu prior art for disclosure of the Defining Limitation – *i.e.*, that the card data defines the memory location for the biometric signature. However, Hsu fails to teach or disclose the Defining

7

Limitation, and therefore Petitioner has failed to meet its burden of proving

unpatentability of any challenged claim.

### 1. Hsu

Hsu is titled "Controlled Access to Doors and Machines Using Fingerprint

Matching" and describes "[a] system and related method for controlling access to

building doors or to machines, such as automatic teller machines (ATMs)."

Appx0943; Appx0018; Appx0078.  The system of Hsu stores biometric data in a

database, and combines fingerprint matching with another form of identification,

such as an ID card with a transponder that sends preliminary identification

information (*e.g.*, an employee number), to an access controller.  Appx0943-0944.

Thus, Hsu reports that "[i]n accordance with the present invention, a high-speed

fingerprint matching device is used in conjunction with a personal identification

medium carried by each user seeking access to a building or machine."  Appx0945

at 4:1-4.

Importantly, Hsu is silent as to how the memory location for the biometric

signature is "defined" in the database during enrollment.  Hsu states several times

that the user's fingerprint data is stored "in association with" her identification

data.  Appx0944 at 1:55-2:3 ("the system of the invention comprises…a fingerprint

database containing reference fingerprint data for every user of the system, *in*

8

*association with* an identification of the user…") (emphasis added); Appx0945 at 4:53-57 ("The database is basically a table that *associates* each user number with a stored fingerprint image…") (emphasis added).  But nowhere does Hsu explain how the particular memory address for the biometric signature is determined, and it certainly does not disclose that it is the card information itself (*e.g.*, the employee number) that *defines* (sets or establishes) where in memory the biometric signature will be stored.

Turning to enrollment in particular, Hsu's discussion is similarly silent as to how the biometric signature memory location is established, and also fails to disclose that the memory address is defined by the card information.  Again, Hsu teaches that during enrollment the employee number and the biometric signature are stored together, but it lacks any disclosure that it is the card information that sets or establishes the biometric signature's memory address.  Hsu explains:

> The enrollment procedure requires that each user enroll by presenting a finger to fingerprint sensor 16, which generates a fingerprint image for a fingerprint enrollment analyzer 64.  At the same time, the user's identity has to be independently verified, by some means other than fingerprint matching…and the user also presents an account number, employee number or similar identity number.  If the user does not have such a number, one is assigned at this stage.  The account number is stored in the database 44 *in association with* the user's fingerprint image data.

Appx0947 at 7:1-12 (emphasis added).

9

### 2. Other Prior Art

Discussion of other references relied upon by Petitioner will be addressed below to the extent needed.

### B. Claim Construction

As pertinent to the issues on appeal, the Board construed the following claim terms:

1. <u>"dependent upon"</u>

The Board construed "dependent upon" – which is contained within the larger Defining Limitation – according to its plain and ordinary meaning to mean "contingent upon or determined by." Appx0013-0014.

2. <u>"defining, dependent upon the received card information, a memory location in a local memory external to the card"</u>

The construction of this clause was most germane to the patentability issues. Patent Owner argued that the proper construction is: "the system sets or establishes a memory location in a local memory external to the card, said location being contingent upon or determined by the received card information." Appx0014. The Board ruled that "Patent Owner's construction is sufficiently accurate." Appx0014.

The Board further elaborated, quoting the related Apple IPR FWD, that:

during an *enrollment* process, the claimed "biometric signature," e.g., a fingerprint, is not yet stored in the memory and no memory location has been "set" or "established" for the fingerprint.  When the fingerprint, and then the card, is provided to the system during enrollment, the card information provides data that establishes *where, e.g.*, at what memory location or address, the system will *store* the fingerprint data.

Appx0015 (emphasis in original); *see also* Appx0016.

Although the Board's formal construction of the Defining Limitation is correct, the Board erred by misapplying and/or by re-interpreting its own construction such that "defining" (*i.e.,* setting or establishing) was unreasonably broadened to include storage of the biometric signature merely "in association with" the card information, and without requiring that the card information itself "set" or "establish" the specific address within the larger memory database at which the biometric signature will be stored.

## C. Procedural Background

Petitioner sought review of the '039 Patent solely on the basis of obviousness.  Appx0290; Appx0398.  The Petitions asserted multiple grounds of obviousness but the central issue in dispute as to each was whether Hsu disclosed the Defining Limitation.  As to this issue, the Board concluded that Hsu does disclose that the card information "defines," "sets" or "establishes" the memory location at which the biometric signature would be stored.  In reaching this conclusion, the Board relied principally on Hsu's statement that in the fingerprint

11

database, "fingerprint data are *associated with* corresponding user numbers, or employee or customer account numbers." Appx0032-0033, citing Appx0946-0947, ¶ 26 (emphasis added). The Board cited Hsu's teaching that during enrollment a user presents a fingerprint and '[a]t the same time, the user's identity has to be independently verified…and the user also presents an account number, employee number or similar identity number." Appx0033. The Board reasoned that:

> [u]nderstanding that during enrollment Hsu stores the user's fingerprint data "associated with" a user's employee number on the card, we further understand that the identification information, e.g., employee number, on the identification card defines, sets, or establishes *where* the fingerprint is stored; that is, the user's fingerprint data is stored with the database record corresponding to the relevant employee number.

Appx0034 (underlined emphasis added).

The Board explained its view that storing the biometric signature "*in association with*" the card information equates to the card information "defining," "setting," or "establishing" the memory location. The Board agreed that "these are different words," but asserted that the ordinary meaning of "associated" is "related, connected, or combined together." [3] Appx0034. Going a step further, the Board stated:

---

[3] The Board cited the Merriam Webster online dictionary for the alleged "ordinary meaning" of "associated." Appx0034, citing Appx3712. Neither party proposed a definition of "associated" in the proceedings below, nor was there any evidence for the "ordinary meaning" of that term in the record before the Board's reference to the Merriam Webster online dictionary.

12

> *Considering common database structures and functions*, we are persuaded that Hsu, by "associating" a user's fingerprint data with a database record corresponding to a particular employee, concomitantly discloses "defining," setting," or "establishing" a memory location for the fingerprint data in relation to the employee account number.

Appx0034 (emphasis added).  The Board provided no evidence or explanation as to what "common database structure and functions" it was relying upon. Appx0034.

Ultimately, the Board was "persuaded…that Hsu's *association of* a fingerprint with a user's underlying account or employee number in a database record during enrollment discloses limitation 1[C][4], namely 'defining, dependent upon the received card information, a memory location in a local memory external to the card.'"  Appx0038-0039 (emphasis added).  Having reached this conclusion, the Board found all challenged claims unpatentable. [5]

## SUMMARY OF ARGUMENT

The Board's ruling rests on an erroneous finding that Hsu discloses the Defining Limitation; if Hsu does not disclose that the card information "defines"

---

[4] As used below, "limitation 1[C]" corresponds to the Defining Limitation here.
[5] In the '093 IPR, the Board found all challenged claims unpatentable under Ground 1, and therefore did not reach Ground 2.  Appx0056, n. 11.  In the '094 IPR, the Board found the challenged claims unpatentable under Grounds 1, 3, 5, and 7, and therefore did not reach Grounds 2, 4, 6, and 8.  Appx0112, Appx0123-0124 at n. 17-20.

the memory address for storing the biometric signature, then Petitioner has failed to meet its burden of proving unpatentability.

The Board's Decision(s) must be reversed for two independent reasons. First, although it initially reached the correct construction of the Defining Limitation, the Board ultimately re-interpreted or misapplied it to include the mere "association" of the card information and the biometric signature when stored. This unreasonably broad construction is incorrect and is not supported by the record. Minimally, the Board's application of an improper claim construction requires vacatur and remand.

Second, under either construction the Board's finding that Hsu discloses the Defining Limitation is not supported by substantial evidence. There is no disclosure in Hsu that the card information "defines" the memory address at which the biometric signature will be stored. Petitioner's expert admitted that "*Hsu is silent on how a new user record is created*" during enrollment. Ex. 1032, ¶ 33 (emphasis added). The Board's effort to "leap" ('093 IPR FWD, p. 35) to fill this gap is unavailing, and relies on assumption and hindsight. Substantial evidence does not support a finding that Hsu discloses the Defining Limitation. Therefore, the finding of unpatentability must be reversed.

## ARGUMENT

## I.    STANDARD OF REVIEW

The Federal Circuit reviews the PTAB's factual findings for substantial evidence and its legal determinations *de novo*. *See e.g., In re Van Os*, 844 F.3d 1359, 1360 (Fed. Cir. 2017). Claim construction is a legal question, reviewed *de novo*. *See In re Am. Acad. Sci. Tech Ctr.*, 367 F.3d 1359, 1363 (Fed. Cir. 2004). Obviousness is a question of law based on subsidiary findings of fact. *Id.* An obviousness determination generally requires a finding that "all claimed limitations are disclosed in the prior art," *PAR Pharm., Inc. v. TWI Pharms., Inc.*, 773 F.3d 1186, 1194 (Fed. Cir. 2014); cf. *Koninklijke Philips N.V. v. Google LLC*, 948 F.3d 1330, 1337-38 (Fed. Cir. 2020) (explaining that the common knowledge of a skilled artisan can be used to supply a missing limitation in some circumstances), and "that a person of ordinary skill in the art would have been motivated to combine or modify the teachings in the prior art and would have had a reasonable expectation of success in doing so," *OSI Pharms. LLC v Apotex, Inc.,* 939 F.3d 1375, 1382. The PTAB "must make findings of relevant facts, and present its reasoning in sufficient detail that the court may conduct meaningful review of the agency action." *In re Lee*, 277 F.3d 1338, 1346 (Fed. Cir. 2002).

## II.    THE BOARD ERRED IN FINDING THE CHALLENGED CLAIMS OBVIOUS OVER THE PRIOR ART

### A. The Board Misconstrued or Misapplied the Construction of the Defining Limitation

Initially the Board correctly construed the Defining Limitation, consistently with the related Apple IPR, to mean that the system "sets" or "establishes" the biometric signature's memory location "contingent upon or determined by" the card information.  Appx0014-0016; Appx0072-0075.  The Board held:

> We understand that during an enrollment process the claimed "biometric signature," e.g., a fingerprint, is not yet stored in the memory, and no memory location or address has been "defined," as in "set" or "established," in the memory for storing the fingerprint, until card information is received. Once the card information and fingerprint are received during enrollment, the card information provides data that establishes *where,* i.e., at what memory location or address, the system will *store* the fingerprint data.  The memory location or address where the fingerprint data is stored is therefore "contingent" on the card information, as Patent Owner's construction requires.

Appx0075 (underlined emphasis added); *see also*, Appx0016.  Had the Board properly applied this construction it would have concluded that Hsu fails to disclose the Defining Limitation.  As discussed below there is no disclosure in Hsu that the card information "provides data that establishes" the specific database address at which the biometric signature is stored.

Instead, the Board altered or otherwise misapplied its claim construction. The Board effectively broadened its interpretation and held that the card

16

information merely being stored "in association with" the biometric signature is the same as the card information providing data that "defines," "sets," or "establishes" a specific memory location in the database for the biometric signature. *See e.g.*, Appx0034. In so doing, the Board erred.

First, there is no definitional basis for the Board's conclusion that "associated with" equates to "defining," "setting" or "establishing," as used in the '039 Patent. In finding that these admittedly "different" words apparently have the same meaning, the Board cited a definition of "associated" from the Merriam Webster online dictionary. Appx0034. The Board asserted that the "ordinary meaning" of "associated" is "related, connected, or combined together." Appx0034 Significantly, the Board cited no further basis for the conclusion that "defining" also means or includes "associated with." The Board cited neither the specification nor the file history for any intrinsic evidence that "defining" as used in the '039 Patent claims includes mere "association."

Instead, based on the above definition of "associated," as well as purported consideration of "common database structures and functions" that the Board did not identify,[6] the Board was "persuaded that Hsu, *by 'associating'* a user's

---

[6] The Board's reliance on "common database structures and functions" to attempt to fill the gaps in the prior art without any support in the record is itself error. *See In re Zurko*, 258. F.3d 1379, 1386 (Fed. Cir. 2001) ("the Board cannot simply reach

fingerprint data with a database record corresponding to a particular employee, *concomitantly discloses* 'defining,' 'setting,' or 'establishing' a memory location for the fingerprint data in relation to the employee account number." Appx0034. (emphasis added). As such, it is apparent that the Board broadly re-interpreted or misapplied the construction of "defining" to include not only "set" or "establish," but also "associated with." This conclusion is legal error, as there is no support in the record for interpreting "defining" as used in the '039 Patent to include mere "association."

Even using the definition of "associated" cited by the Board, there can be no reasonable dispute that "related, connected, or combined together" means something different from "define," "set," or "establish." Just because two items are "related, connected or combined together" in storage does not logically mean that one of the items is the item that provides the data that "sets" or "establishes" the particular address at which the other item will be stored. More is needed, and in Hsu the "more" is lacking. Hsu includes no disclosure that the employee number itself provides the data that "defines," "sets" or "establishes" the specific address in the memory database at which the biometric signature will be stored.

_____

conclusions based on its own understanding or experience -- or on its assessment of what would be basic knowledge or common sense. Rather, the Board must point to some concrete evidence in the record in support of these findings").

18

Further, there is no intrinsic evidence that supports inclusion of mere
"association" in the construction of "defining."  The '039 Patent explains, for
example, "[t]he biometric signature is stored at *a memory address defined by the
('unique') card information* on the user's card as read by the card reader of the
verification station."  Appx0273 at 2:64-67 (emphasis added).  The '039 Patent
further teaches that "[i]n an enrollment phase … [t]he card data 604 *defines the
location 607 in the memory* 124 where the unique biometric signature is stored."
Appx0276 at 7:43-49 (emphasis added). The '039 Patent repeatedly refers to the
memory address as "defined by the card [information/data]," confirming that the
received card information is the basis for the "defining" (*i.e*., the setting or
establishing) of a memory location. *See, e.g.,* Appx0265 at Abstract, Appx0274 at
3:4-11, Appx0276 at 7:53-56, Appx0277 at 9:23-25 and 9:62-67.  Figure 4 of the
'039 Patent explicitly shows, via arrow 608, the card data "defining" – *i.e.,* setting
or establishing – the specific memory address (607) for the user's biometric
signature within a larger database 124.  Appx0269 at Fig. 4.

The intrinsic evidence thus supports the Board's conclusion, both here
(initially) and in the related Apple IPR, that "defining" means "setting" or
"establishing."  Appx0014-0017, Appx0072-0075, Appx3765-3772.  No intrinsic
evidence supports a finding that the meaning of the Defining Limitation should be

so broad as to include mere "association" – *i.e.,* "related, connected, or combined together."[7]

Re-interpretation or misapplication of a disputed claim term by the Board is error.  For example, in *In re Abbott Diabetes Care, Inc.*, 696 F.3d 1142 (Fed. Cir. 2012), the Board construed the disputed "substantially fixed" term such that it would "be understood by the skilled worker to allow some movement of the sensor relative to the position of the sensor control unit." *Id*. at 1146.  In application, however, the Board applied a broader construction and determined that prior art teaching a sensor that was "somewhat constrained" disclosed the "substantially fixed" claim limitation.  *Id.* at 1147.  "That is to say, the Board equated 'somewhat restrained in movement' to 'allow[ing] some movement.'"  *Id.* The Federal Circuit vacated and remanded.  The Court held that "[w]hile the Board's original construction is reasonable in view of the specification, the Board's modified construction requiring only a "somewhat restrained" sensor is not. On remand, the Board should apply its original construction of 'substantially fixed.'"  *Id.* at 1152; *see also*, *D'Agostino v. MasterCard Int'l, Inc.*, 844 F.3d 945, 950 (Fed. Cir. 2016) (vacating and remanding the Board's ruling, noting that "[t]he Board departed from

---

[7] Indeed, Petitioner never proposed a construction of "defining" that includes "in association with."  *See e.g.*, Appx0298-0301.

20

or misapplied the above-stated clear meaning when—whether as a matter of claim construction or as a matter of application to [the prior art]…it concluded that the claim limitation covers a situation in which the customer first seeks a transaction code for an identified 'chain of stores' and, later, picks a specific store within that chain.").

The present case is analogous.  Here, the Board initially properly construed "defining" to mean that the card information provides the data that "sets" or "establishes" the memory location at which the biometric signal will be stored.  However, the Board subsequently either "departed from or misapplied," *D'Agostino, supra*, the correct construction when it substantially broadened it to include "in association" within the meaning of "defining."

Moreover, this re-interpretation or misapplication was clearly material to the Board's holding.  As it explained, "[c]onsistent with our claim construction, the 'association' is the *where*.  In other words, we understand Hsu's <u>associating</u> the fingerprint data with the personal data record in fingerprint database 44 <u>defines, sets, or establishes</u> where the fingerprint data is stored."  Appx0035; Appx0094 (italics emphasis in original; underlined emphasis added).  As a result, at least on the basis of the Board's claim construction error, the FWD should be reversed (or, minimally, vacated and remanded).

21

### B. The Board's Finding That Hsu Discloses the Defining Limitation Is Not Supported By Substantial Evidence

Whether under the Defining Limitation's correct construction (where "defining" means to "set" or "establish") or under the Board's erroneous construction that equates "association" with "sets" or "establishes," the Board's holding that Hsu teaches the Defining Limitation is not supported by substantial evidence and should be reversed.

A claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time of the invention to a person of ordinary skill in the art.  35 U.S.C. § 103(a); *KSR Int'l. Co. v. Teleflex Inc*., 550 U.S. 398, 406 (2007).  The question of obviousness is resolved based on the underlying four-factor factual determinations as called for in *Graham v John Deere Co*., 383 U.S. 1, 17-18 (1966).  Here, the Court must evaluate whether the prior art combination argued by Petitioner and relied upon by the Board actually arrives at the claimed invention.  Because Hsu does not disclose the Defining Limitation, the answer is "no," and the PTAB lacked substantial evidence otherwise.

In particular, in finding the '039 Patent unpatentable the Board relied solely on Hsu for disclosure of the Defining Limitation, which is a required element of each challenged claim.  Relevant to the Defining Limitation, Hsu teaches only that

22

the card information (*i.e.,* Hsu's employee number) and the biometric signature (*i.e.*, Hsu's fingerprint) are stored "in association" with each other.  Appx0947 at 7:10-12.  No where does Hsu disclose that the card information provides data that "defines" – *i.e.*, sets or establishes – the specific location in the larger memory database where a user's biometric signature will be stored.  Put another way, there is no disclosure or teaching in Hsu that the employee number is itself tethered to a particular database memory address, and that it directs the biometric signature to be stored at that address.  Indeed, Petitioner's expert, Mr. Lipoff, acknowledged that "*Hsu is silent on how a new user record is created*" during enrollment.  Appx3160-3161, ¶ 33 (emphasis added).

To fill the gap of Hsu's "silence," the Board goes down the path of equating "in association" with "setting or establishing," which was error as described above.  The Board then reasons that "in Hsu, the fingerprint data can only be stored once the system has received data indicative of, for instance, an employee number from a user's identification badge, *which thus defines a database record with which the fingerprint data can be 'associated*.'"  Appx0036 (emphasis added); Appx0095.  The problem with this finding is that Hsu is devoid of any disclosure that its employee number includes data tethered to a specific database address.  The Board effectively acknowledges this in stating that "[w]e do not see it as a *significant leap*

23

to understand that in Hsu the user's personal data record is the location with which the fingerprint data is associated and stored in fingerprint database 44." Appx0035 (emphasis added)[8].

But here the Board is admitting that it is indeed taking at least *some leap* to connect the necessary dots to conclude that Hsu discloses the Defining Limitation. This "leap" is necessary because, in fact, there is no disclosure in Hsu that the "user's personal data record" has any relationship to any specific memory location. This is in stark contrast to the '039 Patent's teachings, which require that the card information itself must "define" the specific memory address at which the user's biometric signature must be stored. Returning to Figure 4 of the '039 Patent (shown below in colored form), for example, it clearly shows the card information setting or establishing a *specific location* within a larger memory database at which the biometric signature will be stored:

---

[8] In the '094 IPR FWD, the Board changes its language, and states "[w]e do not consider it a significant leap, or even a leap at all, to understand that associating the fingerprint data according to…the user's account number or employee number on Hsu's card or badge, sets or establishes the database record or address location *where* the fingerprint data is stored in Hsu's fingerprint database 44." Appx0094 (italics emphasis in original; underlined emphasis added). It is telling that even the Board seems uncertain as to how much of a "leap" it was required to take.



Appx0269 at Fig. 4.

This is in sharp contrast to Hsu, in which the employee number and the fingerprint are shown in its Figure 4 (as annotated by Petitioner) as being stored merely "in association with" one another, but not at any *specific address* within the larger memory database that is "defined," "set" or established" by the card information (employee number):



25

Appx0950 at Fig. 4.

Therefore the Board must "leap" by way of an *assumption* that the user's employee number in Hsu is somehow tethered to a specific memory address. But there is no such teaching in Hsu, and the Board points to none.[9]

The Board also relies on testimony from Petitioner's expert to attempt to fill the gaps of Hsu's teachings as to how the biometric signature's memory location is defined. *See e.g.*, Appx0037-0038. For example, the Board relies on Mr. Lipoff's testimony about alleged "simple known options for creating database records." Appx0037, citing Appx3160-3161, ¶ 33-34. But Mr. Lipoff's testimony is entirely conclusory; he offers no independent or corroborative evidence, such as prior art publications or products, identifying any such "simple known options".[10] Mr.

---

[9] As this Court has often held, "[s]ince *KSR*, we have repeatedly explained that obviousness findings grounded in 'common sense' must contain explicit and clear reasoning providing some rational underpinning why common sense compels a finding of obviousness." *In re Van Os*, 844 F.3d 1359, 1361 (Fed. Cir. 2017); *see also Randall Mfg. v. Rea*, 733 F.3d 1355, 1362 (Fed. Cir. 2013) ("In recognizing the role of common knowledge and common sense, we have emphasized the importance of a factual foundation to support a party's claim about what one of ordinary skill in the relevant art would have known.")

[10] As noted above, the Board's analysis of Hsu also took into account alleged "common database structures and functions." Appx0034. But like Mr. Lipoff's testimony, the Board's reference to such "common" database structures and functions is conclusory and entirely unsupported by evidence. *In re Zurko*, 258. F.3d at 1386 ("the Board cannot simply reach conclusions based on its own understanding or experience -- or on its assessment of what would be basic

26

Lipoff's testimony is mere hindsight, attempting to fill in the gaps of the prior art's teachings after the fact of the '039 Patent inventions.[11]

Ultimately, the Board concluded:

> We are persuaded that Hsu does, in fact, explain *how* the account number and fingerprint data are stored in the fingerprint database. Hsu establishes a memory location for storing the fingerprint data in "association" with an employee or account number, and the "association" is contingent on receiving the employee or account number from Hsu's card or badge during enrollment.

*See* Appx0038 (emphasis in original), citing Appx0047 at 7:10-12 (wherein Hsu again explains that "[t]he account number is stored in the database 44 in association with the user's fingerprint image data.").

The Board's conclusion, however, is contrary to the evidence. Its finding that Hsu in fact discloses "*how*" the card information and biometric signature are stored in the database is contrary to Petitioner's own admission that "*Hsu is silent on how a new user record is created*" during enrollment. Appx3160-3161, ¶ 33 (emphasis added). Indeed, the Board accepted this as correct elsewhere in the

---

knowledge or common sense. Rather, the Board must point to some concrete evidence in the record in support of these findings").

[11] In any event, the Board erred in crediting this unsupported, conclusory testimony. *See* 37 C.F.R. § 42.65(a) ("Expert testimony that does not disclose the underlying facts or data on which the opinion is based is entitled to little or no weight."). Certainly this unsupported expert testimony fails to rise to the level of substantial evidence.

FWD.  *See* Appx0037 (crediting Mr. Lipoff's testimony that Hsu does not explain "how a new user record is created" during enrollment).

Moreover, the Board's conclusion that Hsu discloses "*how*" the account number and fingerprint data are stored in the fingerprint database is missing a logical step.  Even assuming that Hsu's storage of the fingerprint is "contingent upon" receipt of the employee number, that does not mean that the employee number itself provides the data that "sets" or "establishes" the specific memory address where the fingerprint will be stored as is required in the '039 Patent.  Again, the Board is making a "leap" in *assuming* that the employee number carries some memory address information, but in fact there is no disclosure of this in Hsu.

Thus, the Board's finding that Hsu discloses card information that "defines" the biometric signature memory location is not supported by substantial evidence.  There is no disclosure in Hsu that the card information "sets" or "establishes" the specific location in the memory database where a given user's biometric signature will be stored, such as shown in Figure 4 of the '039 Patent.  Further, merely storing an employee number and a fingerprint "in association with" each other does not equate to the employee number therefore setting or establishing the specific memory address at which the biometric signature will be stored.  There is no teaching or disclosure in Hsu that the employee number also includes memory

address information.  As a result, the Board "leaps" to an assumption that "Hsu must also use card information…to define, set, or establish a memory location before storing the fingerprint data, wherein the employee number is associated with the fingerprint data."  But there is no substantial factual support for this assumption.  By Petitioner's own admission, Hsu is silent as to the creation of the new user record during enrollment.

Because the Board lacked substantial evidence to support its finding that Hsu discloses the Defining Limitation, and because the Board's Decision(s) rest on this finding, Petitioner has failed to meet its burden of proof as to unpatentability of the challenged claims.  As a result, the Board's Decision(s) must be reversed, and the claims of the '039 Patent should be deemed patentable.

## CONCLUSION

Each challenged claim includes the Defining Limitation.  Petitioner and the Board rely solely on Hsu for the prior art teaching of the Defining Limitation.  For the reasons stated above, however, Hsu does not disclose the Defining Limitation.  Therefore, the Board's Decision that the claims of the '039 Patent are unpatentable should be reversed.

29

Respectfully submitted,

Dated: May 28, 2024

By: /s/ Steven M. Coyle
Steven M. Coyle
Michael J. Rye
Nicholas A. Geiger
Cantor Colburn LLP
20 Church Street, 22nd Floor
Hartford, CT 06103
Tel.: (860) 286-2929
Fax.: (860) 286-0115
scoyle@cantorcolburn.com
mrye@cantorcolburn.com
ngeiger@cantorcolburn.com

*Counsel for Appellant CPC Patent Technologies PTY LTD.*

ADDENDUM

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

ASSA ABLOY AB, ASSA ABLOY INC.,
ASSA ABLOY RESIDENTIAL GROUP, INC., AUGUST HOME, INC.,
HID GLOBAL CORPORATION, and
ASSA ABLOY GLOBAL SOLUTIONS, INC.,
Petitioner,

v.

CPC PATENT TECHNOLOGIES PTY, LTD,
Patent Owner.

---

IPR2022-01093
Patent No. 8,620,039 B2

---

Before SCOTT A. DANIELS, AMBER L. HAGY and
FREDERICK C. LANEY, *Administrative Patent Judges.*

DANIELS, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

I.    INTRODUCTION

ASSA ABLOY AB, ASSA ABLOY Inc., ASSA ABLOY Residential Group, Inc., August Home, Inc., HID Global Corporation, and ASSA ABLOY Global Solutions, Inc., ("ASSA" or "Petitioner") filed a Petition requesting *inter partes* review ("IPR") of claims 1, 2, 13, 14, 19, and 20 of U.S. Patent No. 8,620,039 B2 (Ex. 1001, "the '039 patent"). Paper 2 ("Pet"). CPC Patent Technologies PTY, Ltd, ("CPC" or "Patent Owner") filed a Preliminary Response to the Petition. Paper 12 ("Prelim. Resp."). With our email authorization, Petitioner filed a Reply to Patent Owner's Preliminary Response. Paper 16 ("Prelim. Reply"). Also with our authorization, Patent Owner filed a Sur-Reply to Petitioner's Reply. Paper 19 ("Prelim. Sur-Reply").

Following our Institution Decision (Paper 20, "Inst. Dec."), in which we determined that Petitioner was *not* time-barred from filing its Petition, Patent Owner filed a Response. Paper 24 ("PO Resp."). *See* Inst. Dec. 9–34. Petitioner filed a Reply. Paper 26 ("Pet. Reply"). Patent Owner filed a Sur-Reply. Paper 30 ("PO Sur-Reply"). An oral hearing was held on November 9, 2023. A transcript of the hearing has been entered as Paper 37. ("Tr.").

We have jurisdiction under 35 U.S.C. § 6. This Final Written Decision is entered pursuant to 35 U.S.C. § 318(a). For the reasons explained below, we determine that Petitioner has met its burden of showing by a preponderance of the evidence that claims 1, 2, 13, 14, 19, and 20 are unpatentable.

A.    *Real Parties in Interest*

Petitioner states that ASSA ABLOY AB, ASSA ABLOY Inc., ASSA ABLOY Residential Group, Inc., August Home, Inc., HID Global

Corporation, and ASSA ABLOY Global Solutions, Inc., are the real parties in interest.[1] Pet. 1. Patent Owner states that CPC Patent Technologies PTY, LTD is the real party in interest. Paper 4, 2.

### B. Related Matters

Petitioner indicates that it filed a declaratory judgment against Patent Owner with respect to the '039 patent in *ABLOY AB, et al. v. CPC Patent Technologies Pty Ltd., et al.*, No. 3-22-cv-00694, in the United States District Court for the District of Connecticut. Pet. 1–2. And Petitioner points out that the '039 Patent is asserted against Apple, Inc., in *CPC Patent Technologies Pty Ltd v. Apple Inc.*, No. 3:22-cv-02553, in the United States District Court for the Northern District of California, San Jose Division. *Id.* Petitioner points out that Apple challenged the '039 patent in IPR2022-00600. *Id.* at 2. On October 13, 2023, we entered a Final Written Decision (Paper 22) in IPR2022-00600 finding claims 1, 2, 19, and 20 of the '039 patent invalid for obviousness.

In addition to the proceedings noted by Petitioner, Patent Owner indicates that "the following judicial and/or administrative matters [] may affect, or be affected by, a decision in this proceeding:" *CPC Patent Technologies PTY Ltd. v. HMD Global Oy*, Case No. 6:21-cv-00166 in the United States District Court for the Western District of Texas; IPR2022-00601; IPR2022-00602; IPR2022-01006; IPR2022-01045; IPR2022-01089; and IPR2022-01094. Paper 4, 2–3.

---

[1] In its Declaratory Judgment Complaint against Patent Owner, Petitioner also refers to ASSA ABLOY Global Solutions, Inc., as "ASSA ABLOY Global Solutions, Inc. ('Hospitality')." Ex. 2007, 2.

C.    *The '039 Patent (Ex. 1001)*

The '039 patent, titled "Card Device Security Using Biometrics," relates to a biometric card pointer (BCP) system intended to more efficiently and securely permit a user to store biometric information during a user enrollment phase, and in future verification processes permits the user access their account using an identification (ID) card and biometric information such as a fingerprint. Ex. 1001, code (54), 2:51–3:11.

The '039 patent explains that in the enrollment phase "[t]he card user's biometric signature is automatically stored the first time the card user uses the verification station in question (this being referred to as the enrolment phase)." *Id.* at 2:62–64. The '039 patent explains further that "[t]he biometric signature is stored at a memory address defined by the ('unique') card information on the user's card as read by the card reader of the verification station." *Id.* at 2:64–67. Following the enrollment phase, the '039 patent describes that

> [a]ll future uses (referred to as uses in the verification phase) of the particular verification station by someone submitting the aforementioned card requires the card user to submit both the card to the card reader and a biometric signature to the biometric reader, which is verified against the signature stored at the memory address defined by the card information thereby determining if the person submitting the card is authorised to do so.

*Id.* at 3:4–11.[2]  For both enrollment and future uses, the use of the ID card at a verification station "is identical from the card user's perspective, requiring

[2] The words "enrolment," "authorise," and "authorisation" are the British spellings of "enrollment," "authorize," and "authorization." *See, e.g.*, https://www.merriam-webster.com/dictionary/authorisation, last visited Jan.

merely input of the card to the card reader, and provision of the biometric signature ([e.g.] thumb print or retinal scan etc.) to the biometric reader." *Id.* at 3:12–15.

Figure 4 of the '039 patent is reproduced below.



**Fig. 4**

Figure 4, of the '039 patent, above, illustrates swipe or smart card 601 including card information 605 encompassing fields for card type 602, card range 603, and card data 604. The '039 patent describes that "the card data 604 acts as the memory reference which points, as depicted by an arrow 608,

5, 2023. We will use the American English spelling of these words except where quoted from the '039 patent.

to a particular memory location at an address 607 in the local database 124."
*Id.* at 7:31–35. Information 605 can be encoded on a magnetic strip on the
card, for example. *Id.* at 7:28–29. The '039 patent explains that for a
specific user "[i]n an initial enrolment phase, . . . [t]he card data 604 defines
the location 607 in the memory 124 where their unique biometric signature
is stored." *Id.* at 7:43–49. And, the '039 patent explains further that "in
later verification phases, . . . [t]his signature is compared to the signature
stored at the memory location 607 in the memory 124, the memory location
607 being defined by the card data 604 read from their card 601 by the card
reader 112." *Id.* at 7:50–56.

Figures 6 and 7, reproduced below, depict the differences between
verification process 205 shown in Figure 6, and enrollment process 207
shown in Figure 7.



**Fig. 6**

Figure 6 illustrates verification process 205, which occurs after the
enrollment process, illustrated below in Figure 7.



**Fig. 7**

Figure 7 of the '039 patent illustrates enrollment process 207 where the system at "step 401 stores the biometric signature received by the step 203 in the memory 124 at a memory address defined by the card data 604." *Id.* at 9:64–66 (referring to elements 203 and 124 described in Figure 5). Figure 6 illustrates that verification process 205

> is entered from the step 204 in FIG. 5, after which a step 301 authorises the transaction. This authorisation step 301 indicates that the biometric signal received by the biometric reader 102 in the step 203 matches the biometric signature previously stored in the local database 124 by a previous enrolment process 207.

*Id.* at 9:43–48. Then, "step 204 reads the contents stored at a single memory address defined by the card data 604 and checks these contents against the biometric signature received in the step 203." *Id.* at 8:34–37.

A difference between verification process 205 and enrollment process 207 is that the enrollment process includes step 401, which *stores* the biometric signature "at a memory address defined by the card data 604," whereas in verification process 205 "step 204 *reads* the contents stored at a

single memory address defined by the card data 604" and compares the stored biometric signature with the input biometric signature. *Id.* at 9:65–66, 8:24–26.

### D.    Illustrative Claim

Claims 1 and 19 are independent.  Each of claims 2 and 20 depends, respectively, from independent claims 1 and 19.  Claim 1, a method claim, including disputed limitations highlighted in italics, illustrates the claimed subject matter and is reproduced below:

> 1. 1[P] A method of enrolling in a biometric card pointer system, the method comprising the steps of:
>
> 1[A] receiving card information;
>
> 1[B] receiving the biometric signature;
>
> 1[C] *defining, dependent upon the received card information, a memory location in a local memory external to the card;*
>
> 1[D] determining if the defined memory location is unoccupied; and
>
> 1[E] storing, if the memory location is unoccupied, the biometric signature at the defined memory location.

Ex. 1001, 12:29–38.[3]  Limitations 1[A]–1[E] are similarly recited in independent claim 13 as an apparatus claim for "[a] biometric card pointer enrolment system," and also in independent claim 19 in the context of "a processor to execute a method of enrolling in a biometric card pointer system." *Id.* at 13:67–14:9, 15:25–16:11.

---

[3] We adopt and have applied Petitioner's alphanumeric designations for the elements of the challenged claims. *See, e.g.,* Pet. 17–37.

### E.    Prior Art and Asserted Grounds

Petitioner asserts that claims 1, 2, 13, 14, 19, and 20 would have been unpatentable based on the following grounds:

| Ground | Claim(s) Challenged | 35 U.S.C. §[4] | Reference(s)/Basis |
|--------|---------------------|----------------|--------------------|
| 1 | 1, 2, 13, 14, 19, 20 | 103(a) | Hsu,[5] Sanford,[6] |
| 2 | 1, 2, 13, 14, 19, 20 | 103(a) | Hsu, Sanford, Tsukamura[7] |

Petitioner relies on the testimony of Stuart Lipoff.  Ex 1006 ¶¶ 1–138. Patent Owner presents the testimony of Samuel Russ, Ph.D.  Ex. 2039 ¶¶ 1–72.

## II.    ANALYSIS

### A.    Legal Standards

A patent claim is unpatentable under 35 U.S.C. § 103 if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.  35 U.S.C. § 103; *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007).  "[W]hen a patent claims a structure already known in

---

[4] The Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284, 296–07 (2011), took effect on September 16, 2011.  The changes to 35 U.S.C. §§ 102 and 103 in the AIA do not apply to any patent application filed before March 16, 2013.  Because the application for the patent at issue in this proceeding has an effective filing date before March 16, 2013, we refer to the pre-AIA version of the statute.

[5] Ex. 1003, European Patent Appl'n No. EP 0924655 A2 (pub. June 23, 1999).

[6] Ex. 1004, PCT Appl'n No. PCT/US03/07238 (pub. Sept. 18, 2003).

[7] Ex. 1005, US Patent No. 6,963,660 B1 (Nov. 8, 2005).

the prior art that is altered by the mere substitution of one element for another known in the field, the combination must do more than yield a predictable result." *KSR*, 550 U.S. at 416 (citing *United States v. Adams*, 383 U.S. 39, 50–51 (1966)). The question of obviousness is resolved based on underlying factual determinations including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) when in evidence, objective evidence of non-obviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

> B.    *Level of Ordinary Skill in the Art*

Factors pertinent to a determination of the level of ordinary skill in the art include (1) the educational level of the inventor; (2) the type of problems encountered in the art: (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology, and (6) educational level of workers active in the field. *Envt'l. Designs, Ltd. v. Union Oil Co.*, 713 F.2d 693, 696–697 (Fed. Cir. 1983) (citing *Orthopedic Equip. Co. v. All Orthopedic Appliances, Inc.,* 707 F.2d 1376, 1381–82 (Fed. Cir. 1983)). Not all such factors may be present in every case, and one or more of these or other actors may predominate in a particular case. *Id.* Moreover, these factors are not exhaustive but are merely a guide to determining the level of ordinary skill in the art. *Daiichi Sankyo Co. Ltd, Inc. v. Apotex, Inc.*, 501 F.3d 1254, 1256 (Fed. Cir. 2007).

In determining a level of ordinary skill, we also may look to the prior art, which may reflect an appropriate skill level. *Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001). Additionally, the Supreme Court informs us that "[a] person of ordinary skill is also a person of ordinary creativity, not an automaton." *KSR*, 550 U.S. at 421.

Petitioner proposes that a person of ordinary skill in the art at the time of the '039 patent "would have had at least an undergraduate degree in electrical engineering, or equivalent education, and at least two years of work experience in the field of security and access-control." Pet. 10–11 (citing Ex. 1006 ¶ 26).

Patent Owner offers the level of ordinary skill we adopted in IPR2022-00600 which is that a person of ordinary skill in the art at the time of the '039 Patent

> would have had at least a bachelor's degree in computer engineering, computer science, electrical engineering, or a related field, with at least one year of experience in the field of human-machine interfaces and device access security. Additional education or experience might substitute for the above requirements.

*See* IPR2022-00600, Paper 22 at 12 (PTAB October 13, 2023) (Final Written Decision).

In this proceeding, Patent Owner's and Petitioner's levels of ordinary skill in the art, in particular education, are not substantively different. Petitioner's proposal requires at least two years of experience in the field of security and access control, compared to one year in Patent Owner's case. We maintain our determination of the level of ordinary skill in the art from IPR2022-00600 including at least one year of experience as Patent Owner urges. On this record, Patent Owner's proposed level of ordinary skill in the art is consistent with our review and understanding of the technology and descriptions in the '039 patent and the asserted prior art references. *Okajima*, 261 F.3d at 1355. Indeed, the difference between one and two years of experience in the field is fairly minimal considering that neither party asserts that it is necessary to have a significant amount of experience,

e.g., 5–10 years in the field.   For consistency we rely on the same level of ordinary skill in the art that we determined in IPR2022-00600.

### C.    Claim Construction

We interpret a claim "using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. 282(b)." 37 C.F.R. § 42.100(b) (2020).   Under this standard, we construe the claim "in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent." *Id.* Furthermore, we expressly construe the claims only to the extent necessary.  *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) ("[W]e need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy.'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

### 1.    "A method of enrolling"

Patent Owner argues that the independent claims are specifically directed to an enrollment process, e.g., "[a] method of enrolling," recited in the preamble of claim 1, and that the preamble should be considered limiting.  PO Resp. 6.  Patent Owner argues that "the 'method of enrolling' in the preamble of Claim 1 provides antecedent basis for 'the enrolment method' in the body of dependent Claim 2." *Id.* (citing Ex. 1001, 12:29–42).  Petitioner disagrees, arguing that "a 'method of enrolling' is nothing more than a nonlimiting intended use." Pet. Reply 13.  Petitioner also asserts that this term is "not critical to the issues in dispute" and "[e]ven if the phrase is limiting, Hsu, Sanford, and Tsukamura each disclose an enrollment process." *Id.* at 14 (citing Pet. 20, 36–37, 78).

Because Petitioner contends that Hsu, Sanford, and Tsukamura each disclose an enrollment process and Patent Owner does not expressly dispute that they do, in this case we need not explicitly determine whether the term is limiting. We can agree that "[a] method of enrollment" provides antecedent basis for at least dependent claim 2 and that the preamble provides context to the recited method step limitations in the body of independent claim 1. *See* Ex. 1001 12: 41–42 (dependent claim 2 referring "to the enrollment method of claim 1"). Apart from considering the limitations of claim 1 within the context of an enrollment process, because the term does not create any particular dispute between the parties that we need to resolve, we need not determine whether it is limiting.

### 2.    *"dependent upon"*

Petitioner indicates that the parties agreed in the district court litigation that "dependent upon," recited in claim 1 and 19, should be given its plain and ordinary meaning, "defined as 'contingent on or determined by.'" Pet. 16 (citing Ex. 1013, 2). Patent Owner agrees, adding that "a memory location in a local memory which merely corresponds to, *but is not contingent upon or determined by*, the received card information is not 'dependent upon' the received card information." PO Resp. 10 (citing Ex. 2039 ¶ 33). Patent Owner points out that Petitioner asserts the meaning of "dependent upon" is not material to patentability. *Id.* Patent Owner contends, however, that "because 'dependent upon' is integral to the 'defining, *dependent upon* the received card information, a memory location in a local memory external to the card', its meaning must be considered when analyzing the entire claim term." *Id.*

We agree that for purposes of understanding claim 1, we should consider the plain and ordinary meaning of "dependent upon," so that limitation 1[c] is understood as follows:

> [1c] *defining, [contingent upon or determined by] the received card information, a memory location in a local memory external to the card;*

Accordingly, in this proceeding, we will consistently apply the plain and ordinary meaning of "dependent upon" which is "contingent upon or determined by."

> 3. *"defining, dependent upon the received card information, a memory location in a local memory external to the card"*

Patent Owner argues that "the proper construction of this entire clause is: 'the system sets or establishes a memory location in a local memory external to the card, said location being contingent upon or determined by the received card information.'" PO Resp. 11. Patent Owner asserts that a person of ordinary skill in the art "would interpret the word 'defining,' especially in the context of enrollment, to mean 'setting' or 'establishing.'" *Id.* at 12.

Petitioner proposes alternative constructions, first that "defining" means that "a memory location is somehow determined from (or is dependent on) the card information." Pet. 11. Second, that "defining" means "a memory location is specified by the card information itself." Petitioner contends that the second construction is most consistent with the specification of the '039 patent specification. *Id.* at 12. According to Petitioner, and considering that the '039 describes "a biometric card pointer system," a person of ordinary skill in the art "would have understood that the user's card information itself specifies the physical memory address (such as

by acting as a pointer) for the user's biometric signature." *Id.* at 13 (citing Ex. 1006 ¶ 47).

Consistent with our prior decision in IPR2022-00600, we determine, also in this proceeding, that Patent Owner's construction is sufficiently accurate. *See Apple, Inc. v. CPC Patent Technologies, Ltd.*, IPR2022-00600, Paper 22, 29–39 (Final Written Decision); *see also NTP Inc., v. Research in Motion, Ltd.*, 418 F.3d 1282, 1293 (Fed. Cir. 2005) (noting that, when construing claims in patents that derive from the same parent application and share common terms, "we must interpret the claims consistently across all asserted patents"). In IPR2033-00600, we explained that

> [c]onsidering the abstract and the specification of the '039 patent, what "defining, dependent upon . . ." means as a whole, in the context of claim 1 and "a method of enrolling," is that during an *enrollment* process, the claimed "biometric signature," e.g., a fingerprint, is not yet stored in the memory and no memory location or address has been "set" or "established" for the fingerprint. When the fingerprint, and then the card, is provided to the system during enrollment, the card information provides data that establishes *where, e.g.,* at what memory location or address, the system will *store* the fingerprint data.[8]

IPR2022-00600, Paper 22, 30. We also explained that "[i]mportantly . . . we do not understand that 'defining . . . a memory location,' or Patent Owner's alternative wording, 'establishing' or 'setting,' means '[*creating*] . . . a memory location in a local memory.'" *Id.* at 32. We explained further that

---

[8] We use the terms "memory location" and "memory address" interchangeably because, in terms of computer memory, an "address" is well-understood as "[a] number specifying a location in memory where data is stored." MICROSOFT COMPUTER DICTIONARY, 5th Ed. (2002) Microsoft Press.

"[w]hile we might agree that 'the memory location cannot [already be defined],' . . . we do not agree that it 'cannot already exist.'" *Id.* at 33.

During the oral hearing in this proceeding, Patent Owner's counsel argued that "Patent Owner in this case has not argued that defining means creating." Tr. 31:3–4. Patent Owner's counsel argued further, "[a]ll we're saying that Claim 1 requires is that when a user swipes their card, that is the information that is on the card, not – in that moment in time, not something else in the system, but the information on the card that directs the system where to store that particular user's fingerprint or other biometric data." *Id.* at 31:7–11.

Considering Patent Owner's arguments and asserted claim construction with respect to the phrase "defining, dependent upon" and limitation 1[C] as a whole, we maintain the claim construction given in IPR2022-00600 for the reasons given in the Final Written Decision. IPR2022-00600, Paper 22, 30. We understand that during an enrollment process the claimed "biometric signature," e.g., a fingerprint, is not yet stored in the memory, and no memory location or address has been "defined," as in "set" or "established," in the memory for storing the fingerprint, until card information is received. Once the card information and fingerprint are received during enrollment, the card information provides data that establishes *where,* i.e., at what memory location or address, the system will *store* the fingerprint data.

    *4.    "unoccupied"*

In our Institution Decision, as argued by Petitioner and based on the express written description of the '039 patent, we determined that "unoccupied" means "a memory location that has not been used in the enrollment process for a user, or the information stored at the memory

location has been deleted." Inst. Dec. 38–39; *see also* Ex. 1001, 9:29–33 ("The term 'occupied' in this context means that the memory location in question has been used in the enrolment process for a user, and that the information stored at the memory location in question has not been deleted by a BCP system administrator."). Patent Owner does not dispute this construction. PO Resp. 14.

Although patentability on the claims at issue in this case does not turn on the construction of this term, we nevertheless maintain our construction from our Institution Decision that "unoccupied" means "a memory location that has not been used in the enrollment process for a user, or the information stored at the memory location has been deleted." Inst. Dec. 38–39.

> 5. *Other claim terms agreed upon and construed by the District Court*

The parties indicate that the following terms have been construed by the District Court:

> "*biometric card pointer system*" – Nonlimiting preamble term with no patentable weight;
>
> "*biometric card pointer enrollment system*" – Nonlimiting preamble term with no patentable weight;
>
> "*biometric signature*" – Plain and ordinary meaning.

Pet. 16 (citing Ex. 1012, 1); PO Resp. 15 (citing Ex. 1012, 2).

Considering these constructions and that our analysis does not turn on any particular claim construction for these terms, and because these constructions are not in dispute, we need not determine any specific claim construction for these terms in this proceeding.

### 6.     Means-plus-function terms

In our Institution Decision we accepted Petitioner's proposed constructions for the several "means for" and "code for" limitations recited in claims 13, 14, 19, and 20.  *See* Inst. Dec. 43 (The Board explaining that "we find Petitioner's proposed constructions of these term under 35 U.S.C. § 112(6) consistent with the record in this case.").  These constructions are also consistent with the District Court proceeding.  Inst. Dec. 39–43; *see also* Ex. 1012, 1–4.  For its part, Patent Owner states that it "takes no position on these proposed constructions as they are not material to the alleged grounds for unpatentability asserted in the Petition."  PO Resp. 15.

Based on our review of the complete trial record and because patentability on the claims at issue in this case does not turn on construction of the relative structures and functions of these means-plus-function terms, and because they are not in dispute, we maintain the constructions from our Institution Decision including that "code for" is an equivalent recitation for "means for."  Inst. Dec. 39–43.

### D.     Ground 1: Claims 1, 2, 13, 14, 19 and 20 – Obviousness over Hsu (Ex. 1003) and Sanford (Ex. 1004)

For the reasons below, and on the complete record before us, Petitioner has shown by a preponderance of the evidence that claims 1, 2, 13, 14, 19, and 20 would have been obvious over Hsu and Sanford.

### 1.     Hsu (Ex. 1003)

Titled "Controlled Access to Doors and Machines Using Fingerprint Matching," Hsu describes "[a] system and related method for controlling access to building doors or to machines, such as automatic teller machines (ATMs)."  Ex. 1003, Abstract, codes (54), (57).  Hsu describes using "an account number or employee number, to access a fingerprint database (44)

and retrieve reference fingerprint data previously stored there during an enrollment procedure." *Id.*, Abstract. Figure 3 from Hsu, as annotated by Petitioner (Pet. 8), is reproduced below.



Hsu's Figure 3 is a block diagram illustrating card reader 62 (blue) reading "an account number or other type of identification unique to the user, and passes this data to the access controller 42' [(brown)] over line 48." Ex. 1003, 6:10–12. Based on the user's unique identification, access controller 42' communicates with finger print database 44 (green) "to access the fingerprint database 44 and obtain a user reference fingerprint on line 56 from the database." *Id.* at 6:14–16. Hsu explains that

> [t]he controller 42' also sends a "start" signal on line 58 to the fingerprint correlator 46, which compares the reference fingerprint with a subject fingerprint image supplied from the sensor 16 over line 54. If the correlator 46 finds a match, the correlator sends a signal over line 58 to the access controller 42',

which transmits an appropriate signal to the computer 60 on line 28, indicating that access has been granted.

*Id.* at 6:16–24.

Hsu also describes an enrollment process shown in Figure 4 and reproduced below.



FIG. 4

Hsu's Figure 4 illustrates a block diagram showing that a user's fingerprint is obtained by fingerprint sensor 16 and passes through fingerprint enrollment analyzer 64 before being stored in fingerprint database 44. *Id.* at 7:51–8:23. Hsu explains that, along with providing a fingerprint during enrollment, "[a]t the same time, the user's identity has to be independently verified, by some means other than fingerprint matching, as indicated in block 66, and the user also presents an account number, employee number or similar identity number." *Id.*

### 2. *Sanford (Ex. 1004)*

Sanford is titled "Credit Card Transaction without using a Pin with Automated Cashier Machine" and describes "[a]n automated cashier machine (ACM) is provided that offers a secure and convenient way for users to access cash from their card without using a PIN." Ex. 1004, Abstract, codes (54), (57). Sanford describes that "[b]y verifying a user's image using facial biometrics, transactions may be conducted without using

a pin." *Id.* ¶ 7. Sanford explains further that "[o]ther methods of verification known in the art may also be used, such as iris, voice signature, and fingerprint technology." *Id.* ¶ 20. The relevant part of Sanford's Figure 2, as annotated by the Board, is reproduced below.



Sanford's figure 2 is a block diagram illustrating a method for performing a PIN-less credit card transaction using an ACM (automated cashier machine). *Id.* ¶ 24. After swiping a user's card at step 200, the system determines whether the user's card information is already stored, i.e., enrolled, and "the ACM 12 determines if the credit card account number of the user is enrolled to use the PIN-less credit card system." *Id.* In determining if the user is enrolled, "ACM 12 may communicate with ACM computer system 18 to

look up the user's credit card number." *Id.* ¶ 25. At step 202, highlighted yellow above, ACM 12 determines an enrollment course of action; if the card is not enrolled, moving to step 232, or, if the card is already enrolled, conducting a verification course of action via step 204. *Id.*

### 3. Independent Claim 1

We consider initially the elements of claim 1.

#### a) Petitioner's Arguments

##### (1) Preamble – 1[P] "A method of enrolling in a biometric card pointer system"

To the extent the preamble could be considered limiting, Petitioner argues that Hsu teaches "a biometric card pointer system" where "access control unit 14 includes an access controller (42 or 42') that "uses the account number [or user number] . . . to access the fingerprint database 44 [green] and obtain a user reference fingerprint." Pet. 19 (citing Ex. 1006 ¶¶ 20, 24). With respect to "enrolling," Petitioner contends that Hsu's Figure 4 "discloses 'a method of enrolling' in its biometric card pointer system. Specifically, 'FIG. 4 is a block diagram showing a fingerprint enrollment process as used in FIG[]. 3.'" *Id.* at 20 (quoting Ex. 1003 ¶ 14). Hsu's Figure 4, as annotated by Petitioner (*id.* at 20), is reproduced below.



FIG. 4

Figure 4 is a block diagram illustrating "a fingerprint enrollment process as used in either of the systems of FIGS. 2 and 3." Ex. 1003 ¶ 14. Mr. Lipoff testifies that considering Hsu's Figure 4 "[a]s shown, '[t]he account number is stored in the database 44 [green] in association with the user's fingerprint image data.' Once a user is enrolled, he or she may use his or her card to access his or her reference fingerprint for verification purposes." Ex. 1006 ¶ 73 (quoting Ex. 1003 ¶ 24).

### (2) Limitation 1[A] – "receiving card information"

Petitioner points to Hsu's Figure 3 and argues that a person of ordinary skill in the art "would have understood that Hsu's received 'account number' is the claimed 'card information.'" Pet. 23 (citing Ex. 1006 ¶ 78). Petitioner argues that "Hsu's enrollment process also includes 'receiving card information.' Hsu includes various disclosures of 'reading data from a card reader,' which confirm that the card reader (or its equivalent, a polling transceiver) in the access controller is receiving card information." *Id.* (citing Ex. 1003 ¶ 9). Mr. Lipoff testifies that based on Hsu's "various disclosures of 'reading data from a card reader,'" . . . a person of ordinary skill in the art "would have understood that regardless of the type of card used, Hsu's enrollment process includes receiving card information (*e.g.,* account number or employee number)." Ex. 1006 ¶¶ 79–80 (citing Ex 1009 ¶¶ 9, 26).

### (3) Limitation 1[B] – "receiving the biometric signature"

Petitioner argues that as shown in Hsu's Figure 1, "the access control unit includes a 'fingerprint sensor 16' (red) for 'scan[ning] the user's

fingerprint.'"  Pet. 26 (citing Ex. 1003 ¶¶ 20–21, 24).  Hsu's Figure 1 as annotated by Petitioner (*id.* at 27) is reproduced below.



FIG. 1

Hsu's Figure 1 depicts access controller 14 having fingerprint sensor 16 (highlighted red) for receiving a fingerprint from user 10.  *See* Ex. 1003 ¶ 17 ("When the user 10 reaches the door, he or she places a finger on the fingerprint sensor 16.").

> *(4)    Limitation 1[C] – "defining, dependent upon the received card information, a memory location in a local memory external to the card"*

Petitioner argues specifically that Hsu's Figure 1 "discloses 'a local memory external to the card.' As shown in Figure 1, the 'access control unit 14' (yellow) is external to the 'identification badge 18 [card]' (pink)." Pet. 28.  Hsu's Figure 1 as annotated by Petitioner (*id.* at 28) is reproduced below.



FIG. 1

Hsu's Figure 1 depicts access controller 14 (highlighted yellow) which is separate, i.e., external to the card or ID badge 18 (highlighted pink) worn by user 10. *See* Ex. 1003 ¶ 20 (access controller 14 includes "fingerprint database 44, and a fingerprint correlator 46"). Mr. Lipoff testifies that a person of ordinary skill in the art "would also have understood that a database is stored in a memory. Thus, in my opinion, the 'fingerprint database (44)' in Figure 2 of Hsu discloses 'a local memory external to the card.'" Ex. 1006 ¶ 90.

Petitioner argues with respect to the phrase "defining dependent upon the received card information, a memory location . . ." that Hsu specifically discloses "'[t]he database is basically a table that associates each user number with a stored fingerprint image, or with selected distinctive attributes or features of the user's fingerprint image.'" Pet. 31 (quoting Ex. 1003 ¶ 20). Hsu's Figure 4, as annotated by Petitioner (*id.* at 20), is reproduced below.



FIG. 4

Hsu's Figure 4 is a block diagram of an enrollment process illustrating fingerprint database 44 (highlighted green) including reference prints and related account number for each user or employee. Ex. 1003 ¶ 26. Mr. Lipoff testifies that a person of ordinary skill in the art "would have understood that, given a user [account] number, Hsu's system easily determines from fingerprint database 44 the specific memory location for storing the associated fingerprint." Ex. 1006 ¶ 93.

> (5)  Limitation 1[D] – "determining if the defined memory location is unoccupied"

Petitioner argues that Hsu in combination with Sanford renders claim limitation 1[D] obvious. Pet. 32. Petitioner asserts that Hsu discloses the "defined memory location," but does not explicitly discuss determining whether a memory location is occupied or not. *Id.* Petitioner turns to Sanford, arguing that "Sanford discloses in step S202 (yellow) 'determin[ing] if the credit card account number of the user is enrolled to use the PIN-less credit card system.'" *Id.* at 33. Sanford's Figure 2, in relevant part, and as annotated by Petitioner (*id.* at 34), is reproduced below.



Sanford's Figure 2, reproduced in part above, as annotated by Petitioner, is a block diagram illustrating a decision making process at step 202 (highlighted yellow) based on whether a user's card is enrolled (yes, highlighted in green) or not (no, highlighted in red) in the ACM. *See* Ex. 1004, Fig. 2.

With respect to a motivation to combine Hsu and Sanford, which we address in further detail below, Mr. Lipoff testifies that a person of ordinary skill in the art, understanding that Hsu has a database that may include a fingerprint associated with a user or employee number, "would not want to enroll a user who already enrolled." Ex. 1006 ¶ 112 (citing Ex. 1004 ¶ 38). Mr. Lipoff explains that "[r]e-enrollment is usually unnecessary because fingerprints do not change. Re-enrollment also consumes unnecessary system resources, takes time, and is generally undesirable. Therefore, before enrolling a user, it is my opinion that a POSITA would have been motivated to first check whether the user is already enrolled, as disclosed by Sanford." *Id.* Mr. Lipoff testifies further that "checking whether a user is enrolled also

makes the system more user-friendly. If the user is enrolled, the user can seamlessly proceed with biometric verification." *Id.* ¶ 114.

> *(6)    Limitation 1[E] – "storing, if the memory location is unoccupied, the biometric signature at the defined memory location"*

Following from limitations 1[C]–[D], Petitioner argues that Hsu in combination with Sanford renders claim limitation 1[E] obvious, because "Sanford discloses that if a user is not enrolled (*i.e.,* if Hsu's memory location is unoccupied), the user is directed to complete enrollment, which involves storing the user's biometric information (*e.g.,* picture or fingerprint) in the database." Pet. 36 (citing Ex. 1004 ¶ 37). Mr. Lipoff testifies that because both Hsu and Sanford disclose an enrollment process for a user, where Sanford teaches checking if a storage location is unoccupied, a person of ordinary skill in the art, would have known to, "*e.g.,* check[] Hsu's database to see if a user is not yet enrolled per Sanford, and if so, storing], the biometric signature [*e.g.,* user's fingerprint] at the defined memory location [*e.g.,* at the memory address in Hsu's database assigned to the user]." Ex. 1006 ¶ 107.

> *(7)    Analogous Art and Motivation to Combine Hsu and Sanford*

Petitioner's assertion that Hsu and Sanford are analogous art to the '039 Patent, and Petitioner's evidence and arguments as to motivation to combine, are undisputed by Patent Owner. *See* generally Prelim. Resp. For completeness, we address Petitioner's foundational arguments and evidence as to analogous art and motivation to combine to ensure that Petitioner has met its burden under 35 U.S.C. §§ 312 (a)(3), 316(e).

### *(a)    Analogous Art*

Petitioner argues that Hsu and Sanford are analogous prior art with respect to the '039 patent. Pet. 37. Petitioner contends that "[b]oth references (and the '039 Patent) are directed to ways of performing efficient biometric authentication, including using fingerprints." *Id.* Petitioner argues that "[b]oth references (and the '039 Patent) teach authenticating a user by comparing a fingerprint captured by a sensor to a stored fingerprint." *Id.* (citing Ex. 1003, Abstract; Ex. 1004, Abstract).

As to analogous art, we consider two criteria when evaluating whether prior art is analogous: (1) whether the art is from the same field of endeavor, regardless of the problem addressed, and (2) if the reference is not within the field of the inventor's endeavor, whether the reference still is reasonably pertinent to the particular problem with which the inventor is involved. *In re Clay*, 966 F.2d 656, 658–59 (Fed. Cir. 1992).

The '039 patent is directed broadly to "security issues associated with use of card devices such as credit cards, smart cards, and wireless card-equivalents such as wireless transmitting fobs." Ex. 1001, 1:14–16. More specifically, the '039 patent explains that its disclosure addresses "problems relating to secure access and/or secure processes, by automatically storing a card user's biometric signature in a local memory in a verification station comprising a card reader, [and] a biometric signature reader." *Id.* at 2:53–57. Based on this, a reasonable field of endeavor involves enrollment and user verification systems including card devices and biometric signatures.

As Petitioner points out, both Hsu and Sanford expressly disclose enrollment and biometric user verification systems that compare a user fingerprint to a stored fingerprint for identity verification purposes. *See, e.g.*, Ex. 1003 ¶¶ 4, 13, 20, 24, Fig. 3, *see also* Ex. 1004 ¶¶ 4, 8–9, 16,

36. For example, Hsu explains that "FIG. 2 shows the principal components of the access control unit 14 in block diagram form, including an identification polling transceiver 40, a door controller 42, a fingerprint database 44, and a fingerprint correlator 46." *Id.* at ¶ 20. Similarly, Sanford describes that in "a secure and convenient way for users to access cash from their card without using a PIN . . . [a]n identifying image of a user is taken and an amount for withdraw is received. If the amount for withdrawal is approved, the ACM verifies the identifying image of the user to an image of the user in a profile." Ex. 1004 ¶ 6. Also, Sanford states that "[o]ther methods of verification known in the art may also be used, such as iris, voice signature, and fingerprint technology." *Id.* ¶ 20.

On the complete record now before us, we are persuaded that Hsu and Sanford are analogous art to the '039 patent as they are directed to the same field of endeavor, which is enrollment and user verification systems including card devices and biometric signatures.

### (b)    *Motivation to Combine*

With respect to a motivation to combine, Petitioner argues that although Hsu does not expressly disclose checking if the memory location in Hsu's database assigned to the user is unoccupied "this would be obvious to a POSITA." Pet. 32. To this end, Petitioner argues that Sanford describes an algorithm including a "check of whether a user is enrolled into Hsu's system." *Id.* at 37 (citing Ex. 1006 ¶ 108)." Petitioner points out that Hsu describes an embodiment "where the user already has an account/user/ employee number but has not yet enrolled their fingerprint." *Id.* at 26 (citing Ex. 1006 ¶ 110). Petitioner argues that "[i]n this context, a POSITA would have been motivated to implement Sanford's check to determine whether a

user (*e.g.*, with a user/account number) is enrolled in Hsu's system." *Id.* (citing Ex. 1006 ¶ 111).

In support, Petitioner's declarant, Mr. Lipoff, testifies that a person of ordinary skill in the art would have implemented Sanford's check to determine whether a user is enrolled in Hsu's system, for several reasons. Ex. 1006 ¶¶ 111–114. First, Mr. Lipoff explains, "in most instances, a POSITA would not want to enroll a user who already enrolled" because "[r]e-enrollment also consumes unnecessary system resources, takes time, and is generally undesirable." *Id.* ¶ 112. Second, Mr. Lipoff explains that "checking whether a user is enrolled helps prevent fraud whereby an unauthorized user is able to overwrite the fingerprint of an authorized user by using the authorized user's user number or account number." *Id.* ¶ 113. Also, Mr. Lipoff testifies that "checking whether a user is enrolled also makes the system more user-friendly. If the user is enrolled, the user can seamlessly proceed with biometric verification." *Id.* ¶ 114.

On the complete record now before us, we find persuasive Petitioner's explanations for a motivation to combine Hsu and Sanford. Sanford, as Mr. Lipoff testifies persuasively, describes *how* a person of ordinary skill in the art would construct a system to check to see if a user is enrolled in a biometric identity verification system before determining a further course of action. *Id.* ¶¶ 98–100. In addition, Mr. Lipoff provides several reasons *why* a person of ordinary skill in the art would have looked to Sanford for "the simple and straightforward way to determine whether such user has been enrolled [and] to check if the user's data is already stored in Hsu's database." *Id.* ¶ 115; *see also KSR*, 550 U.S. at 420 (explaining that "any need or problem known in the field of endeavor at the time of invention and

addressed by the patent can provide a reason for combining the elements in the manner claimed").

b)   *Patent Owner's Arguments*

Patent Owner focuses its arguments on limitation 1[C], arguing that "Hsu is devoid of any teaching or suggestion that the user's card information sets or establishes (*i.e.*, defines) the memory location for the user's fingerprint data during enrollment." PO Resp. 16 (citing Ex. 2039 ¶ 46). According to Patent Owner, Hsu does not "set" or "establish" a memory location for the fingerprint data because Hsu mainly describes that "[t]he account number is stored in the database 44 in association with the user's fingerprint image data." *Id.* at 17 (quoting Ex. 1003, 7:1–12). Patent Owner's position is that Hsu doesn't define any memory location in particular, but "that the user's fingerprint data and account number are presented *at the same time* and are then stored in the database *in association with* each other." *Id.* at 18 (citing Ex. 2039 ¶ 49). In other words, Patent Owner's argument is that, unlike the claimed method, Hsu's card information does not provide data that sets or establishes *where,* i.e., at what memory location or address, the system will *store* the fingerprint data.

c)   *Analysis*

Hsu expressly describes an enrollment process for a user including fingerprint database 44 and describes that "the fingerprint database 44 contains reference fingerprint image data for each user, employee, or customer using the system, and that the reference fingerprint data are associated with corresponding user numbers, or employee or customer account numbers." Ex. 1003 ¶ 26. Hsu's Figure 4, illustrating the enrollment process, as annotated by Petitioner (Pet. 20), is reproduced below.



FIG. 4

Hsu's Figure 4 is a block diagram showing an enrollment process illustrating fingerprint database 44 (highlighted green) including reference prints and related account number for each user or employee. Ex. 1003 ¶ 26.

Based on the description and Figure 4, Hsu tells us a location, that is *where*, i.e., in fingerprint database 44, the fingerprint is to be stored during enrollment. Hsu explains that in fingerprint database 44, "fingerprint data are associated with corresponding user numbers, or employee or customer account numbers." *Id.* Accordingly, we understand from this description that the user's fingerprint is stored in relation to, i.e., "associated with," the user's employee account number, for example. Still, a key question is *how* is the fingerprint data stored during enrollment, because, consistent with our claim construction, the card information must "set" or "establish" where the fingerprint data is to be stored. This question is also answered by Hsu. Hsu explains that when a user presents a fingerprint during enrollment, "[a]t the same time, the user's identity has to be independently verified, by some means other than fingerprint matching, as indicated in block 66, and the user also presents an account number, employee number or similar identity number." *Id.* In this way, Hsu describes presenting identification data apart from biometric data, and includes presenting, for example, an employee

identification card or badge, including the user's employee number. *See* Ex. 1003 ¶ 11 (Hsu describing that "the identification medium carried by each user includes a machine-readable card, and the step of reading data from an identification medium includes reading data from a card reader in which the machine-readable card is placed by the user"). Understanding that during enrollment Hsu stores the user's fingerprint data "associated with" a user's employee number on the card, we further understand that the identification information, e.g., employee number, on the identification card defines, sets, or establishes *where* the fingerprint is stored; that is, the user's fingerprint data is stored with the database record corresponding to the relevant employee number.

Given this, we conclude that Patent Owner's position that Hsu does not disclose a memory location "defined by," "set," or "established" by card information is not accurate. Patent Owner's argument mainly contrasts the terms "associated with," as described in Hsu, with our claim construction that "defined by," means "set" or "established." We agree that these are different words, but an ordinary meaning of "associated" is "related, connected, or combined together." MERRIAM WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/associated (last visited Jan. 9, 2024) (Ex. 3001). Considering common database structures and functions, we are persuaded that Hsu, by "associating" a user's fingerprint data with a database record corresponding to a particular employee, concomitantly discloses "defining," "setting," or "establishing" a memory location for the fingerprint data in relation to the employee account number. Consistent with our understanding of Hsu's disclosure, Mr. Lipoff testifies persuasively that in Hsu "[t]he 'fingerprint image, or [] selected distinctive attributes or features of the user's fingerprint image' are not

stored at *any* memory location in the database—rather, it is stored at a memory location associated with the specific user/employee number received from a card." Ex. 1006 ¶ 93 (citing Ex. 1003 ¶ 26).

Patent Owner's counsel made clear, during oral argument, its position that "there's no discussion at all in Hsu that the ID number/card information in enrollment for purposes of storing the signature, stores [fingerprint data] at a specified location – by location specifically specified by the card data." Ex. 3001 42:21–23. But we do not agree with this position. As discussed above, Hsu describes that fingerprint data is stored associated with the card data, e.g., an account or employee number. Ex. 1003 ¶ 26 (Hsu describing that "the reference fingerprint data are associated with corresponding user numbers, or employee or customer account numbers."). Consistent with our claim construction, the "association" is the *where*. In other words, we understand that Hsu's associating the fingerprint data with the personal data record in fingerprint database 44 defines, sets, or establishes where the fingerprint data is stored. This occurs, as Hsu explains, because during enrollment the user data such as account or employee number is supplied by the user's card. *Id.* ¶ 11. We do not see it as a significant leap to understand that in Hsu the user's personal data record is the location with which the fingerprint data is associated and stored in fingerprint database 44.

Patent Owner also argues that "[i]n contrast to the claimed method, Hsu teaches that the user's fingerprint data and account number are presented *at the same time* and are then stored in the database *in association with* each other." PO Resp. 18 (citing Ex. 2039 ¶ 49). Patent Owner's declarant, Dr. Russ, similarly testifies that "in Hsu, the fingerprint data and the account number are presented together and are then stored together . . . [t]here is no step in Hsu wherein the account number (or the 'card

information') first sets or establishes the memory location." Ex. 2039 ¶ 49. This argument takes advantage of the fact that Hsu does explicitly state a temporal order for "storing . . . the biometric signature" as recited in claim 1. However, as we explained in our claim construction,

> during an enrollment process the claimed "biometric signature," e.g., a fingerprint, is not yet stored in the memory, and no memory location or address has been "defined," as in "set" or "established," in the memory for storing the fingerprint, until card information is received. Once the card information and fingerprint is received during enrollment, the card information provides data that establishes *where,* i.e., at what memory location or address, the system will *store* the fingerprint data.

Section II.C.3. Similarly, in Hsu, the fingerprint data can only be stored once the system has received data indicative of, for instance, an employee number from a user's identification badge, which thus defines a database record with which the fingerprint data can be "associated."

This all makes sense, logically, because Hsu's fingerprint data are not randomly stored, as Mr. Lipoff explains, "in *any* memory location." Ex. 1006 ¶ 93. Hsu's fingerprint data cannot be stored until directed to, i.e. "associated with," a certain database address or record, and in Hsu that is a database record containing the user's identification information. *See* Ex. 1003, 7:7–12. (Hsu describing that during enrollment "the user also presents an account number, employee number or similar identity number . . . [t]he account number is stored in the database 44 in association with the user's fingerprint image data"). Accordingly, from a temporal standpoint during enrollment, Hsu must also use card information, e.g., an employee number stored on the card, to define, set, or establish a memory location before storing the fingerprint data, wherein the employee number is associated with the fingerprint data. Commensurate with our understanding

of Hsu's disclosure, we credit Mr. Lipoff's testimony that even though Hsu does not explain exactly "how a new user record is created" during enrollment, a person of ordinary skill in the art would "try using simple known options for creating database records." Ex. 1032 ¶ 33. Mr. Lipoff explains persuasively that "upon a user enrolling, they provide a previously unseen card/user number, [and] the system then creates a new record for the user, including setting/establishing for the first time the memory location for storing the user's fingerprint." *Id.* ¶ 34.

When asked during his deposition to describe Hsu's database structure and functions, Mr. Lipoff testified consistently with his declaration, explaining essentially that it is the user's employee or account number that defines where the fingerprint data is stored:

> Q. So the account number indicates where the fingerprint is stored because they are stored in association with each other; is that correct?
>
> . . .
>
> A. THE WITNESS:· Well, I think it's – it's more than that. The structure that the database, as Hsu describes it, I believe -- let me see. I think it's in paragraph 20. Let me see if I can find it. Yeah, so in paragraph 20, column 4, the database is basically a table that associates each user number with a stored fingerprint image or selected attributes.
>
> So what this is telling me is the user number, which you – you said we should call the account number, I believe it's the same thing here, is -- is a database, and so the user number is defining the memory location in which the stored fingerprint image will be stored because the structure of the database is one, as indicated here in column 4, that starts with the user number telling you where to find the memory location that has the stored fingerprint image.

Ex. 1041, 33:16–34:9.  When Patent Owner's counsel pointed out that Hsu's paragraph 20 did not pertain specifically to enrollment, Mr. Lipoff explained that the database structure and function in paragraph 20 also applies to the enrollment process shown in Figure 4:

> A. Paragraph 20 describes the principle [sic] components of the access control unit, which includes the fingerprint database which is the same fingerprint database that's in – that's in – I'm sorry. Same fingerprint database that's in Figure 4. Figure 4 is the previous paragraph of Hsu we were discussing. Paragraph 26 is the enrollment procedure, but by the time you get to the enrollment procedure, Hsu, earlier in paragraph 20, defined the structure of that same database – database item 44 in Figure 4.

*Id.* at 34:19–35:9.

Summarizing its position, Patent Owner argues that "Hsu merely discloses that the user's account number and fingerprint data are stored in association with each other.  Hsu offers no other teachings as to how the account number and fingerprint data are stored in the database."  PO Resp. 15XX (citing Ex. 2039 ¶¶ 53–54).  Considering our analysis and the evidence discussed above, we disagree.  We are persuaded that Hsu does, in fact, explain *how* the account number and fingerprint data are stored in the fingerprint database.  Hsu establishes a memory location for storing the fingerprint data in "association" with an employee or account number, and the "association" is contingent on receiving the employee or account number from Hsu's card or badge during enrollment.  *See* Ex 1003, 7:10–12, Fig. 4. (Hsu explaining that "[t]he account number is stored in the database 44 in association with the user's fingerprint image data.").

Overall, we are persuaded, based on Petitioner's arguments and evidence, including the testimony of Mr. Lipoff, that Hsu's association of a fingerprint with a user's underlying account or employee number in a

database record during enrollment discloses limitation 1[C], namely "defining, dependent upon the received card information, a memory location in a local memory external to the card."

Patent Owner does not present substantive arguments with respect to the remaining limitations 1[P]–[B] and 1[D]–[E] nor with respect to the combination of Hsu and Sanford. Having reviewed the entirety of the record now before us, specifically the disclosures in Hsu and Sanford, we accept Petitioner's arguments and evidence with respect to the remaining limitations as our own. Pet. 17–40. We also find that Petitioner and Mr. Lipoff have provided articulated reasoning with evidentiary underpinning as to why an ordinarily skilled artisan would have been motivated to combine the teachings of Hsu and Sanford. Pet. 37–40; Ex. 1003 ¶¶ 108–115.

> *d)*     *Conclusion as to claim 1*

Based on the complete record before us and for the reasons expressed above, we are persuaded that Petitioner has shown by a preponderance of evidence that claim 1 would have been obvious over Hsu and Sanford.

> *4.*     *Dependent claim 2*

Claim 2 depends from claim 1 as it recites "storing a biometric signature according to the enrolment method of claim 1." Ex. 1001, 12:41–42. Claim 2 specifically recites "[a] method of securing a process at a verification station." *Id.* at 12:39. Thus, different from the enrollment process of claim 1, claim 2 is directed to a verification process that follows the enrollment process.

Patent Owner does not provide separate substantive arguments with respect to claim 2, mainly arguing that claim 2 contains the same method steps, specifically limitation 1[C], of claim 1 and "[a]s the prior art cited by

[Petitioner] does not teach this limitation, the cited prior art does not render these dependent claims obvious as a result thereof." PO Resp. 30.

Petitioner argues that Hsu discloses using its system for ATM machines to "conduct banking transactions, such as cash withdrawal or deposit transactions." Pet. 41 (quoting Ex. 1003 ¶ 24). Petitioner argues specifically, that "[b]ecause a user of Hsu's system may conduct banking transactions only after her fingerprint is verified, access to the banking transaction process is a verified access." *Id.*

Claim 2 recites in pertinent part the additional step of:

> verifying the subsequently presented presentation of the card information and the biometric signature if the subsequently presented biometric signature matches the biometric signature at the memory location, in said local memory, defined by the subsequently presented card information.

Ex. 1001, 12:45–50.

Petitioner argues that Hsu discloses "fingerprint correlator 46" in Figure 2 as annotated by Petitioner (Pet. 47) and reproduced below.



Hsu's Figure 2 illustrates diagrammatically the use of fingerprint correlator 46 in conjunction with fingerprint sensor 16 and fingerprint database 44. Ex. 1003, Fig. 2.  Petitioner argues that "fingerprint correlator 46 (purple) 'compares the subject fingerprint from the sensor 16, received over line 54, with the reference fingerprint features received from the database 44 over line 56' to 'determine[] . . . [if] there is a match.'"  Pet. 48 (quoting Ex. 1003 ¶¶ 21, 24).  Petitioner argues further that because "Hsu's card information (*e.g.,* user number or account number) is used to retrieve the stored biometric signature (*e.g.,* fingerprint) . . . Hsu discloses 'verifying the subsequently presented presentation of the card information and the biometric signature if the subsequently presented biometric signature matches the [stored] biometric signature.'"  *Id.* at 48–49 (citing Ex. 1006 ¶ 131**).**

Mr. Lipoff testifies that after enrollment, and because the fingerprint is stored associated with, i.e., "set" or "established" by the employee number or account number in a database record, "Hsu discloses 'verifying the subsequently presented presentation of the card information [*e.g.,* Hsu's account or user number] and the biometric signature [*e.g.,* Hsu's fingerprint] if the subsequently presented biometric signature [*e.g.,* Hsu's fingerprint] matches the biometric signature at the memory location.'"  Ex. 1006 ¶ 133.

Petitioner's arguments and Mr. Lipoff's testimony are consistent with Hsu's disclosure.  For example, Hsu expressly describes a verification procedure using a stored fingerprint:

> The correlator 46 then rapidly compares the subject fingerprint from the sensor 16, received over line 54, with the reference fingerprint features received from the database 44 over line 56.  If the correlator 46 determines that there is a match, a match signal is transmitted to the door controller 42 over line 58,

> and the controller generates an "open" signal on line 28 to the
> door release actuator 30.

Ex. 1003, 5:22–29. For dependent claim 2, we have considered and, on the complete record before us, in addition to our analysis above, accept as our own, Petitioner's arguments and evidence set forth at pages 40–49 of the Petition. Accordingly, we determine that Petitioner has shown by a preponderance of the evidence that claim 2 would have been obvious over Hsu and Sanford.

5. *Independent claim 13 and dependent claim 14*

Independent claim 13 is an apparatus claim reciting "[a] biometric card pointer enrolment system," and includes similar limitations as independent claim 1. Ex. 1001, 13:67. Different from claim 1, claim 13 also recites "a card device reader," "a biometric reader," and for the remaining limitations recites "means for" along with the same functional language as in limitations 1[C]–[E].

Petitioner argues that besides disclosing the biometric pointer system, "Hsu's biometric card pointer system is also an enrollment system that allows users to be enrolled." Pet. 49–50 (citing Ex. 1006 ¶¶ 68–74, 136). Petitioner points to Hsu's "bank card reader 62," and "fingerprint sensor 16 to account for the recited card and biometric readers in claim 13. *Id.* at 50–51. Considering the "means for" limitations in the remainder of the claim, Petitioner points to the requisite function and structure, for example, for limitation 13[C] Petitioner explains that

> [t]he function of this limitation is "defining, dependent upon the
> received card information, a memory location in a local memory
> external to the card."

*Id.* And for the structure:

> Structure corresponding to the claimed means is a computer system with a processor executing an application that uses any segment of card information 605 from a card 601 (1) as a memory reference as shown in Fig. 4 or (2) to determine a group of associated memory references or 3) all equivalents of (1) and (2). Structure is found in '039 Patent, col. 6, line 66 – col. 7, line 23; col. 7, lines 31-35, 39-42, 47-48; col. 8, lines 44-46; col. 11, lines 29-37; col. 12, lines 1-9; Fig. 4.

*Id.* at 51–52. Petitioner argues that "as explained for Limitation 1[C], Hsu discloses the recited function" which is "defining, dependent upon the received card information, a memory location in a local memory external to the card." *Id.* at 52. For the structure, Petitioner asserts that "Hsu discloses or renders obvious that fingerprint matching is performed by computer processors executing software/application . . . [f]or example, Hsu discloses using ASIC capable of 'parallel processing' for fingerprint verification." *Id.* at 53 (citing Ex. 1006 ¶ 23). And, Petitioner argues "Hsu discloses using card information to determine a group of memory references, which are associated because they correspond to the same user." *Id.* (citing Ex. 1006 ¶ 149).

Apart from its arguments with respect to independent claim 1[C], Patent Owner does not dispute Petitioner's evidence that Hsu, and Hsu in view of Sanford, disclose and teach the limitations of independent claim 13. *See generally* PO Resp. And, in addition to being persuaded that Hsu discloses the necessary structure and function intimated by "means for," we find that Hsu renders obvious limitation 13[C] for the same reasons as limitation 1[C]. Based on our review, we find that the complete record fully supports Petitioner's showing that Hsu and Sanford disclose all the limitations of claim 13. Pet. 49–56.

Dependent claim 14, similar to claim 2, relates to a "verified access system" including "means for verifying (i) a subsequent presentation of card information to the card device reader . . . and (ii) a subsequent presentation of a biometric signature to the biometric reader." Ex. 1001, 14:10–21. Mr. Lipoff testifies that with respect to "means for verifying," "Hsu discloses the recited function, for the same reasons I explained for Limitation 2[C]." Ex. 1006 ¶ 174. And for structure, Mr. Lipoff testifies that a person of ordinary skill in the art "would have understood that the verification process in Hsu (*i.e.,* comparing an inputted fingerprint to a stored fingerprint) would or could obviously be accomplished by at least one processor executing an application." *Id.* ¶ 175.

For dependent claim 14, we have considered and on the complete record before us, accept as our own, Petitioner's arguments and evidence set forth at pages 57–60 of the Petition. After weighing all relevant factual findings, including the level of ordinary skill in the art, the scope and content of Hsu and Sanford, and any differences between Hsu, Sanford and the claimed invention, we conclude that Petitioner demonstrates by a preponderance of the evidence that claims 13 and 14 of the '039 patent are unpatentable as obvious over Hsu and Sanford under 35 U.S.C. § 103(a).

## 6.    *Claims 19 and 20*

Independent claim 19 and dependent claim 20 include essentially the same limitations as claims 1 and 2, except, that the preamble to claim 19 recites:

> A non-transitory computer readable medium having recorded thereon a computer program for directing a processor to execute a method of enrolling in a biometric card pointer system, the program comprising:

Ex. 1001, 15:25–16:2. And, for example, the limitation of "receiving card information," in independent claim 1, is recited in independent claim 19 as "code for receiving card information."

Petitioner argues that Hsu "discloses various components of its biometric card pointer system (*e.g.,* access control unit) in Figs. 2, 3, and 4, such as a card reader, a fingerprint sensor, a door/access controller, a fingerprint correlator, and a fingerprint database." Pet. 60. Petitioner argues further that Sanford specifically describes a system that "includes a processor. The processor may be, for example, a computer, workstation, mainframe, pocket PC, personal digital assistant, etc. The processor also preferably includes or is in communication with a verification process 22 and database 24. Verification process 22 may be a software-implemented process that communicates with database 24." *Id.* at 61 (quoting Ex. 1004 ¶ 18). Based on such disclosures, Mr. Lipoff testifies that a person of ordinary skill in the art "would have understood that the Hsu-Sanford system includes a processor running computer programs stored on a non-transitory computer readable medium." Ex. 1006 ¶ 179.

Mr. Lipoff's testimony as to what a person of ordinary skill in the art would understand in regards to the known internals, programming instructions, and memory structure for a biometric card enrollment and verification system is unrebutted on this record.

Petitioner's arguments and evidence are in all other respects the same as the arguments and evidence presented with respect to claims 1 and 2. We have considered, and on the complete record before us, accept as our own, Petitioner's arguments and evidence set forth at pages 60–73 of the Petition as to claims 19 and 20. Accordingly, we determine that Petitioner has

shown by a preponderance of the evidence that claims 19 and 20 would have been obvious over Hsu and Sanford for the same reasons as claims 1 and 2.

    E.    *Ground 2: Claims 1, 2, 13, 14, 19 and 20 in view of Hsu, Sanford, and Tsukamura*

Because we determine that claims 1, 2, 13, 14, 19, and 20 would have been obvious over Hsu and Sanford, we need not address these same claims 1, 2, 13, 14, 19, 20 as obvious over Hsu, Sanford, and Tsukamura.

    F.    *Patent Owner's continued 315(b) arguments*

In their Response, Patent Owner reiterates their 315(b) argument that we previously addressed in our Institution Decision. PO Resp. 30–47; Inst. Dec. 9–34. Now, Patent Owner argues that in our prior decision we placed too much weight on a lack of control of the proceedings by Apple, and that "[r]ather, a key to the RPI analysis is whether Apple and Petitioners have a structured, preexisting business relationship and whether Apple would receive more than a merely generalized benefit if trial is instituted." PO Resp. 34 (citing *Applications in Internet Time, LLC v. RPX Corp.*, 897 F.3d 1336, 1351 (Fed. Cir. 2018)).

As an initial matter, we think that Patent Owner's argument mischaracterizes, or at least oversimplifies the holding in *AIT*. In *AIT*, the Federal Circuit admonished the Board for (1), making "certain factual findings that are not supported by substantial evidence," and (2) "fail[ing] to adhere to the expansive formulation of 'real party in interest' that is dictated by the language, structure, purpose, and legislative history of § 315(b)." *AIT*, 897 F.3d at 1351. The Federal Circuit explained in *AIT* that the Board failed to appreciate, among other things, the specific nature of the relationship between RPX and Salesforce, "that RPX, . . . is a for-profit company whose clients pay for its portfolio of 'patent risk solutions.'" *Id.*

The Court stated that "the Board did not consider these facts, which, taken together, imply that RPX can and does file IPRs to serve its clients' financial interests, and that a key reason clients pay RPX is to benefit from this practice in the event they are sued by an NPE." *Id.* at 1352. As discussed below, we have not overlooked the facts and evidence surrounding the parties' relationship nor failed to consider the parties' litigation efforts in the district courts. To the extent Patent Owner has raised valid arguments that may have not been clearly addressed by the Board, we provide the following additional analysis.

With respect to point (1), it is important, factually, that the developer-distributor business relationship between Petitioner and Apple contrasts sharply with the specific intent of the NPE patent portfolio litigation relationship between RPX and Salesforce. As we described in our Institution Decision, Petitioner's product "Yale Smart Locks", including "the Yale Assure Lock uses a software application ('App') on one's mobile phone, here on an iPhone sold by Apple, to lock and unlock doors. The App is developed by Petitioner, or one of its business partners, and distributed to iPhone users through the Apple App store." Inst. Dec. 16. The Developer Agreement (the "Agreement") between Petitioner and Apple mainly provides "a limited license" to use Apple software "to develop and test" the developer's software applications for integration on Apple's iOS platforms. Ex. 2009. Importantly, different from *AIT*, in this case we have before us no facts or evidence showing that the intent, express or otherwise, of the Agreement between Petitioner and Apple is *fundamentally* based on

protecting one party or the other from patent litigation.[9]  To the extent Patent Owner now argues that we did not appreciate all of its arguments and evidence as to the parties underlying actions in related district court proceedings, we address that matter in due course below.  Before doing so, we turn to point (2), and whether, in this case, our Institution Decision appropriately considered the "expansive formulation of 'real party in interest.'"  *AIT*, 897 F.3d at 1351.

In *AIT*, the Federal Circuit explained that the "Board's determination that Salesforce was not a real party in interest under § 315(b) relied on an impermissibly narrow understanding of the common-law meaning of the term."  *Id.* at 1357.  For one thing, the Court pointed out that "an agent with an ownership interest in the subject matter of the suit, or one who is the trustee of an express trust or a party in whose name a contract has been made for the benefit of another, may qualify as a real party in interest."  *Id.*  In this proceeding, Patent Owner has failed to point to any persuasive evidence, apart from software compatibility with Apple's iOS platforms as discussed in the Agreement, that Apple has any overt interest, influence, development or design influence over Petitioner's "Yale Smart Locks" products or App.  In addition, Patent Owner has produced no evidence that Apple holds any ownership interest, assets, or expressly administers any property rights as a trustee or agent for the benefit of Petitioner indicative of real party in interest relationships under common law.

---

[9] We acknowledge that the Agreement contains representations and warranties of noninfringement, as well as indemnification clauses.  Ex. 2009, 16, 41–43.  We consider that these clauses are perhaps best understood, at least from Apple's perspective as a distributor, as mechanisms to avoid liability should the need arise, rather than tools exerting control or perpetuating an agency relationship with Petitioner.

Essentially the entirety of the evidence of the business relationship in this proceeding is contained within the Agreement which we already discussed in detail in our Institution Decision. Inst. Dec, 9–34. For example, there is an indemnification clause that requires Petitioner to

> [u]pon Apple's request, defend, Apple, its directors, officers, employees, independent contractors and agents (each an "Apple Indemnified Party") from any and all claims, losses, liabilities, damages, taxes, expenses and costs, including without limitation, attorneys' fees and court costs (collectively, "Losses"), incurred by an Apple Indemnified Party and arising from or related to . . . any claims that Your Covered Product or the distribution, sale, offer for sale, use or importation of Your Covered Product (whether alone or as an essential part of a combination), Licensed Application Information, metadata, or Pass Information violate or infringe any third party intellectual property or proprietary rights;

*Id.* at 43. There is no evidence in this case that Apple has invoked their rights under this clause, nor has Patent Owner argued or explained how this clause or the parties' actions before the Board and in the underlying district court litigation implicate a common law agency relationship between the parties. An agency relationship could potentially occur if Apple were to request Petitioner to step in and defend it. Yet Patent Owner has provided no argument or persuasive evidence that such is the case here. Apple has, in fact, committed to its own defense by filing its own IPR, e.g., IPR2022-00600, against Patent Owner. Moreover, compelling evidence provided by Petitioner in this case is exactly the opposite, and avers under penalty of perjury that "[t]here have been no communications between Petitioners and Apple, directly or through counsel, relating to indemnification or obligation to indemnify based on assertion of . . . U.S. Patent No. 8,620,039) (*id.* at 11–12)." Ex. 1023, 8–9, 14.

We recognize that Apple may derive some benefit if additional claims of the '039 patent are determined to be unpatentable in this proceeding. This derived benefit does not, however, make Apple an RPI to this proceeding. *See WesternGeco LLC v. ION Geophysical Corp.*, 889 F.3d 1308, 1321 (Fed. Cir. 2018) (stating in the context of the broader concept of privity that "[a]s a general proposition, we agree with the Board that a common desire among multiple parties to see a patent invalidated, without more, does not establish privity").

On the facts and evidence before us in this proceeding it is the Agreement, analyzed here and in our Institution Decision, that best explains the business relationship between the parties. The Agreement sets forth with reasonable clarity the specific expectations of the parties, mainly that (a) Petitioner is allowed "a limited license to use the Apple Software and Services provided to You under this Program to develop and test Your Applications on the terms and conditions set forth in this Agreement;" and (b) "Applications that meet Apple's Documentation and Program Requirements may be submitted for consideration by Apple for distribution via the App Store, Custom App Distribution, or for beta testing through TestFlight." Ex. 2009, 1. Accordingly, the evidence leads us to conclude that Apple is a distributor of Petitioner's App for use with Petitioner's "Yale Smart Lock" products, and without more, that is about all that can be said about the relationship.

We turn, below, to particular facts in this case that Patent Owner argues the Board overlooked in our Institution Decision.

During oral argument Patent Owner's counsel raised an issue concerning our earlier conclusion in our Institution Decision that Apple is *not* a real party in interest to this proceeding or a privy with Petitioner. Inst.

Dec. 28; Tr. 45–46. Counsel contends "there is an inconsistency between [Petitioner's], you know, assertions regarding Apple in the [Declaratory Judgment] complaint. And then in defending the RPI position." Tr. 45:20–23. Specifically, counsel explained that they "didn't see that the Board specifically considered our argument that it's relevant that ASSA ABLOY filed the DJ complaint with respect to the '039 patent, even though the '039 patent had never been raised by Patent Owner to ASSA ABLOY." *Id.* at 46:3–6. Counsel further argued that the present "situation mirror[s] the situation in the *Worlds v. Bungie* case, where a very similar fact pattern was considered relevant by the [F]ederal [C]ircuit." *Id.* at 46:7–9; *see also Worlds Inc. v. Bungie, Inc.*, 903 F.3d 1237, 1239 (Fed. Cir. 2018) ("*Bungie*") (determining that because "the Board erred in its real-party-in-interest analysis, we vacate its decisions and remand for proceedings consistent with this opinion").

As an initial matter, our analysis of Petitioner's section 315(b) time-bar arguments in our Institution Decision covers 20 pages and considers in detail evidence submitted by both parties regarding business relationships and the Apple Developer License Agreement, i.e., the "Agreement," (Ex. 2009) including warranties, indemnification, product inspection and insurance, between Petitioner and Apple. Inst. Dec. 9–29. For example, as it relates to Patent Owner's issue raised here, we noted that "[i]n the Declaratory Judgment complaint, Petitioner states, '[CPC] is also engaged in an aggressive litigation campaign that includes Apple Inc. ('Apple'), *a business partner* of [Petitioner]." *Id.* at 14. We explained that

> [t]he business relationship between Apple and Petitioner is that Petitioner, or one of the named entities collectively referred to as Petitioner, makes products that interface with Apple products and may be sold on Apple's website. For example, ASSA

> ABLOY Residential Group, Inc., a named entity included as a Petitioner in this proceeding, makes and sells security locks under the brand name "Yale" . . . the Yale Assure Lock uses a software application ("App") on one's mobile phone, here on an iPhone sold by Apple, to lock and unlock doors. The App is developed by Petitioner, or one of its business partners, and distributed to iPhone users through the Apple App store.

*Id.* at 14–15. Thus, in our Institution Decision, we did consider the fact that Petitioner, in its Declaratory Judgment Complaint, admitted to being a business partner with Apple. We also considered the fact that as part of the business relationship Petitioner entered into the Agreement. *Id.* at 18. We considered critical clauses in the Agreement such as the representations and warranties clause explaining that "[w]e do *not* consider Section 3.2(d) to be a 'warranty.' It is not a guarantee that products will not infringe. It is a representation of the developer's current 'knowledge and belief.' It is far different from the obligations created by the App developer's agreement in *Bungie*." *Id.* at 19.

With respect to indemnification, we determined that the Agreement did in fact contain an indemnification clause, which *could* be implemented "upon Apple's request." *Id.* at 22. However, also different from the facts in *Bungie*, in this case we have sworn interrogatories provided by Petitioner presenting strong evidence that "[t]here have been no communications between Petitioners and Apple, directly or through counsel, relating to indemnification or obligation to indemnify based on assertion of . . . U.S. Patent No. 8,620,039." *Id.* at 23 (quoting Ex. 1023, 11–12).

Patent Owner now urges us to also consider the fact that its cease-and-desist letters to Petitioner, i.e., the "Yale Letters" (Exs. 2005, 2006), never threatened Petitioner with infringement of the '039 patent, only U.S. Patent Nos. 9,665,705 and 9,269,208. *See* Prelim. Resp. 7 (Patent Owner arguing

that it "never raised or otherwise mentioned the '039 Patent to Yale or any of the Petitioners at any time") (citing Ex. 2008). This is a concern, Patent Owner contends, because Petitioner filed its Declaratory Judgment Complaint admitting to a business relationship with Apple as well as this IPR, and both proceedings challenge the '039 patent. *See* Ex. 2007 ¶ 2 (Petitioner stating in its Declaratory Judgment Complaint that "[t]he ASSA ABLOY Entities seek a declaration of non-infringement of U.S. Patent Nos. 9,269,208 ("the '208 Patent"), 9,665,705 ("the '705 Patent"), and 8,620,039 ("the '039 Patent") (collectively, the "Patents-in-Suit")").

This argument is frankly somewhat undeveloped in Patent Owner's explanations of the facts and background in its Preliminary Response. Prelim. Resp. 5–10. We acknowledge that Petitioner was apparently never overtly threatened with infringement of the '039 patent. Ex 2005; Ex. 2006. Yet Patent Owner fails to persuasively explain *why* Petitioner's challenges to the '039 patent in the Declaratory Judgment Complaint weigh in favor of finding a privy or a real party-in-interest relationship between Petitioner and Apple. *See* Prelim. Resp. 7 (Patent Owner arguing largely that "Patent Owner never raised or otherwise mentioned the '039 Patent to Yale or any of the Petitioners at any time"). As we understand the argument, Patent Owner alleges that because it never threatened Petitioner with the '039 patent, Petitioner is now, without provocation, doing Apple's bidding and working at Apple's behest by challenging the '039 patent in the Declaratory Judgment Complaint and in these *inter partes* review proceedings. It is also not clearly explained why the inclusion of Petitioner's related entities of ASSA ABLOY Global Solutions, Inc. ('Hospitality'), and HID Global Corporation, in these IPR proceedings as real parties-in-interest and also in the Declaratory Judgment Complaint, matters as to the relationship between

Petitioner and Apple. *See* Prelim. Resp. 8 (Patent Owner's arguing that "Petitioners also filed the Declaratory Judgment Complaint as to HID and Hospitality, whom Patent Owner had never contacted regarding the patents or technology at issue") (citing Ex. 2005; Ex. 2006; Ex. 2008).

Two things can be true. Petitioner can have a business relationship with Apple and both parties can have a legitimate interest in defending themselves separately in litigation. We do not find anything in Petitioner's Declaratory Judgment Complaint that alters our prior decision in this regard. The fact that Petitioner and each of its entities were not explicitly threatened with infringement allegations in the Yale Letters as to the '039 patent does not mean that Patent Owner would never assert infringement against Petitioner based on the '039 patent claims. Ex. 2005; Ex. 2006. This is especially true in light of the fact that Patent Owner asserted the '039 patent against Apple in *CPC Patent Technologies Pty Ltd v. Apple Inc.*, No. 3:22-cv-02553, apparently due to or resulting from the products that Petitioner makes, uses, and sells through Apple's electronic device platforms. Ex. 2007 ¶ 44 ("On February 23, 2021, [Patent Owner] asserted all three of the Patents-in-Suit against Apple.").

On the facts here, we conclude that filing a declaratory judgment action or an *inter partes* review to challenge the claims of a patent, i.e., the '039 patent, that was asserted against a third party, but based on Petitioner's product, is a reasonable litigation strategy for Petitioner independently. The declaratory judgment action filing itself does not demonstrate some sort of heightened collusion even where a benefit inures to a party with whom Petitioner has a business relationship. Patent Owner has not explained, for instance, that, but for Apple's technology or actions, Petitioner has no actionable reason to challenge the patentability of the '039 patent claims.

*See, generally*, Prelim. Resp. Also, by way of example, Patent Owner argues in its Preliminary Response that in the Declaratory Judgment Complaint, "Petitioners further asserted that 'it is highly likely that Charter Pacific will sue the Assa Abloy Entities *on the same patents that have been asserted against Apple*." Prelim. Resp. 22 (quoting Ex. 2007 ¶ 30). In our view, this assertion is primarily offered in the Complaint to show Petitioner's apprehension of litigation because it admittedly makes, uses, and sells products potentially covered by the claims in the same three patents through Apple's platforms. Patent Owner does not explain persuasively why Petitioner would not have been concerned about infringing the '039 patent, nor why such apprehension shows any more intimate relationship than we considered in our Institution Decision. The mere fact that an accused infringer, in this case Petitioner, files a declaratory judgment action explaining its business relationship with Apple and offering reasons supporting the declaratory judgment action with respect to the same three patents that Apple is accused of infringing, does not, without more, establish persuasive additional information or substantive facts that we failed to consider in our original analysis.

Overall, and on the complete record before us we do not find that any of Petitioner's assertions in its Declaratory Judgment Complaint change our underlying conclusion that Petitioner and Apple are not in privy or real parties in interest. *See* Inst. Dec. 34 (determining that "[t]he totality of the evidence before us does not establish anything other than a traditional business relationship between Apple and Petitioner").

### III. CONCLUSION[10]

For the reasons discussed above, we determine Petitioner meets its burden of establishing, by a preponderance of the evidence, that the challenged claims are unpatentable, as summarized in the following table:

| Claims | 35 U.S.C. § | Reference(s)/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1, 2, 13, 14, 19, 20 | 103(a) | Hsu, Sanford | 1, 2, 13, 14, 19, 20 | |
| 1, 2, 13, 14, 19, 20 | 103(a) | Hsu, Sanford, Tsukamura[11] | | |

### III. ORDER

For the reasons given, it is

ORDERED that, based on a preponderance of the evidence, claims 1, 2, 13, 14, 19, and 20 of the '039 patent have been shown to be unpatentable; and

[10] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. §§ 42.8(a)(3), (b)(2).

[11] Because Petitioner's contentions regarding the obviousness of claims 1, 2, 13, 14, 19, and 20 in view of Hsu and Tsukamura are dispositive of these challenged claims, we do not reach asserted ground 2. *See In re Gleave*, 560 F.3d. at 1338.

FURTHER ORDERED that, because this is a Final Written Decision, any party to the proceeding seeking judicial review of this Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

For PETITIONER:

Dion Bregman
Andrew Devkar
James Kritsas
MORGAN, LEWIS & BOCKIUS LLP
dion.bregman@morganlewis.com
andrew.devkar@morganlewis.com
james.kritsas@morganlewis.com

PATENT OWNER:

Andrew Ryan
CANTOR COLBURN LLP
aryan@cantorcolburn.com

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

ASSA ABLOY AB, ASSA ABLOY INC.,
ASSA ABLOY RESIDENTIAL GROUP, INC., AUGUST HOME, INC.,
HID GLOBAL CORPORATION, and
ASSA ABLOY GLOBAL SOLUTIONS, INC.,
Petitioner,

v.

CPC PATENT TECHNOLOGIES PTY, LTD,
Patent Owner.

IPR2022-01094
Patent No. 8,620,039 B2

Before SCOTT A. DANIELS, AMBER L. HAGY and
FREDERICK C. LANEY, *Administrative Patent Judges.*

DANIELS, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

## I.    INTRODUCTION

ASSA ABLOY AB, ASSA ABLOY Inc., ASSA ABLOY Residential Group, Inc., August Home, Inc., HID Global Corporation, and ASSA ABLOY Global Solutions, Inc., ("ASSA" or "Petitioner") filed a Petition requesting *inter partes* review ("IPR") of claims 3–12 and 15–18 of U.S. Patent No. 8,620,039 B2 (Ex. 1001, "the '039 patent"). Paper 2 ("Pet"). CPC Patent Technologies PTY, Ltd., ("CPC" or "Patent Owner") filed a Preliminary Response to the Petition. Paper 11 ("Prelim. Resp."). Petitioner filed a Reply to Patent Owner's Preliminary Response. Paper 15 ("Prelim. Reply"). Patent Owner filed a Sur-Reply to Petitioner's Reply. Paper 18 ("Prelim. Sur-Reply").

Following our Institution Decision (Paper 20, "Inst. Dec."), in which we determined that Petitioner was *not* time-barred from filing its Petition, Patent Owner filed a Response. Paper 23 ("PO Resp."). *See* Inst. Dec. 9–34. Petitioner filed a Reply. Paper 25 ("Pet. Reply"). Patent Owner filed a Sur-Reply. Paper 29 ("PO Sur-Reply"). An oral hearing was held on November 9, 2023. A transcript of the hearing has been entered as Paper 35. ("Tr.").

We have jurisdiction under 35 U.S.C. § 6. This Final Written Decision is entered pursuant to 35 U.S.C. § 318(a). For the reasons explained below, we determine that Petitioner has met its burden of showing by a preponderance of the evidence that claims 3–12 and 15–18 are unpatentable.

### A.    *Real Parties in Interest*

Petitioner states that ASSA ABLOY AB, ASSA ABLOY Inc., ASSA ABLOY Residential Group, Inc., August Home, Inc., HID Global Corporation, and ASSA ABLOY Global Solutions, Inc., are the real parties

in interest.[1]  Pet. 1.  Patent Owner states that CPC Patent Technologies PTY, Ltd., is the real party in interest.  Paper 4, 2.

   B.   *Related Matters*

   Petitioner indicates that it filed a declaratory judgment against Patent Owner with respect to the '039 patent in *ASSA ABLOY AB, et al. v. CPC Patent Technologies Pty Ltd., et al.*, No. 3-22-cv-00694, in the United States District Court for the District of Connecticut.  Pet. 1–2.  And Petitioner points out that the '039 Patent is asserted against Apple, Inc., in *CPC Patent Technologies Pty Ltd v. Apple Inc.*, No. 3:22-cv-02553, in the United States District Court for the Northern District of California, San Jose Division.  *Id.*  Petitioner points out that Apple challenged the '039 patent in IPR2022-00600.  *Id.* at 2.  On October 13, 2023, we entered a Final Written Decision (Paper 22) in IPR2022-00600 finding claims 1, 2, 19, and 20 of the '039 patent invalid for obviousness.  Concurrently with this Decision, in IPR2022-01093, we determine that claims 1, 2, 13, 14, 19, and 20 of the '039 patent are invalid for obviousness.

   In addition to the proceedings noted by Petitioner, Patent Owner indicates that "the following judicial and/or administrative matters [] may affect, or be affected by, a decision in this proceeding:" *CPC Patent Technologies PTY Ltd. v. HMD Global Oy*, Case No. 6:21-cv-00166 in the United States District Court for the Western District of Texas; IPR2022-00600; IPR2022-00601; IPR2022-00602; IPR2022-01006; IPR2022-01045; IPR2022-01089; and IPR2022-01093.  Paper 4, 2–3.

---

[1] In its Declaratory Judgment Complaint against Patent Owner, Petitioner also refers to ASSA ABLOY Global Solutions, Inc., as "ASSA ABLOY Global Solutions, Inc. ('Hospitality')."  Ex. 2007, 2.

C.    *The '039 Patent (Ex. 1001)*

The '039 patent, titled "Card Device Security Using Biometrics," relates to a biometric card pointer (BCP) system intended to more efficiently and securely permit a user to store biometric information during a user enrollment phase, and in future verification processes permits the user access their account using an identification (ID) card and biometric information such as a fingerprint. Ex. 1001, code (54), 2:51–3:11.

The '039 patent explains that in the enrollment phase "[t]he card user's biometric signature is automatically stored the first time the card user uses the verification station in question (this being referred to as the enrolment phase)." *Id.* at 2:62–64. The '039 patent explains further that "[t]he biometric signature is stored at a memory address defined by the ('unique') card information on the user's card as read by the card reader of the verification station." *Id.* at 2:64–67. Following the enrollment phase, the '039 patent describes that

> [a]ll future uses (referred to as uses in the verification phase) of the particular verification station by someone submitting the aforementioned card requires the card user to submit both the card to the card reader and a biometric signature to the biometric reader, which is verified against the signature stored at the memory address defined by the card information thereby determining if the person submitting the card is authorised to do so.

*Id.* at 3:4–11.[2]  For both enrollment and future uses, the use of the ID card at a verification station "is identical from the card user's perspective, requiring

[2] The words "enrolment," "authorise," and "authorisation" are the British spellings of "enrollment," "authorize," and "authorization." *See, e.g.*, https://www.merriam-webster.com/dictionary/authorisation, last visited Jan.

merely input of the card to the card reader, and provision of the biometric signature ([e.g.] thumb print or retinal scan etc.) to the biometric reader." *Id.* at 3:12–15.

Figure 4 of the '039 patent is reproduced below.



**Fig. 4**

Figure 4, of the '039 patent, above, illustrates swipe or smart card 601 including card information 605 encompassing fields for card type 602, card range 603, and card data 604. The '039 patent describes that "the card data 604 acts as the memory reference which points, as depicted by an arrow 608,

5, 2023. We will use the American English spelling of these words except where quoted from the '039 patent.

to a particular memory location at an address 607 in the local database 124."
*Id.* at 7:31–35.  Information 605 can be encoded on a magnetic strip on the
card, for example.  *Id.* at 7:28–29.  The '039 patent explains that for a
specific user "[i]n an initial enrolment phase, . . . [t]he card data 604 defines
the location 607 in the memory 124 where their unique biometric signature
is stored."  *Id.* at 7:43–49.  And, the '039 patent explains further that "in
later verification phases, . . . [t]his signature is compared to the signature
stored at the memory location 607 in the memory 124, the memory location
607 being defined by the card data 604 read from their card 601 by the card
reader 112."  *Id.* at 7:50–56.

Figures 6 and 7, reproduced below, depict the differences between
verification process 205 shown in Figure 6, and enrollment process 207
shown in Figure 7.



**Fig. 6**

Figure 6 illustrates verification process 205, which occurs after the
enrollment process, illustrated below in Figure 7.



**Fig. 7**

Figure 7 of the '039 patent illustrates enrollment process 207 where the system at "step 401 stores the biometric signature received by the step 203 in the memory 124 at a memory address defined by the card data 604." *Id.* at 9:64–66 (referring to elements 203 and 124 described in Figure 5). Figure 6 illustrates that verification process 205

> is entered from the step 204 in FIG. 5, after which a step 301 authorises the transaction. This authorisation step 301 indicates that the biometric signal received by the biometric reader 102 in the step 203 matches the biometric signature previously stored in the local database 124 by a previous enrolment process 207.

*Id.* at 9:43–48. Then, "step 204 reads the contents stored at a single memory address defined by the card data 604 and checks these contents against the biometric signature received in the step 203." *Id.* at 8:34–37.

A difference between verification process 205 and enrollment process 207 is that the enrollment process includes step 401, which *stores* the biometric signature "at a memory address defined by the card data 604," whereas in verification process 205 "step 204 *reads* the contents stored at a

single memory address defined by the card data 604" and compares the stored biometric signature with the input biometric signature. *Id.* at 9:65–66, 8:24–26 (emphasis added).

D.    *Illustrative Claim*

Claims 3, 15, and 18 are independent.  Each of claims 4–12 and 16–17 depends, respectively, from independent claims 3 and 15.  Claim 3, a method claim, illustrates the claimed subject matter and is reproduced below with certain limitations of interest in italics:[3]

> 3.    3[P] A method of securing a process at a verification station, the method comprising the steps of:
>
> 3[A] (a) providing card information from a card device to a card reader in the verification station;
>
> 3[B] (b) inputting a biometric signature of a user of the card device to a biometric reader in the verification station;
>
> 3[C] (c) determining if the provided card information has been previously provided to the verification station;
>
> 3[D(P)] (d) *if the provided card information has not been previously provided to the verification station;*
>
> 3[D(1)] *(da) storing the inputted biometric signature in a memory at a memory location defined by the provided card information;* and
>
> 3[D(2)] (db) performing the process dependent upon the received card information;
>
> 3[E(P)] (e) if the provided card information has been previously provided to the verification station;
>
> 3[E(1)] (ea) comparing the inputted biometric signature to the biometric signature stored in the memory at

---

[3] We adopt and have applied Petitioner's alphanumeric designations for the elements of the challenged claims. *See, e.g.,* Pet. 12–36.

the memory location defined by the provided card information;

3[E(2)] (eb) if the inputted biometric signature matches the stored biometric signature, performing the process dependent upon the received card information; and

3[E(3)] (ec) if the inputted biometric signature does not match the stored biometric signature, not performing the process dependent upon the received card information.

Ex. 1001, 11:67–14:21. The limitations 3[A]–3[E(3)] are similarly recited in independent claim 15 as an apparatus claim for "[a] verification station for securing a process," and also in independent claim 18 in the context of "[a] non-transitory computer readable medium." *Id.* at 14:23–46, 14:64–15:24.

E.    *Prior Art and Asserted Grounds*

Petitioner asserts that claims 1–12 and 15–18 would have been unpatentable based on the following grounds:

| Ground | Claim(s) Challenged | 35 U.S.C. §[4] | Reference(s)/Basis |
|--------|---------------------|----------------|---------------------|
| 1 | 3, 4, 6–11, 15, 16, 18 | 103(a) | Sanford,[5] Hsu,[6] |
| 2 | 3, 4, 6–11, 15, 16, 18 | 103(a) | Sanford, Hsu, Tsukamura[7] |
| 3 | 5 | 103(a) | Sanford, Hsu, Leu[8] |

[4] The Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284, 296–07 (2011), took effect on September 16, 2011. The changes to 35 U.S.C. §§ 102 and 103 in the AIA do not apply to any patent application filed before March 16, 2013. Because the application for the patent at issue in this proceeding has an effective filing date before March 16, 2013, we refer to the pre-AIA version of the statute.

[5] Ex. 1004, PCT Appl'n No. PCT/US03/07238 (pub. Sept. 18, 2003).

[6] Ex. 1003, European Patent Appl'n No. EP 0924655 A2 (pub. June 23, 1999).

[7] Ex. 1005, US Patent No. 6,963,660 B1 (Nov. 8, 2005).

[8] Ex. 1008, European Patent Appl'n No. EP O 881 608 A1 (pub. Dec. 2, 1986)

| Ground | Claim(s) Challenged | 35 U.S.C. §[4] | Reference(s)/Basis |
|---|---|---|---|
| 4 | 5 | 103(a) | Sanford, Hsu, Leu, Tsukamura |
| 5 | 12 | 103(a) | Sanford, Hsu, Houvener[9] |
| 6 | 12 | 103(a) | Sanford, Hsu, Tsukamura, Houvener |
| 7 | 17 | 103(a) | Sanford, Hsu, McCalley[10] |
| 8 | 17 | 103(a) | Sanford, Hsu, Tsukamura, McCalley |

Petitioner relies on the testimony of Stuart Lipoff. Ex 1006 ¶¶ 1–459. Patent Owner presents the testimony of Samuel Russ, Ph.D. Ex. 2039 ¶¶ 1–72.

## II.    ANALYSIS

### A.    Legal Standards

A patent claim is unpatentable under 35 U.S.C. § 103 if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. 35 U.S.C. § 103; *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). "[W]hen a patent claims a structure already known in the prior art that is altered by the mere substitution of one element for another known in the field, the combination must do more than yield a predictable result." *KSR*, 550 U.S. at 416 (citing *United States v. Adams*, 383 U.S. 39, 50–51 (1966)). The question of obviousness is resolved based on underlying factual determinations including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the

---

[9] Ex. 1010, US Patent No. 5,790,674 (Aug. 4, 1998).
[10] Ex. 1011, US Patent No. 5,956,415 (Sep. 21, 1999).

prior art; (3) the level of ordinary skill in the art; and (4) when in evidence, objective evidence of non-obviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

      B.      *Level of Ordinary Skill in the Art*

Factors pertinent to a determination of the level of ordinary skill in the art include (1) the educational level of the inventor; (2) the type of problems encountered in the art: (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology, and (6) educational level of workers active in the field. *Envt'l. Designs, Ltd. v. Union Oil Co.*, 713 F.2d 693, 696–697 (Fed. Cir. 1983) (citing *Orthopedic Equip. Co. v. All Orthopedic Appliances, Inc.,* 707 F.2d 1376, 1381–82 (Fed. Cir. 1983)). Not all such factors may be present in every case, and one or more of these or other actors may predominate in a particular case. *Id.* Moreover, these factors are not exhaustive but are merely a guide to determining the level of ordinary skill in the art. *Daiichi Sankyo Co. Ltd, Inc. v. Apotex, Inc.*, 501 F.3d 1254, 1256 (Fed. Cir. 2007).

In determining a level of ordinary skill, we also may look to the prior art, which may reflect an appropriate skill level. *Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001). Additionally, the Supreme Court informs us that "[a] person of ordinary skill is also a person of ordinary creativity, not an automaton." *KSR*, 550 U.S. at 421.

Petitioner proposes that a person of ordinary skill in the art at the time of the '039 patent "would have had at least an undergraduate degree in electrical engineering, or equivalent education, and at least two years of work experience in the field of security and access-control." Pet. 8 (citing Ex. 1006 ¶ 26).

Patent Owner offers the level of ordinary skill we adopted in IPR2022-00600, which is that a person of ordinary skill in the art at the time of the '039 Patent

> would have had at least a bachelor's degree in computer engineering, computer science, electrical engineering, or a related field, with at least one year of experience in the field of human-machine interfaces and device access security. Additional education or experience might substitute for the above requirements.

PO Resp. 6–7; *see also* IPR2022-00600, Paper 22 at 12 (PTAB October 13, 2023) (Final Written Decision).

In this proceeding, Patent Owner's and Petitioner's levels of ordinary skill in the art, in particular education, are not substantively different. Petitioner's proposal requires at least two years of experience in the field of security and access control, compared to one year as proposed by Patent Owner. We maintain our determination of the level of ordinary skill in the art from IPR2022-00600, including at least one year of experience as Patent Owner urges. On this record, Patent Owner's proposed level of ordinary skill in the art is consistent with our review and understanding of the technology and descriptions in the '039 patent and the asserted prior art references. *See Okajima*, 261 F.3d at 1355. Indeed, the difference between one and two years of experience in the field is fairly minimal considering that neither party asserts that it is necessary to have a significant amount of experience, e.g., 5–10 years in the field. For consistency, we rely on the same level of ordinary skill in the art that we determined in IPR2022-00600.

C.     *Claim Construction*

We interpret a claim "using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C.

282(b)." 37 C.F.R. § 42.100(b) (2020). Under this standard, we construe the claim "in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent." *Id.* Furthermore, we expressly construe the claims only to the extent necessary to determine whether to institute *inter partes* review. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) ("[W]e need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy.'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

> 1.    *"if the provided card information has not been previously provided to the verification station . . . storing the imputed biometric signature"*

Patent Owner argues that the independent claims challenged here, for example limitations 3[D](P)+[D](1)], are specifically directed to an enrollment process, although the word "enrolling" or "enrollment," is not recited expressly in the claims. PO Resp. 7 (citing Ex. 2039 ¶ 39). Patent Owner argues that a person of ordinary skill in the art "would understand this to be an enrollment process because the user's card information has not previously been entered into the system and the user's biometric data has not previously been stored in the system's memory. *Id.*

Petitioner does not address whether the claims encompass an enrollment process. *See, generally*, Pet.

Because at least Hsu, Sanford, and Tsukamura each discloses an enrollment process, in this case we need not explicitly determine whether the language from which Patent Owner argues infers "enrollment" in claim 3 is limiting. We can agree that from reading the '039 patent in context there is

a difference between verification process 205 and enrollment process 207.
As we explained in our Institution Decision

> the enrollment process includes step 401, which *stores* the biometric signature "at a memory address defined by the card data 604," whereas in verification process 205 "step 204 *reads* the contents stored at a single memory address defined by the card data 604" and compares the stored biometric signature with the input biometric signature.

Inst. Dec. 7 (citing Ex. 1001, 9:65–66, 8:24–26). The language of the independent claims and the requirement that where the card information has *not* been previously provided, "storing the inputted biometric signature," tracks with the specification description of an enrollment phase. *See* Ex. 1001, 9:63–65 ("The [enrollment] process 207 is entered from the step 206 in FIG. 5, after which a step 401 stores the biometric signature received by the step 203 in the memory 124."). Therefore, for purposes of this Decision, we will consider the limitations of claims 3, 15, and 18 to include, at least in part, an enrollment process. However, because the terms "enrolling" or "enrollment" do not create any particular dispute between the parties that we need to resolve, we need not determine whether they are, in fact limitations.

### 2. "a memory location defined by the provided card information"

Claim limitation 3[D](1) recites the step of "storing the inputted biometric signature in a memory *at a memory location defined by the provided card information.*" Ex. 1001, 12:61–63 (emphasis added). Patent Owner argues that "the proper construction of [this] claim term is: 'the system sets or establishes a memory location in a memory, said location being contingent upon or determined by the provided card information.'" PO Resp. 8. Patent Owner also argues that a person of ordinary skill in the

art "would interpret the word 'defined,' especially in the context of enrollment, to mean 'setting' or 'establishing.'" *Id.*

Petitioner proposes alternative constructions. Petitioner first proposes that "defining" means that "a memory location is somehow determined from (or is dependent on) the card information." Pet. 9. Petitioner alternatively proposes that "defining" means "a memory location is specified by the card information itself." *Id.* Petitioner contends that the second construction is most consistent with the specification of the '039 patent specification. *Id.* According to Petitioner, and considering that the '039 describes "a biometric card pointer system," a person of ordinary skill in the art "would have understood that the user's card information itself specifies the physical memory address (such as by acting as a pointer) for the user's biometric signature." *Id.* at 11 (citing Ex. 1006 ¶ 47).

Consistent with our prior decision in IPR2022-00600 and our concurrent decision in IPR2022-01093, we determine also in this proceeding that Patent Owner's construction is sufficiently accurate.[11] *See Apple, Inc. v. CPC Patent Technologies, Ltd.*, IPR2022-00600, Paper 22, 29–39 (Final Written Decision); *see also NTP Inc., v. Research in Motion, Ltd.*, 418 F.3d 1282, 1293 (Fed. Cir. 2005) (noting that, when construing claims in patents that derive from the same parent application and share common terms, "we

---

[11] Different from independent claim 1 addressed in IPR2022-01093 and IPR2022-00600, independent claim 3, and specifically limitation 3[D(1)], does not recite "defining, *dependent* upon the received card information," but "defined by the provided card information." *Compare* Ex. 1001, 12:33, *with id.* at 12:63–64. Limitation 3[E(2)] does additionally recite "performing the process *dependent upon* the received card information." For purposes of claim construction, we do not find the claim language as to these limitations between claims 1 and 3 to be substantively different in scope or meaning nor does either party argue that they are.

must interpret the claims consistently across all asserted patents"). In our Final Written Decision in IPR2033-00600, we explained that

> [c]onsidering the abstract and the specification of the '039 patent, what "defining, dependent upon . . ." means as a whole, in the context of claim 1 and "a method of enrolling," is that during an *enrollment* process, the claimed "biometric signature," e.g., a fingerprint, is not yet stored in the memory and no memory location or address has been "set" or "established" for the fingerprint. When the fingerprint, and then the card, is provided to the system during enrollment, the card information provides data that establishes *where, e.g.,* at what memory location or address, the system will *store* the fingerprint data.[12]

IPR2022-00600, Paper 22, 30. We also explained that "[i]mportantly . . . we do not understand that 'defining . . . a memory location,' or Patent Owner's alternative wording, 'establishing' or 'setting,' means '[*creating*] . . . a memory location in a local memory.'" *Id.* at 32. We explained further that "[w]hile we might agree that 'the memory location cannot [already be defined],' . . . we do not agree that it 'cannot already exist.'" *Id.* at 33. During the oral hearing in this proceeding, Patent Owner's counsel argued that "Patent Owner in this case has not argued that defining means creating." Tr. 31:3–4. Patent Owner's counsel argued further, "[a]ll we're saying that Claim 1 requires is that when a user swipes their card, that is the information that is on the card, not -- in that moment in time, not something else in the

---

[12] We use the terms "memory location" and "memory address" interchangeably because, in terms of computer memory, an "address" is well-understood as "[a] number specifying a location in memory where data is stored." MICROSOFT COMPUTER DICTIONARY, 5th Ed. (2002) Microsoft Press.

system, but the information on the card that directs the system where to store that particular user's fingerprint or other biometric data."[13]  *Id.* at 31:7–11.

Considering Patent Owner's arguments and asserted claim construction with respect to the phrase "memory location defined by the provided card information" and limitation 3[D](1) as a whole, we maintain the claim construction given in IPR2022-00600 for the reasons provided here and in the Final Written Decision in that proceeding.  IPR2022-00600, Paper 22, 29–36.

We understand that, during an enrollment process, the claimed "biometric signature," e.g., a fingerprint, is not yet stored in the memory, and no memory location or address has been "defined," as in "set" or "established," in the memory for storing the fingerprint, until card information is received.  Once the card information and fingerprint are received during enrollment, the card information provides data that establishes *where,* i.e., at what memory location or address, the system will *store* the fingerprint data.  The memory location or address where the fingerprint data is stored is, therefore, "contingent" on the card information, as Patent Owner's construction requires.

> 3.    *Other claim terms agreed upon and construed by the District Court*

Petitioner indicates that the following terms have been previously agreed to between Apple and Patent Owner:

> "*dependent upon*" – Plain and ordinary meaning, defined as "contingent on or determined by"

---

[13] We understand in the context of this proceeding that Patent Owner's counsel's argument would apply to independent claims 3, 15, and 18 as well as claim 1.

"*biometric signature*" – Plain and ordinary meaning.
Pet. 12 (citing Ex. 1013, 2). Patent Owner does not specifically address these terms in its Patent Owner Response.

Considering these constructions and that our analysis does not turn on any particular claim construction for these terms, and because these constructions are not in dispute, we need not determine any specific claim construction for these terms in this proceeding.

4.     *Means-plus-function terms*

In our Institution Decision we accepted Petitioner's proposed constructions for the several "means for" and "code for" limitations recited in claims 15 and 18. *See* Inst. Dec. 42 (The Board explaining that "we find Petitioner's proposed constructions of these term under 35 U.S.C. § 112(6) consistent with the record in this case."). These constructions are also consistent with the District Court proceeding. Inst. Dec. 39–43; *see also* Ex. 1012, 1–4. Patent Owner does not address the means-plus-function terms in the challenged claims.

Because patentability on the claims at issue in this case does not turn on construction of the relative structures and functions of these means-plus-function terms, and because they are not in dispute, we maintain the constructions from our Institution Decision including that "code for" is an equivalent recitation for "means for." Inst. Dec. 39–43.

D.     *Ground 1: Claims 3, 4, 6–11, 15, 16, and 18 – Obviousness over Sanford (Ex. 1004) and Hsu (Ex. 1003)*

For the reasons below, and on the complete record before us, Petitioner has shown by a preponderance of the evidence that claims 3, 4, 6–11, 15, 16, and 18 would have been obvious over Sanford and Hsu.

       *1.     Sanford (Ex. 1004)*

Sanford is titled "Credit Card Transaction without using a Pin with Automated Cashier Machine" and describes "[a]n automated cashier machine (ACM) is provided that offers a secure and convenient way for users to access cash from their card without using a PIN." Ex. 1004, Abstract, codes (54), (57). Sanford describes that "[b]y verifying a user's image using facial biometrics, transactions may be conducted without using a pin." *Id.* ¶ 7. Sanford explains further that "[o]ther methods of verification known in the art may also be used, such as iris, voice signature, and fingerprint technology." *Id.* ¶ 20. The relevant part of Sanford's Figure 2, as annotated by the Board, is reproduced below.



Sanford's figure 2 is a block diagram illustrating a method for performing a PIN-less credit card transaction using an ACM (automated cashier machine). *Id.* ¶ 24. After swiping a user's card at step 200, the system determines whether the user's card information is already stored, i.e. enrolled, and "the ACM 12 determines if the credit card account number of the user is enrolled to use the PIN-less credit card system." *Id.* In determining if the user is enrolled, "ACM 12 may communicate with ACM computer system 18 to look up the user's credit card number." *Id.* ¶ 25. At step 202, highlighted yellow above, ACM 12 determines an enrollment course of action; if the card is not enrolled, moving to step 232, or, if the card is already enrolled, conducting a verification course of action via step 204. *Id.*

### 2. *Hsu (Ex. 1003)*

Titled "Controlled Access to Doors and Machines Using Fingerprint Matching," Hsu describes "[a] system and related method for controlling access to building doors or to machines, such as automatic teller machines (ATMs)." Ex. 1003, Abstract, codes (54), (57). Hsu describes using "an account number or employee number, to access a fingerprint database (44) and retrieve reference fingerprint data previously stored there during an enrollment procedure." *Id.*, Abstract. Figure 3 from Hsu is reproduced below.



FIG. 3

Hsu's Figure 3 is a block diagram illustrating card reader 62 reading "an account number or other type of identification unique to the user, and passes this data to the access controller 42' over line 48." *Id.* at 6:10–12. Based on the user's unique identification access controller 42' communicates with finger print database 44 "to access the fingerprint database 44 and obtain a user reference fingerprint on line 56 from the database." *Id.* at 6:14–16. Hsu explains that

> [t]he controller 42' also sends a "start" signal on line 58 to the fingerprint correlator 46, which compares the reference fingerprint with a subject fingerprint image supplied from the sensor 1 6 over line 54. If the correlator 46 finds a match, the correlator sends a signal over line 58 to the access controller 42', which transmits an appropriate signal to the computer 60 on line 28, indicating that access has been granted.

*Id.* at 6:16–24.

Hsu also describes an enrollment process shown in Figure 4 and reproduced below.



FIG. 4

Hsu's Figure 4 illustrates a block diagram showing that a user's fingerprint is obtained by fingerprint sensor 16 and passes through fingerprint enrollment analyzer 64 before being stored in fingerprint database 44. *Id.* at 7:51–8:23. Hsu explains that along with providing a fingerprint during enrollment, "[a]t the same time, the user's identity has to be independently verified, by some means other than fingerprint matching, as indicated in block 66, and the user also presents an account number, employee number or similar identity number." *Id.*

### 3. Independent claim 3

We consider initially the elements of independent claim 3.

#### a) Petitioner's Arguments

##### (1)   3[P] – "A method of securing a process at a verification station"

Petitioner argues that Sanford discloses a "method of securing a process at a verification station" because Sanford teaches that a user needs to be verified at an ATM, e.g., Sanford's ACM (automated cashier machine). Pet. 13 (citing 1006 ¶¶ 268–272). Specifically, Sanford discloses a secure

and easy way for a user to access cash using a picture, i.e., facial recognition, and without having to use a PIN. *Id.* (citing Ex. 1006 ¶ 269).

Sanford illustrates an exemplary verification system in Figure 1, reproduced below, as annotated by Petitioner (*id.* at 14).



Fig. 1

Figure 1 of Sanford illustrates verification system 10 including cashier machine 12 "capable of taking a picture of a person, and dispensing money" and server 20 "capable of receiving and forwarding communications to and from components of system 10." Ex. 1004 ¶¶ 16–17. Sanford explains that "[v]erification process 22 also may query database 24 to validate a user's credit card number associated with the picture to a card number associated

with the user's picture in the database. Additionally, verification process 22 may query database 24 to verify other aspects of identifying information in the profile." *Id.* ¶ 21.

> (2)  3[A] – *"(a) providing card information from a card device to a card reader in the verification station;"*

For limitation 3(a), Petitioner argues that Sanford's Figure 2 and step 200 disclose swiping or inserting a card in a card reader. Pet. 17–18 (citing Ex. 1004 ¶ 24, Fig. 2). According to Petitioner, Sanford teaches a process including providing *information* from a card to a card reader at a verification station, e.g., Sanford's ACM 12. *Id.* at 17. An excerpt from Sanford's Figure 2 is reproduced below.



Sanford's Figure 2 illustrates step 200 (S200) for swiping or entering a card number at a verification station, and step 202 (S202) determines whether the card is already enrolled.

> (3)    3[B] – "(b) inputting a biometric signature of
>         a user of the card device to a biometric
>         reader in the verification station"

Petitioner argues that Sanford's Figure 2, step 234, which states "[t]ake customer's picture," teaches inputting a biometric signature, in the form of a user's picture, to a biometric reader in the ACM verification system. Pet. 18–19 (citing Ex. 1004 ¶ 16). Mr. Lipoff testifies that a person of ordinary skill in the art "would have understood that if a fingerprint biometric were used in Sanford's system, then the picture taking device would be replaced with a fingerprint reader." Ex. 1006 ¶ 279.

> (4)    3[C] – "(c) determining if the provided card
>         information has been previously provided to
>         the verification station;"

Petitioner contends that Sanford teaches this limitation because at step 202, as shown in Figure 2, Sanford determines whether the card is enrolled, i.e., stored in memory. Pet. 21 (citing Ex. 1004, Fig. 2, step 202; Ex. 1006 ¶¶ 282–285). Mr. Lipoff testifies that a person of ordinary skill in the art would have understood that this "means determining if the card has been previously enrolled, which Sanford discloses," because "after a user provides the credit card account number at step S200 (blue), 'ACM 12 determines [at step S202 (yellow)] if the credit card account number of the user is enrolled to use the PIN-less credit card system.'" Ex. 1006 ¶ 283 (quoting Ex. 1004 ¶¶ 24–25).

     (5)    *3[D(P)+D(1)+D(2)] – "(d) if the provided card information has not been previously provided to the verification station;*

           *(da) storing the inputted biometric signature in a memory at a memory location defined by the provided card information; and*

           *(db) performing the process dependent upon the received card information;"*

Petitioner argues that Sanford checks to see if card information has, or has *not*, been provided, i.e., enrolled, as outlined in Figure 2, step 202; if the card has *not* been enrolled, Sanford then stores the user's picture or, for example, other biometric data, such as a fingerprint. Pet. 23–24 (citing Ex. 1004 ¶ 25). Petitioner explains, however, that "Sanford does not provide specific details about how the user's picture or fingerprint is stored in the database." *Id.* at 27 (citing Ex. 1004 ¶¶ 21, 18). Petitioner argues that Hsu discloses a database that creates an association between a biometric fingerprint and a user employee number or account number. Pet. 33 (citing Ex. 1003 ¶¶ 26, 20). Mr. Lipoff testifies that a person of ordinary skill in the art "would have known that Sanford's database could be setup like that disclosed in Hsu to store Sanford's credit card numbers and associated pictures/fingerprints . . . such that given a user's credit card number, Sanford's ACM could locate the customer's picture/fingerprint data at the associated memory location." Ex. 1006 ¶ 292. Mr. Lipoff testifies further that a person of ordinary skill in the art "would have understood that the biometric signature (*e.g.,* fingerprint) in the Sanford-Hsu system is not stored at *any* memory location in the database—rather, it is stored at *the* memory location associated with the corresponding credit card number (Hsu's user/account/employee number) received from a card." *Id.* ¶ 293

(citing Ex. 1003 ¶¶ 26, 20). Given the knowledge of a person of ordinary skill in the art regarding how a database and tables relate stored information, Petitioner argues that "the 'memory location' for storing the biometric signature (*e.g.,* fingerprint) the Sanford-Hsu system is 'defined by the provided card information.'" Pet. 28 (citing Ex. 1006 ¶ 293).

Petitioner points out that Hsu's Figure 4, as shown below and annotated by Petitioner (*id.* at 72), depicts memory and storage 44 where an account number is stored in the database associated with a fingerprint. *Id.*



Hsu's Figure 4 is a block diagram illustrating storage 44 (highlighted green) including "fingerprint database," "Acc[ount] Nos.," and "Ref. Prints." Ex. 1003, 6:51–58.

> *(6)      3[E(P)+E(1)] – "(e) if the provided card information has been previously provided to the verification station;*
>
> *(ea) comparing the inputted biometric information to the biometric signature stored in the memory at the memory location defined by the provided card information"*

In line with its analysis of the above limitations, Petitioner contends that Sanford discloses checking if the card information has or has not been provided, i.e., enrolled, and if it has been, then the verification process can

compare the picture or fingerprint stored in the manner of Hsu's database; for example, with a user's provided picture or fingerprint. Pet. 31 (citing Ex. 1006 ¶¶ 300–302). In this case, in which Sanford discloses that a user is enrolled, Mr. Lipoff testifies that "[t]he 'verification process 22 may employ an algorithm based on facial biometrics' and compares the inputted image to a stored picture/fingerprint." Ex. 1006 ¶ 301 (quoting Ex. 1004 ¶ 19).

> *(7)    3[E(2)] – "(eb) if the biometric signature matches the stored biometric signature, performing the process dependent upon the received card information"*

Petitioner argues that Sanford teaches this limitation because Sanford verifies the user, for example, in Fig. 2, steps 204–220, which illustrate that a user's picture or other biometric signature, such as a fingerprint, is compared and verified, in the manner taught by Hsu's database for example, with a user's stored picture or fingerprint. Pet. 33. Mr. Lipoff testifies that after verification Sanford discloses "performing the process [*e.g.,* antecedent process from the preamble, here Sanford's cash dispensing] dependent upon the received card information [*e.g.,* Sanford's credit card account number]." Ex. 1006 ¶ 305. In other words, according to Petitioner and Mr. Lipoff, Sanford's process is carried out—that is dispensing cash—after successfully comparing the biometric signatures, and a badge or card account number, for example as described by Hsu, points to the location of the stored biometric signature for verification and comparison purposes.

> *(8)    3[E(3)] – "(ec) if the inputted biometric signature does not match the stored biometric signature, not performing the process dependent upon the received card information."*

According to Petitioner, Sanford teaches that if the biometric signature does not match a stored signature, then, as shown and described in

Figure 2, step 226, the user is printed a receipt and instructed to re-enroll, and the system does not dispense cash to the user. Pet. 34–35 (citing Ex. 1004 ¶ 30). An excerpt from Sanford's Figure 2 is reproduced below.



Sanford's Figure 2 describes at step 226 (S226) that where a user's picture cannot be verified, "[p]rint receipt and send customer to c[]ashier's cage to complete re-enrollment."

### (9)    *Analogous Art and Motivation to Combine Sanford and Hsu*

Petitioner argues that Sanford and Hsu are analogous prior art with respect to the '039 patent. Pet. 37. Petitioner contends that "[b]oth references (and the '039 Patent) are directed to ways of performing efficient biometric authentication, including using fingerprints." *Id.* Petitioner argues that "[b]oth references (and the '039 Patent) teach authenticating a user by comparing a fingerprint captured by a sensor to a stored fingerprint." *Id.* (citing Ex. 1003, Abstract; Ex. 1004, Abstract).

We consider two criteria when evaluating whether prior art is analogous: (1) whether the art is from the same field of endeavor, regardless of the problem addressed; and (2) if the reference is not within the field of the inventor's endeavor, whether the reference still is reasonably pertinent to

the particular problem with which the inventor is involved. *In re Clay*, 966 F.2d 656, 658–59 (Fed. Cir. 1992).

The '039 patent is directed broadly to "security issues associated with use of card devices such as credit cards, smart cards, and wireless card-equivalents such as wireless transmitting fobs." Ex. 1001, 1:14–16. More specifically, the '039 patent explains that its disclosure addresses "problems relating to secure access and/or secure processes, by automatically storing a card user's biometric signature in a local memory in a verification station comprising a card reader, [and] a biometric signature reader." *Id.* at 2:53–57. Based on framework and disclosure, we determine that a reasonable field of endeavor involves enrollment and user verification systems including card devices and biometric signatures.

As Petitioner points out, both Sanford and Hsu expressly disclose enrollment and biometric user verification systems that compare a user fingerprint to a stored fingerprint for identity verification purposes. *See, e.g.*, Ex. 1003 ¶¶ 4, 13, 20, 24, Fig. 3; *see also* Ex. 1004 ¶¶ 4, 8–9, 16, 36. For example, Hsu explains that "FIG. 2 shows the principal components of the access control unit 14 in block diagram form, including an identification polling transceiver 40, a door controller 42, a fingerprint database 44, and a fingerprint correlator 46." *Id.* at ¶ 20. Similarly, Sanford describes that in "a secure and convenient way for users to access cash from their card without using a PIN . . . [a]n identifying image of a user is taken and an amount for withdraw is received. If the amount for withdrawal is approved, the ACM verifies the identifying image of the user to an image of the user in a profile." Ex. 1004 ¶ 6. Also, Sanford states that "[o]ther methods of verification known in the art may also be used, such as iris, voice signature, and fingerprint technology." *Id.* ¶ 20.

On the complete record now before us, we are persuaded that Sanford and Hsu are analogous art to the '039 patent as they are directed to the same field of endeavor, which is—enrollment and user verification systems including card reading devices and biometric signatures.

With respect to motivation to combine, Petitioner argues that although Sanford does not expressly disclose "a specific memory structure with a memory location for storing a picture/fingerprint that is defined by card information[,] [t]his is disclosed by Hsu." Pet. 37. To this end, Petitioner argues that

> [b]oth references (and the '039 Patent) teach that the stored fingerprint is associated with a number provided by the user and/or the user's card. Sanford discloses a user's picture (or fingerprint) associated with a user's card number provided by a user. Hsu discloses that the stored fingerprint data is associated with a user number or account number provided by a user's card.

*Id.* (citing Ex 1003 ¶¶ 18–21, 26).

Petitioner's declarant, Mr. Lipoff, testifies that a person of ordinary skill in the art would have implemented Hsu's database 44 in Sanford's system because "Hsu discloses that '[t]he database is basically a table that associates each user number with a stored fingerprint image, or with selected distinctive attributes or features of the user's fingerprint image.'" Ex. 1006 ¶ 311 (quoting Ex. 1003 ¶ 20, Fig. 4). Mr. Lipoff reasons that combining the references "improve[s] the efficiency of a biometric authentication system by comparing a captured fingerprint with a single stored fingerprint in a one-to-one manner, instead of needing to compare against multiple stored fingerprints in a one-to-many manner." *Id.* ¶ 310.

On this record, we find persuasive Petitioner's explanations for a motivation to combine Sanford and Hsu. Hsu, as Mr. Lipoff testifies

persuasively, describes specifically *how* a person of ordinary skill in the art would implement a database in a verification system to associate an account or credit card number with a stored biometric signature. *Id.* ¶¶ 281–294. In addition, Mr. Lipoff provides persuasive reasoning as to why a person of ordinary skill in the art would have looked to Hsu to "perform a database look-up to locate the user's biometric data, including picture/fingerprint and other data, at the specific memory location defined by the card/user number" *Id.* ¶ 313; *see also KSR*, 550 U.S. at 420 (explaining that "any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed").

b)    *Patent Owner's Arguments*

Patent Owner focuses its arguments on limitation 3[C(P)] and 3[C](1)], arguing that "Hsu is devoid of any teaching or suggestion that the user's card information sets or establishes (*i.e.*, defines) the memory location for the user's fingerprint data during enrollment." PO Resp. 11 (citing Ex. 2039 ¶ 46). According to Patent Owner, Hsu does not "set" or "establish" a memory location for the fingerprint data because Hsu mainly describes that "[t]he account number is stored in the database 44 in association with the user's fingerprint image data." *Id.* at 12 (quoting Ex. 1003, 7:1–12). Patent Owner's position is that Hsu does not define any memory location in particular, but "that the user's fingerprint data and account number are presented *at the same time* and are then stored in the database *in association with* each other." *Id.* at 13 (citing Ex. 2039 ¶ 49). In other words, Patent Owner's argument is that, unlike the claimed method, Hsu's card information does not provide data that sets or establishes *where,*

i.e., at what memory location or address, the system will *store* the fingerprint data.

c)    *Analysis*

Hsu expressly describes an enrollment process for a user including fingerprint database 44 and describes that "the fingerprint database 44 contains reference fingerprint image data for each user, employee, or customer using the system, and that the reference fingerprint data are associated with corresponding user numbers, or employee or customer account numbers." Ex. 1003 ¶ 26. Hsu's Figure 4, illustrating the enrollment process, as annotated by Petitioner (Pet. 72), is reproduced below.



FIG. 4

Hsu's Figure 4 is a block diagram showing an enrollment process illustrating fingerprint database 44 (highlighted green) including reference prints and related account number for each user or employee. Ex. 1003 ¶ 26.

Based on the description and Figure 4, Hsu tells us a location, that is *where*, i.e., in fingerprint database 44, the fingerprint is to be stored during enrollment. Hsu explains that in the fingerprint database 44 "fingerprint data are associated with corresponding user numbers, or employee or customer account numbers." *Id.* Accordingly, we understand from this

description that the user's fingerprint is stored in relation to, i.e., "associated with," the user's employee account number, for example. Still, a key question is *how* is the fingerprint data stored during enrollment. Consistent with our claim construction, the card information must "set" or "establish" where the fingerprint data is to be stored—that is, the location must be "*contingent upon or determined by* the user's account number itself during enrollment." *See supra,* Section II.C.2. Petitioner relies on Hsu for this teaching. Pet. 28–32. Hsu explains that when a user presents a fingerprint during enrollment "[a]t the same time, the user's identity has to be independently verified, by some means other than fingerprint matching, as indicated in block 66, and the user also presents an account number, employee number or similar identity number." Ex. 1003, 7:4–8. In this way, Hsu describes presenting identification data apart from biometric data, and includes presenting, for example, an employee identification card or badge, including the user's employee number. *See* Ex. 1003 ¶ 11 (describing that "the identification medium carried by each user includes a machine-readable card, and the step of reading data from an identification medium includes reading data from a card reader in which the machine-readable card is placed by the user"). Understanding that during enrollment Hsu stores the user's fingerprint data "associated with" a user's employee number on the card, we further understand that the identification information, e.g., employee number, on the identification card defines, sets, or establishes, *where* the fingerprint is stored; that is—the user's fingerprint data is stored with the database record corresponding to the relevant employee number.

Given this, we conclude that Patent Owner's position that Hsu does not disclose a memory location "defined by," "set," or "established" by card

information is not accurate. *See* PO Resp. 12 (arguing that "[t]here is definitively no teaching or suggestion that the user's account number (or similar identity number) sets or establishes the memory location for the fingerprint data during enrollment") (citing Ex. 2039 ¶ 48). Patent Owner's argument mainly contrasts the term "associated with," as described in Hsu, with our claim construction that "defined by" means "set" or "established." *Id.* We agree that these are different words, but an ordinary meaning of "associated" is "related, connected, or combined together." MERRIAM WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/associated (last visited Jan. 9, 2024) (Ex. 3001). Considering common database structures and functions, we are persuaded that Hsu, by "associating" a user's fingerprint data with a database record corresponding to a particular employee, concomitantly discloses "defining," "setting," or "establishing" a memory location for the fingerprint data in relation to the employee account number. Consistent with our understanding of Hsu's disclosure, Mr. Lipoff testifies persuasively that in Hsu "[t]he 'fingerprint image, or [] selected distinctive attributes or features of the user's fingerprint image' are not stored at *any* memory location in the database—rather, it is stored at a memory location associated with the specific user/employee number received from a card." Ex. 1006 ¶ 93 (citing Ex. 1003 ¶ 26).

Patent Owner's counsel made clear, during oral argument, its position that "there's no discussion at all in Hsu that the ID number/card information in enrollment for purposes of storing the signature, stores [fingerprint data] at a specified location -- by location specifically specified by the card data." Tr. 42:21–23. But we do not agree with this position. As discussed above, Hsu describes that fingerprint data is stored associated with the card data,

e.g., an account or employee number. Ex. 1003 ¶ 26 (describing that "the reference fingerprint data are associated with corresponding user numbers, or employee or customer account numbers"). Consistent with our claim construction, the "association" is the *where*. In other words, we understand that Hsu's associating the fingerprint data with the personal data record in fingerprint database 44 defines, sets, or establishes where the fingerprint data is stored. This occurs, as Hsu explains, because during enrollment the user data such as account or employee number is supplied by the user's card. *See id.* (explaining that during enrollment, in addition to a fingerprint image, "the user also presents an account number, employee number or similar identity number"). We do not consider it a significant leap, or even a leap at all, to understand that associating the fingerprint data according to, that is— "contingent on, or determined by," the user's account number or employee number on Hsu's card or badge, sets or establishes the database record or address location *where* the fingerprint data is stored in Hsu's fingerprint database 44.

Patent Owner also argues that "[i]n contrast to the claimed method, Hsu teaches that the user's fingerprint data and account number are presented *at the same time* and are then stored in the database *in association with* each other." PO Resp. 13 (citing Ex. 2039 ¶ 49). Patent Owner's declarant, Dr. Russ, similarly testifies that "in Hsu, the fingerprint data and the account number are presented together and are then stored together . . . [t]here is no step in Hsu wherein the account number (or the 'card information') first sets or establishes the memory location." Ex. 2039 ¶ 49. This argument takes advantage of the fact that Hsu does explicitly state a temporal order for "storing . . . the biometric signature" as recited in claim 1. However, as we explained in our claim construction,

during an enrollment process the claimed "biometric signature," e.g., a fingerprint, is not yet stored in the memory, and no memory location or address has been "defined," as in "set" or "established," in the memory for storing the fingerprint, until card information is received. Once the card information and fingerprint is received during enrollment, the card information provides data that establishes *where,* i.e., at what memory location or address, the system will *store* the fingerprint data.

Section II.C.2. Similarly, in Hsu, the fingerprint data can only be stored once the system has received data indicative of, for instance, an employee number from a user's identification badge, which thus defines a database record with which the fingerprint data can be "associated."

This all makes sense, logically, because Hsu's fingerprint data are not randomly stored, as Mr. Lipoff explains, "in *any* memory location." Ex. 1006 ¶ 93. Hsu's fingerprint data cannot be stored until directed to, i.e. "associated with," a certain database address or record, and in Hsu that is a database record containing the user's identification information. *See* Ex. 1003, 7:7–12 (describing that during enrollment "the user also presents an account number, employee number or similar identity number . . . [t]he account number is stored in the database 44 in association with the user's fingerprint image data"). Accordingly, from a temporal standpoint during enrollment, Hsu must also use card information, e.g., an employee number, to define, set, or establish a memory location with which the fingerprint data can be associated, before storing the fingerprint data. Commensurate with our understanding of Hsu's disclosure, we credit Mr. Lipoff's testimony that even though Hsu does not explain exactly "how a new user record is created" during enrollment, a person of ordinary skill in the art would have "tr[ied] using simple known options for creating database records." Ex. 1032 ¶ 32. Mr. Lipoff explains persuasively that "upon a user

enrolling, they provide a previously unseen card/user number, [and] the system then creates a new record for the user, including setting/establishing for the first time the memory location for storing the user's fingerprint." *Id.* ¶ 33.

When asked during his deposition to describe Hsu's database structure and functions, Mr. Lipoff testified consistently with his declaration, explaining essentially that it is the user's employee or account number that defines where the fingerprint data is stored:

> Q. So the account number indicates where the fingerprint is stored because they are stored in association with each other; is that correct?
>
> . . .
>
> A. THE WITNESS:· Well, I think it's – it's more than that. The structure that the database, as Hsu describes it, I believe -- let me see. I think it's in paragraph 20. Let me see if I can find it. Yeah, so in paragraph 20, column 4, the database is basically a table that associates each user number with a stored fingerprint image or selected attributes.
>
> So what this is telling me is the user number, which you -- you said we should call the account number, I believe it's the same thing here, is -- is a database, and so the user number is defining the memory location in which the stored fingerprint image will be stored because the structure of the database is one, as indicated here in column 4, that starts with the user number telling you where to find the memory location that has the stored fingerprint image.

Ex. 1041, 33:16–34:9. When Patent Owner's counsel pointed out that Hsu's paragraph 20 did not pertain specifically to enrollment, Mr. Lipoff explained that the database structure and function in paragraph 20 also applies to the enrollment process shown in Figure 4:

> A. Paragraph 20 describes the principle [sic] components of the access control unit, which includes the fingerprint database

which is the same fingerprint database that's in – that's in – I'm sorry. Same fingerprint database that's in Figure 4. Figure 4 is the previous paragraph of Hsu we were discussing. Paragraph 26 is the enrollment procedure, but by the time you get to the enrollment procedure, Hsu, earlier in paragraph 20, defined the structure of that same database -- database item 44 in Figure 4.

*Id.* at 34:19–35:9.

Summarizing its position, Patent Owner argues that "Hsu merely discloses that the user's account number and fingerprint data are stored in association with each other. Hsu offers no other teachings as to how the account number and fingerprint data are stored in the database." PO Resp. 15 (citing Ex. 2039 ¶¶ 53–54). Considering our analysis and the evidence discussed above, we disagree. We are persuaded that Hsu does, in fact, explain *how* the account number and fingerprint data are stored in the fingerprint database. Hsu establishes a memory location for storing the fingerprint data in "association" with an employee or account number, and the "association" is contingent on receiving the employee or account number from Hsu's card or badge during enrollment. *See* Ex 1003, 7:10–12, Fig. 4 (explaining that "[t]he account number is stored in the database 44 in association with the user's fingerprint image data").

Overall, we are persuaded based on Petitioner's arguments and evidence, including the testimony of Mr. Lipoff, that Hsu's association of a fingerprint with a user's underlying account or employee number in a database record during enrollment discloses limitation 3[D](1), namely "storing the inputted biometric signature in a memory at a memory location defined by the provided card information." Ex. 1001, 12:61–63.

Patent Owner does not present substantive arguments with respect to the remaining limitations 3[P]–[D] and 3[D](2)–[E](3), nor with respect to

the combination of Sanford and Hsu. *See* PO Resp. 10–15. Having reviewed the entirety of the record now before us, specifically the disclosures in Hsu and Sanford, we accept Petitioner's arguments and evidence with respect to the remaining limitations as our own. Pet. 12–36. We also find that Petitioner and Mr. Lipoff have provided articulated reasoning with evidentiary underpinning as to why an ordinarily skilled artisan would have been motivated to combine the teachings of Sanford and Hsu. *Id.* at 37–39; Ex. 1006 ¶¶ 108–115.

> d)    Conclusion as to claim 3

Based on the complete record before us and for the reasons expressed above, we are persuaded that Petitioner has shown by a preponderance of evidence that claim 3 would have been obvious over Sanford and Hsu.

> 4.    Dependent claim 4

Claim 4 depends from claim 3 and recites in part "wherein the card device is one of a card in which the card information is encoded in a magnetic strip;" or alternatively, "a smart card [or] . . . a key fob." Ex. 1001, 13:12–21.

Patent Owner does not provide separate, substantive arguments with respect to claim 4, but mainly argues that claim 4 "contain[s] the 'memory location defined by the provided card information' limitation examined above." PO Resp. 24. Patent Owner then contends, "As the prior art cited by Petitioners does not teach this limitation, the cited prior art does not render these dependent claims obvious as a result thereof." *Id.*

Petitioner argues that "Sanford also discloses that this card information is encoded in a magnetic strip." Pet. 40 (citing Ex. 1004 ¶¶ 16, 40). Petitioner also argues that Hsu discloses each of the specific cards and key fobs recited in dependent claim 4. *Id.* at 40–41 (citing Ex. 1003 ¶¶ 7,

24). We find Petitioner's evidence persuasive; for example, Hsu describes that "[t]he card may be encoded with data using a magnetic stripe, bar codes, or any other means. Alternatively, the card may be a 'smart card' that includes an electronically readable memory." Ex. 1003, 6:5–9. For dependent claim 4 we have considered and on the complete record before us, in addition to our analysis above, accept as our own, Petitioner's arguments and evidence set forth at pages 40–41 of the Petition. Accordingly, we determine that Petitioner has shown by a preponderance of the evidence that claim 2 would have been obvious over Hsu and Sanford.

### 5.    *Dependent claim 6*

Claim 6 also depends from claim 3 and recites "wherein the performance of the process in the steps (db) and (eb) comprises outputting at least part of the inputted card information from the verification station." Ex. 1001, 13:28–31.

Patent Owner does not provide substantive arguments with respect to claim 6, but mainly argues that claim 6 "contain[s] the 'memory location defined by the provided card information' limitation examined above." PO Resp. 24. Patent Owner then contends, "As the prior art cited by Petitioners does not teach this limitation, the cited prior art does not render these dependent claims obvious as a result thereof." *Id.*

Petitioner points, *inter alia*, to Sanford's disclosure in Figure 1 that illustrates the cashier machine 12 (verification station) communicating with a card issuer, the card issuer ostensibly being financial institution 16 described in Sanford's specification. Pet. 42–43. With respect to "outputting . . . card information," Mr. Lipoff testifies that a person of ordinary skill in the art "would have understood that when dispensing cash for a user, the user's credit card account number is sent to financial

institution 16 (or at least doing so would be obvious)." Ex. 1006 ¶ 324. Mr. Lipoff explains, for example, considering Sanford's Figure 2 as annotated by Mr. Lipoff (Ex. 1003 ¶ 323) and reproduced below, that "if it is determined at step S202 (yellow) that a card is not enrolled, '[i]n step S240 [purple], the transaction is sent for pre-authorization to the financial institution . . . , which may use an Address Verification System (AVS) to help validate the users address.'" *Id.* ¶ 323 (quoting Ex. 1004 ¶ 34).



**Fig. 2**

Figure 2 of Sanford illustrates a method for conducting PIN-less credit card transaction in a flow diagram. Ex. 1004 ¶ 24. Mr. Lipoff testifies further that a person of ordinary skill in the art "would have expected that the 'transaction' that is sent to the 'financial institution' would include the credit card account number." *Id.*

Mr. Lipoff's testimony as to claim 6 is unrebutted on this record. For dependent claim 6, we have considered and on the complete record before us, in addition to our analysis above, accept as our own, Petitioner's arguments and evidence set forth at pages 41–44 of the Petition. Accordingly, we determine that Petitioner has shown by a preponderance of the evidence that claim 6 would have been obvious over Hsu and Sanford.

      *6.    Dependent claims 7–11*

Claims 7–11 depend directly or indirectly from independent claim 3. Just as for claims 4 and 6, Patent Owner does not provide separate, substantive arguments with respect to dependent claims 7–11, but argues again that these dependent claims "contain the 'memory location defined by the provided card information' limitation examined above. As the prior art cited by Petitioners does not teach this limitation, the cited prior art does not render these dependent claims obvious as a result thereof." PO Resp. 24.

Mr. Lipoff's testimony as to dependent claims 7–11 is unrebutted on this record. For dependent claims 7–11, we have considered and on the complete record before us, in addition to our analysis above, accept as our own, Petitioner's arguments and evidence set forth at pages 44–54 of the Petition. Accordingly, we determine that Petitioner has shown by a preponderance of the evidence that claims 7–11 would have been obvious over Sanford and Hsu.

      *7.    Claims 15–16 and 18*

Independent claim 15 is an apparatus claim reciting "[a] verification station for securing a process," and includes similar limitations as independent claim 3. Ex. 1001, 14:22. Different from claim 3, claim 15 also recites "a card device reader," "a biometric signature reader," and for

the remaining limitations recites "means for" along with the same functional language as in limitations 3[C]–[E].

Patent Owner does not provide separate, substantive arguments with respect to claims 15–16 and 18.

Petitioner argues that besides disclosing a verification station including a card reader, "Sanford discloses that its card reader is part of its ACM [automated cashier machine 12], and is therefore coupled to the ACM." Pet. 54 (citing Ex. 1004 ¶ 16). Petitioner equates Sanford's "picture taking device" with the claimed "biometric signature reader" arguing that "when the biometric signature is provided to the biometric signature reader, it is also provided to Sanford's ACM." *Id.* at 55 (citing Ex. 1006 ¶ 357).

Considering the "means for" limitations in the remainder of the claim, Petitioner points to the requisite function and structure in the prior art, which are consistent with our claim construction (*see supra* Section II.C.4; *see also* Inst. Dec. 39–43). For example, for limitation 15[C], Petitioner explains that the function of this limitation is "determining if the provided card information has been previously provided to the verification station." Pet. 56. According to Petitioner, the structure is, "processor unit 105 running software process(es) 206; and equivalents thereof." *Id.*

Petitioner argues that "as explained for Limitation 3[C], Sanford discloses the recited function." *Id.* (citing Ex. 1006 ¶¶ 282–285, 361). For the structure, and considering Sanford's Figure 1 reproduced below as annotated by Petitioner, Petitioner asserts that "Sanford discloses that ACM computer system 18 (brown), which is part of Sanford's ACM (yellow), 'includes a processor . . . [which] may be . . . a computer, workstation, mainframe, pocket PC, personal digital assistant, etc.'" *Id.* (quoting Ex. 1004 ¶ 18).



Fig. 1

Sanford's Figure 1, as annotated by Petitioner (Pet. 64), illustrates ACM computer system 18 (brown), encompassing verification process 22 (blue) and database 24 (green).  Ex. 1004 ¶ 18.  Petitioner points out that Sanford expressly describes that "[t]he processor also preferably includes or is in communication with a verification process 22 [blue] and database 24 [green]. Verification process 22 may be a software- implemented process that communicates with database 24."  Pet. 57 (quoting Ex. 1006 ¶ 18).

Apart from its arguments with respect to independent claim 3[D](1), Patent Owner does not dispute Petitioner's evidence that Sanford, and Sanford in view of Hsu, disclose and teach the limitations of independent claim 15.  *See generally* PO Resp.  And, in addition to being persuaded that Sanford discloses the necessary structure and function intimated by "means

for," we find that Sanford renders obvious limitation 15[C] for the same reasons as limitation 1[C]. Based on our review, we find that the complete record fully supports Petitioner's showing that the combination of Hsu and Sanford discloses all the limitations of independent claim 15. *See* Pet. 49–56.

Dependent claim 16 is similar to claim 4, and relates to a "verified access system" including, *inter alia*, "a reader for a card in which the card information is encoded in a magnetic strip." Ex. 1001, 14:51–52. Besides referencing his testimony with respect to claim 4, Mr. Lipoff testifies that similarly "Sanford discloses verification station with card reader and that its 'card reader may be a magnetic strip reader capable of reading cards with a magnetic strip such as, for example, ATM cards, credit cards, debit cards, or smart cards.'" Ex. 1006 ¶ 387 (quoting Ex. 1004 ¶ 16).

Independent claim 18 includes essentially the same limitations as claim 15, except that the preamble to claim 18 recites:

> A non-transitory computer readable medium having recorded thereon a computer program for directing a process or to execute a method for securing a process at a verification station, said program comprising:

Ex. 1001, 14:64–67. And, for example, the limitation of "means for determining if the provided card information has been previously provided to the verification station" in independent claim 15, is recited in independent claim 18 as "code for determining if card information, . . . has been previously provided to the verification station." *Compare id.* at 14:28–29, *with id.* at 15:1–4. Petitioner asserts that "[t]hese 'code for' terms should be construed the same way as 'means for' terms (*see* Section VII.B). Thus, for the same reasons discussed for claim 15, Sanford and Hsu disclose or render obvious claim 18." Pet. 65–66. Mr. Lipoff testifies that "[i]n order for the

various components of Sanford and Hsu to perform their functions, a POSITA would have understood and found it obvious that both Sanford and Hsu (and the combined system) include one or more processors running computer programs stored on a non-transitory computer readable medium." Ex. 1006 ¶ 389.

Mr. Lipoff's testimony as to what a person of ordinary skill in the art would have understood in regards to the known internals, programming instructions, and memory structure for a biometric card enrollment and verification system is unrebutted on this record.

For independent claim 18, Petitioner's arguments and evidence are in all other respects the same as the arguments and evidence presented with respect to independent claim 15, as Petitioner and Mr. Lipoff specifically refer back to the respective arguments and evidence for the similar limitations in claim 15. Pet. 66.

We have considered, and on the complete record before us, accept as our own, Petitioner's arguments and evidence set forth at pages 54–66 of the Petition as to claims 15–16 and 18. Accordingly, we determine that Petitioner has shown by a preponderance of the evidence that claims 15–16 and 18 would have been obvious over Sanford and Hsu.

E.    *Ground 2: Claims 3, 4, 6–11, 15, 16, and 18 – Obviousness over Sanford, Hsu, and Tsukamura (Ex. 1005)*

Because we determine that claims 3, 4, 6–11, 15, 16, and 18 would have been obvious over the combination of Sanford and Hsu, we need not address these same claims as obvious over the combination of Sanford, Hsu, and Tsukamura.

*F.     Ground 3: Claim 5 – Obviousness over Sanford, Hsu, and Leu (Ex. 1008)[14]*

Dependent claim 5 recites:

> A method according to claim 3, wherein:
>
> the card information provided in the step (a) comprises a header and card data; and
>
> the steps (c), (d) and (e) are only performed if the header indicates that the card belongs to a set of cards associated with the verification station.

Ex. 1001, 13:22–27.  Petitioner argues that "Leu discloses a card reader device that reads a card and verifies the card information to determine whether an event (*e.g.,* indicating whether or not the user has achieved a lottery prize") can be triggered."  Pet. 81 (citing Ex. 1009, 1:26–29; 1:20–27).  Figure 3 of Leu, illustrating a card memory, is reproduced below including Petitioner's annotations (Pet. 82).



**Fig. 3**

[Fig. 3 Translation Key:]
12 = serial number
13 = group
14 = value

Leu's Figure 3 illustrates "the memory of the card" including a non-volatile memory divided into regions 10 and 11.  Ex. 1009, 2:5.  Leu explains that

---

[14] Ex. 1009 is the English translation of Ex. 1008.

"[v]alues that can no longer be changed after the card is sold are contained in the region 10, while the data in the region 11 can still be changed." Ex. 1009, 3:9–12.

Mr. Lipoff explains that Leu describes a serial number 12 (yellow) different for every card, and "[a] group memory 13 (green) 'indicates whether a card is a lottery ticket card or a conventional card.'" Ex. 1006 ¶ 423 (quoting Ex. 1009 3:20–22). Mr. Lipoff testifies that "since the group number and the serial number are stored on the card and are to be read by a card reader device . . . , they are both card information." *Id.* Mr. Lipoff testifies further that in Leu "the determination of whether a card user has won a lottery prize is only performed if the group number indicates that the card belongs to a first set of cards (*i.e.*, lottery cards) and not a second set of cards (*i.e.,* normal prepaid cards)." *Id.* ¶ 426. Thus, according to Mr. Lipoff, "because the card reader is able to interpret the first set of cards (lottery ticket cards) to determine whether a user has won a lottery prize, a POSITA would have understood the first set of cards (lottery ticket cards) are associated with the card reader (verification station)." *Id.*

Petitioner argues that a person of ordinary skill in the art would have combined Leu with Sanford because "Sanford, and Leu are **analogous art** and in the same field of using a card to make transactions. Sanford teaches using a credit card to withdraw cash and Leu teaches using a prepaid card to purchase telephone services." Pet. 86. Mr. Lipoff testifies that "Leu discloses that the disclosed prepaid cards use the same technology as 'credit cards,' which are disclosed in both the '039 Patent and Sanford." Ex. 1006 ¶ 249 (citing Ex. 1009, 2:14–29; Ex. 1001, 1:14–16; Ex. 1004, Title). Mr. Lipoff testifies further, that a person of ordinary skill in the art

implementing the Sanford-Hsu (or Sanford-Hsu-Tsukamura) system would have been motivated to perform a preliminary check to determine whether the card being read is a "valid" credit card (*e.g.*, can be interpreted by the card reader and is suitable for cash withdrawal) because, if the system cannot interpret the card or the card is not suitable for cash withdrawal, the system would never dispense money for a card user.

*Id.* ¶ 430.

Patent Owner does not provide separate, substantive arguments with respect to claim 5 or the motivation and reasons to combine Leu with Sanford and Hsu.

In this proceeding, for claim 5, Petitioner's arguments and Mr. Lipoff's testimony are unrebutted. We have considered, and on the complete record before us, accept as our own, Petitioner's arguments and evidence set forth at pages 80–87 of the Petition as to claim 5. Accordingly, we determine that Petitioner has shown by a preponderance of the evidence that claim 5 would have been obvious over Sanford, Hsu, and Leu.

### G. Ground 5: Claim 12 – Obviousness over Sanford, Hsu and Houvener (Ex. 1009)

Dependent claim 12 recites:

A method according to claim 3, comprising the further steps of:

(f) storing the card information provided by successive instances of the step (a); and

(g) outputting the information stored in the step (f) for audit purposes.

Ex. 1001, 13:61–66. Petitioner argues that "Houvener discloses 'stor[ing] the users PIN and the data from the specific transaction as a transaction record.'" Pet. 88 (quoting Ex. 1010, 7:58–60). Petitioner argues that Houvener discloses an audit process where it is described that "if there is

ever a question as to the voracity of the identification process, the system can recreate a transaction and identify not only the person initiating the transaction but the clerk who was responsible." *Id.* (quoting Ex. 1010, 7:60–65). Mr. Lipoff testifies that a person of ordinary skill in the art would have "understood that the stored transaction records in Houvener need to include sufficient information to allow the system to 'recreate a transaction' and 'identify. . . the person initiating the transaction.'" Ex. 1006 ¶ 438. Mr. Lipoff testifies that a person of ordinary skill in the art "who looked to further improve the Sanford-Hsu system would have understood that additional fraudulent actions may be uncovered when considering a series of transactions and therefore look for teachings like Houvener." *Id.* ¶ 441. Including Houvener's specific transaction data storage and auditing capabilities would be considered, according to Mr. Lipoff, because a person of ordinary skill in the art "would have understood that Sanford discloses the well-known practices of logging card user activities, including card information and biometric information, for auditing purposes" to reduce credit card fraud. *Id.* ¶ 442 (citing Ex. 1004 ¶ 43).

Patent Owner does not provide separate, substantive arguments with respect to claim 12 or the motivation and reasons to combine Houvener with Sanford and Hsu.

In this proceeding, for claim 12, Petitioner's arguments and Mr. Lipoff's testimony are unrebutted. We have considered, and on the complete record before us, accept as our own, Petitioner's arguments and evidence set forth at pages 87–91 of the Petition as to claim 12. Accordingly, we determine that Petitioner has shown by a preponderance of the evidence that claim 12 would have been obvious over Sanford, Hsu, and Houvener.

H.    *Ground 7: Claim 17 – Obviousness over Sanford, Hsu, and McCalley (Ex. 1010)*

Dependent claim 17 recites:

> A verification station according to claim 15, wherein the memory is incorporated in a tamper-proof manner in the verification station.

Ex. 1001, 14:61–63.  Providing an annotated version of McCalley's Figure 22, reproduced below, Petitioner argues that "McCalley's 'overall package may include a tamper resistant housing 191 [yellow] as would be readily understood by those skilled in the art." Pet. 92 (quoting Ex. 1011, 10:49–59).



*FIG. 22*

McCalley's Figure 22 as annotated by Petitioner (Pet. 92) illustrates in partial cross-section tamper resistant housing 191 encompassing fingerprint sensor 30, memory 198, processor 192, and encrypted output 194.  Ex. 1011, 10:45–54.  Petitioner argues that "The '039 Patent, McCalley, Sanford, Hsu and Tsukamura are analogous art and are in the same field of endeavor, *i.e.,* access control using biometric technology.  All references (and the '039 Patent) aim to provide more secured access." Pet. 93.  Mr. Lipoff testifies that "[e]specially in the context of an ATM, as disclosed by Sanford, it was well-known that tamper-proof configuration was beneficial to prevent fraud."  Ex. 1006 ¶ 454.  Mr. Lipoff testifies further that a person of ordinary

skill in the art "would have therefore looked to McCalley for details on how to make the system tamper-proof, such as having a tamper-proof housing." *Id.* Mr. Lipoff explains that "having a tamper-proof housing and making memories self-destructible, [were] methods commonly in use at the time of the '039 Patent." *Id.* ¶ 455.

Patent Owner does not provide separate, substantive arguments with respect to claim 17 or the motivation and reasons to combine McCalley with Sanford and Hsu.

In this proceeding, for claim 17, Petitioner's arguments and Mr. Lipoff's testimony are unrebutted. We have considered, and on the complete record before us, accept as our own, Petitioner's arguments and evidence set forth at pages 91–94 of the Petition as to claim 17. Accordingly, we determine that Petitioner has shown by a preponderance of the evidence that claim 17 would have been obvious over Sanford, Hsu, and McCalley.

I.    *Grounds 4, 6, and 8: Claims 5, 12, and 17 – Obviousness over Sanford, Hsu, Tsukamura, and one of Leu, Houvener, and McCalley*

Because we determine that claims 5, 12, and 17 would have been obvious over Sanford, Hsu, and one of Leu, Houvener or McCalley, we need not address these same claims are obvious over Sanford, Hsu, Tsukamura and one of Leu, Houvener or McCalley.

J.    *Patent Owner's Continued 315(b) Arguments*

In its Response, Patent Owner reiterates its 315(b) argument that we previously addressed in our Institution Decision. PO Resp. 25–32; Inst. Dec. 10–35. Now, Patent Owner argues that in our prior decision we placed too much weight on a lack of control of the proceedings by Apple, and that

"[r]ather, a key to the RPI analysis is whether Apple and Petitioners have a structured, preexisting business relationship and whether Apple would receive more than a merely generalized benefit if trial is instituted." PO Resp. 29–30 (citing *Applications in Internet Time, LLC v. RPX Corp.*, 897 F.3d 1336, 1351 (Fed. Cir. 2018)) ("*AIT*").

As an initial matter, we think that Patent Owner's argument mischaracterizes, or at least oversimplifies, the holding in *AIT*. In *AIT*, the Federal Circuit admonished the Board for (1), making "certain factual findings that are not supported by substantial evidence," and (2) "fail[ing] to adhere to the expansive formulation of 'real party in interest' that is dictated by the language, structure, purpose, and legislative history of § 315(b)." *AIT*, 897 F.3d at 1351. The Federal Circuit explained in *AIT* that the Board failed to appreciate, among other things, the specific nature of the relationship between RPX and Salesforce, "that RPX, . . . is a for-profit company whose clients pay for its portfolio of 'patent risk solutions.'" *Id.* The Court stated that "the Board did not consider these facts, which, taken together, imply that RPX can and does file IPRs to serve its clients' financial interests, and that a key reason clients pay RPX is to benefit from this practice in the event they are sued by an NPE." *Id.* at 1352. As discussed below, we have not overlooked the facts and evidence surrounding the parties' relationship nor failed to consider the parties' litigation efforts in the district courts. To the extent Patent Owner has raised valid arguments that may have not been clearly addressed by the Board, we provide the following additional analysis.

With respect to point (1), it is important, factually, that the developer-distributor business relationship between Petitioner and Apple contrasts sharply with the specific intent of the NPE patent portfolio litigation

relationship between RPX and Salesforce. As we described in our Institution Decision, Petitioner's product "Yale Smart Locks," including "the Yale Assure Lock uses a software application ('App') on one's mobile phone, here on an iPhone sold by Apple, to lock and unlock doors. The App is developed by Petitioner, or one of its business partners, and distributed to iPhone users through the Apple App store." Inst. Dec. 16. The Developer Agreement (the "Agreement") between Petitioner and Apple mainly provides "a limited license" to use Apple software "to develop and test" the developer's software applications for integration on Apple's iOS platforms. Ex. 2009. Importantly, different from *AIT*, in this case we have before us no facts or evidence showing that the intent, express or otherwise, of the Agreement between Petitioner and Apple is *fundamentally* based on protecting one party or the other from patent litigation.[15] To the extent Patent Owner now argues that we did not appreciate all of its arguments and evidence as to the parties' underlying actions in related district court proceedings, we address that matter in due course below. Before doing so, we turn to point (2), and whether, in this case, our Institution Decision appropriately considered the "expansive formulation of 'real party in interest.'" *See AIT*, 897 F.3d at 1351.

In *AIT*, the Federal Circuit explained that the "Board's determination that Salesforce was not a real party in interest under § 315(b) relied on an impermissibly narrow understanding of the common-law meaning of the

---

[15] We acknowledge that the Agreement contains representations and warranties of noninfringement, as well as indemnification clauses. Ex. 2009, 16, 41–43. We consider that these clauses are perhaps best understood, at least from Apple's perspective as a distributor, as mechanisms to avoid liability should the need arise, rather than tools exerting control or perpetuating an agency relationship with Petitioner.

term." *Id.* at 1357. For one thing, the Court pointed out that "an agent with an ownership interest in the subject matter of the suit, or one who is the trustee of an express trust or a party in whose name a contract has been made for the benefit of another, may qualify as a real party in interest." *Id.* In this proceeding, Patent Owner has failed to point to any persuasive evidence, apart from software compatibility with Apple's iOS platforms as discussed in the Agreement, that Apple has any overt interest, influence, development or design influence over Petitioner's "Yale Smart Locks" products or App. In addition, Patent Owner has produced no evidence that Apple holds any ownership interest, assets, or expressly administers any property rights as a trustee or agent for the benefit of Petitioner indicative of real party in interest relationships under common law.

Essentially the entirety of the evidence of the business relationship in this proceeding is contained within the Agreement, which we already discussed in detail in our Institution Decision. Inst. Dec, 10–35. For example, there is an indemnification clause that requires Petitioner to

> [u]pon Apple's request, defend, Apple, its directors, officers, employees, independent contractors and agents (each an "Apple Indemnified Party") from any and all claims, losses, liabilities, damages, taxes, expenses and costs, including without limitation, attorneys' fees and court costs (collectively, "Losses"), incurred by an Apple Indemnified Party and arising from or related to . . . any claims that Your Covered Product or the distribution, sale, offer for sale, use or importation of Your Covered Product (whether alone or as an essential part of a combination), Licensed Application Information, metadata, or Pass Information violate or infringe any third party intellectual property or proprietary rights;

*Id.* at 43. There is no evidence in this case that Apple has invoked its rights under this clause, nor has Patent Owner argued or explained how this clause

or the parties' actions before the Board and in the underlying district court litigation implicate a common law agency relationship between the parties. An agency relationship could potentially occur if Apple were to request Petitioner to step in and defend it. Yet Patent Owner has provided no argument or persuasive evidence that such is the case here. Apple has, in fact, committed to its own defense by filing its own IPR, e.g., IPR2022-00600, against Patent Owner. Moreover, compelling evidence provided by Petitioner in this case is exactly the opposite, as Petitioner avers under penalty of perjury in interrogatory responses that "[t]here have been no communications between Petitioners and Apple, directly or through counsel, relating to indemnification or obligation to indemnify based on assertion of . . . U.S. Patent No. 8,620,039) (*id.* at 11–12)." Ex. 1023, 8–9, 14.

We recognize that Apple may derive some benefit if additional claims of the '039 patent are determined to be unpatentable in this proceeding. This derived benefit does not, however, make Apple an RPI to this proceeding. *See WesternGeco LLC v. ION Geophysical Corp.*, 889 F.3d 1308, 1321 (Fed. Cir. 2018) (stating in the context of the broader concept of privity that "[a]s a general proposition, we agree with the Board that a common desire among multiple parties to see a patent invalidated, without more, does not establish privity").

On the facts and evidence before us in this proceeding, it is the Agreement, analyzed here and in our Institution Decision that best explains the business relationship between the parties. The Agreement sets forth with reasonable clarity the specific expectations of the parties; mainly that (a) Petitioner is allowed "a limited license to use the Apple Software and Services provided to You under this Program to develop and test Your Applications on the terms and conditions set forth in this Agreement," and

(b) "Applications that meet Apple's Documentation and Program Requirements may be submitted for consideration by Apple for distribution via the App Store, Custom App Distribution, or for beta testing through TestFlight." Ex. 2009, 1. Accordingly, the evidence leads us to conclude that Apple is a distributor of Petitioner's App for use with Petitioner's "Yale Smart Lock" products, and without more, that is about all that can be said about the relationship.

We turn, below, to particular facts in this case that Patent Owner argues the Board overlooked in our Institution Decision.

During oral argument Patent Owner's counsel raised a specific issue concerning our earlier conclusion in our Institution Decision that Apple is *not* a real party in interest to this proceeding or a privy with Petitioner. Inst. Dec. 28; Tr. 45–46. Counsel contends "there is an inconsistency between [Petitioner's], you know, assertions regarding Apple in the [Declaratory Judgment] complaint. And then in defending the RPI position." Tr. 45:20–23. Specifically, counsel explained that they "didn't see that the Board specifically considered our argument that it's relevant that ASSA ABLOY filed the DJ complaint with respect to the 039 patent, even though the 039 patent had never been raised by Patent Owner to ASSA ABLOY." *Id.* at 46:3–6. Counsel further argued that the present "situation mirror[s] the situation in the *Worlds v. Bungie* case, where a very similar fact pattern was considered relevant by the [F]ederal [C]ircuit." *Id.* at 46:7–9; *see also Worlds Inc. v. Bungie, Inc.*, 903 F.3d 1237, 1239 (Fed. Cir. 2018) ("*Bungie*") (determining that because "the Board erred in its real-party-in-interest analysis, we vacate its decisions and remand for proceedings consistent with this opinion").

Our analysis of Patent Owner's section 315(b) time bar arguments in our Institution Decision covers over 20 pages and considers in detail evidence submitted by both parties regarding business relationships and the Apple Developer License Agreement, i.e., the "Agreement," (Ex. 2009) including warranties, indemnification, product inspection and insurance, between Petitioner and Apple. Inst. Dec. 10–35. For example, as it relates to Patent Owner's issue raised here, we noted that "[i]n the Declaratory Judgment complaint, Petitioner states, '[CPC] is also engaged in an aggressive litigation campaign that includes Apple Inc. ('Apple'), *a business partner* of [Petitioner]." *Id.* at 15. We explained that

> [t]he business relationship between Apple and Petitioner is that Petitioner, or one of the named entities collectively referred to as Petitioner, makes products that interface with Apple products and may be sold on Apple's website. For example, ASSA ABLOY Residential Group, Inc., a named entity included as a Petitioner in this proceeding, makes and sells security locks under the brand name "Yale" . . . the Yale Assure Lock uses a software application ("App") on one's mobile phone, here on an iPhone sold by Apple, to lock and unlock doors. The App is developed by Petitioner, or one of its business partners, and distributed to iPhone users through the Apple App store.

*Id.* at 15–16. Thus, in our Institution Decision we did consider the fact that Petitioner, in its Declaratory Judgment Complaint, admitted to being a business partner with Apple. We also considered the fact that, as part of the business relationship, Petitioner entered into the Agreement. *Id.* at 16. We considered critical clauses in the Agreement, such as the representations and warranties clause explaining that "[w]e do *not* consider Section 3.2(d) to be a 'warranty.' It is not a guarantee that products will not infringe. It is a representation of the developer's current 'knowledge and belief.' It is far

different from the obligations created by the App developer's agreement in *Bungie*." *Id.* at 20.

As discussed above, we determined that the Agreement did in fact contain an indemnification clause, which *could* be implemented "upon Apple's request." *Id.* at 23–26. However, also different from the facts in *Bungie*, in this case we have sworn interrogatories provided by Petitioner presenting strong evidence that "[t]here have been no communications between Petitioners and Apple, directly or through counsel, relating to indemnification or obligation to indemnify based on assertion of . . . U.S. Patent No. 8,620,039." *Id.* at 26 (quoting Ex. 1023, 11–12).

Patent Owner now urges us to also consider the fact that its cease-and-desist letters to Petitioner, i.e., the "Yale Letters" (Exs. 2005, 2006), never threatened Petitioner with infringement of the '039 patent, only U.S. Patent Nos. 9,665,705 and 9,269,208. *See* Prelim. Resp. 7 (Patent Owner arguing that it "never raised or otherwise mentioned the '039 Patent to Yale or any of the Petitioners at any time.") (citing Ex. 2008). This is a concern, Patent Owner contends, because Petitioner filed its Declaratory Judgment Complaint admitting to a business relationship with Apple as well as this IPR, and both proceedings challenge the '039 patent. *See* Ex. 2007 ¶ 2 (Petitioner stating in its Declaratory Judgment Complaint that "[t]he ASSA ABLOY Entities seek a declaration of non-infringement of U.S. Patent Nos. 9,269,208 ("the '208 Patent"), 9,665,705 ("the '705 Patent"), and 8,620,039 ("the '039 Patent") (collectively, the "Patents-in-Suit")").

This argument is frankly somewhat undeveloped in Patent Owner's explanations of the facts and background in its Preliminary Response. Prelim. Resp. 5–10. We acknowledge that Petitioner was apparently never overtly threatened with infringement of the '039 patent. Ex 2005; Ex. 2006.

Yet Patent Owner fails to persuasively explain *why* Petitioner's challenges to the '039 patent in the Declaratory Judgment Complaint weigh in favor of finding privy or a real party in interest relationship between Petitioner and Apple. *See* Prelim. Resp. 7 (Patent Owner arguing largely that "Patent Owner never raised or otherwise mentioned the '039 Patent to Yale or any of the Petitioners at any time."). As we understand the argument, Patent Owner alleges that because it never threatened Petitioner with the '039 patent, Petitioner is now, without provocation, doing Apple's bidding and working at Apple's behest by challenging the '039 patent in the Declaratory Judgment Complaint and in these *inter partes* review proceedings. It is also not clearly explained why the inclusion of Petitioner's related entities of ASSA ABLOY Global Solutions, Inc. ('Hospitality'), and HID Global Corporation, in these IPR proceedings as real parties in interest and also in the Declaratory Judgment Complaint, matters as to the relationship between Petitioner and Apple. *See* Prelim. Resp. 8 (arguing that "Petitioners also filed the Declaratory Judgment Complaint as to HID and Hospitality, whom Patent Owner had never contacted regarding the patents or technology at issue") (citing Ex. 2005; Ex. 2006; Ex. 2008).

Two things can be true, Petitioner can have a business relationship with Apple and both parties can have a legitimate interest in defending themselves separately in litigation. We do not find anything in Petitioner's Declaratory Judgment Complaint that alters our prior decision in this regard. The fact that Petitioner and each of its entities were not explicitly threatened with infringement allegations in the Yale Letters as to the '039 patent does not mean that Patent Owner would never assert infringement against Petitioner based on the '039 patent claims. Ex. 2005; Ex. 2006. This is especially true in light of the fact that Patent Owner asserted the '039 patent

against Apple in *CPC Patent Technologies Pty Ltd v. Apple Inc.*, No. 3:22-cv-02553, apparently due to or resulting from the products that Petitioner makes, uses, and sells through Apple's electronic device platforms. Ex. 2007 ¶ 44 ("On February 23, 2021, [Patent Owner] asserted all three of the Patents-in-Suit against Apple.").

On the facts here, we conclude that filing a declaratory judgment action or an *inter partes* review to challenge the claims of a patent, i.e., the '039 patent, that was asserted against a third party based on products made by Petitioner, is a reasonable litigation strategy for Petitioner independently. The declaratory judgment action filing itself does not demonstrate some sort of heightened collusion even where a benefit inures to a party with whom Petitioner has a business relationship. Patent Owner has not explained, for instance, that but for Apple's technology or actions, Petitioner has no actionable reason to challenge the patentability of the '039 patent claims. *See, generally*, Prelim. Resp. Also, by way of example, Patent Owner argues in its Preliminary Response that in the Declaratory Judgment Complaint, "Petitioners further asserted that 'it is highly likely that Charter Pacific will sue the Assa Abloy Entities *on the same patents that have been asserted against Apple*." Prelim. Resp. 22 (quoting Ex. 2007 ¶ 30). In our view, this assertion is primarily offered in the Complaint to show Petitioner's apprehension of litigation because it admittedly makes, uses, and sells products potentially covered by the claims in the same three patents through Apple's platforms. Patent Owner does not explain persuasively why Petitioner would not have been concerned about infringing the '039 patent, nor why such apprehension shows any more intimate relationship than we considered in our Institution Decision. The mere fact that an accused infringer, in this case Petitioner, files a declaratory judgment action

explaining its business relationship with Apple and offering reasons supporting the declaratory judgment action with respect to the same three patents that Apple is accused of infringing, does not, without more, establish persuasive additional information or substantive facts that we failed to consider in our original analysis.

Overall, and on the complete record before us, we do not find that any of Petitioner's assertions in its Declaratory Judgment Complaint change our underlying conclusion that Petitioner and Apple are not in privy or real parties in interest. *See* Inst. Dec. 34 (determining that "[t]he totality of the evidence before us does not establish anything other than a traditional business relationship between Apple and Petitioner.").

### III. CONCLUSION[16]

For the reasons discussed above, we determine Petitioner meets its burden of establishing, by a preponderance of the evidence, that the challenged claims are unpatentable, as summarized in the following table:

| Claim(s) | 35 U.S.C. § | Reference(s)/ Basis | Claim(s) Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 3, 4, 6–11, 15, 16, 18 | 103(a) | Sanford, Hsu | 3, 4, 6–11, 15, 16, 18 | |

---

[16] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

| Claim(s) | 35 U.S.C. § | Reference(s)/ Basis | Claim(s) Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 3, 4, 6–11, 15, 16, 18 | 103(a) | Sanford, Hsu Tsukamura[17] | | |
| 5 | 103(a) | Sanford, Hsu, Leu | 5 | |
| 5 | 103(a) | Sanford, Hsu, Leu, Tsukamura[18] | | |
| 12 | 103(a) | Sanford, Hsu, Houvener | 12 | |
| 12 | 103(a) | Sanford, Hsu, Tsukamura, Houvener[19] | | |
| 17 | 103(a) | Sanford, Hsu, McCalley | 17 | |

[17] Because Petitioner's contentions regarding the obviousness of claims 3, 4, 6–11, 15, 16, and 18 in view of Sanford and Hsu are dispositive of these challenged claims, we do not reach asserted ground 2. *See In re Gleave*, 560 F.3d 1331, 1338 (Fed. Cir. 2009).

[18] Because Petitioner's contentions regarding the obviousness of claim 5 in view of Sanford, Hsu and Leu are dispositive of these challenged claims, we do not reach asserted ground 4. *See In re Gleave*, 560 F.3d. at 1338.

[19] Because Petitioner's contentions regarding the obviousness of claim 12 in view of Sanford, Hsu and Houvener are dispositive of these challenged claims, we do not reach asserted ground 6. *See In re Gleave*, 560 F.3d. at 1338.

| Claim(s) | 35 U.S.C. § | Reference(s)/ Basis | Claim(s) Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 17 | 103(a) | Sanford, Hsu, Tsukamura, McCalley[20] | | |

III. ORDER

For the reasons given, it is

ORDERED that, based on a preponderance of the evidence, claims 1, 2, 13, 14, 19, and 20 of the '039 patent have been shown to be unpatentable; and

FURTHER ORDERED that, because this is a Final Written Decision, any party to the proceeding seeking judicial review of this Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

---

[20] Because Petitioner's contentions regarding the obviousness of claim 17 in view of Sanford, Hsu and McCalley are dispositive of these challenged claims, we do not reach asserted ground 8. *See In re Gleave*, 560 F.3d. at 1338.

For PETITIONER:

Dion Bregman
Andrew Devkar
James Kritsas
MORGAN, LEWIS & BOCKIUS LLP
dion.bregman@morganlewis.com
andrew.devkar@morganlewis.com
james.kritsas@morganlewis.com

PATENT OWNER:

Andrew Ryan
CANTOR COLBURN LLP
aryan@cantorcolburn.com

US008620039B2

(12) **United States Patent**　　(10) **Patent No.:**　**US 8,620,039 B2**

Burke　　(45) **Date of Patent:**　**Dec. 31, 2013**

(54) **CARD DEVICE SECURITY USING BIOMETRICS**

(75) Inventor: **Christopher John Burke**, Ramsgate (AU)

(73) Assignee: **Securicom (NSW) Pty Ltd**, New South Wales (AU)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 912 days.

(21) Appl. No.: **12/063,650**

(22) PCT Filed: **Aug. 10, 2006**

(86) PCT No.: **PCT/AU2006/001136**
§ 371 (c)(1),
(2), (4) Date: **Aug. 12, 2010**

(87) PCT Pub. No.: **WO2007/019605**
PCT Pub. Date: **Feb. 22, 2007**

(65) **Prior Publication Data**
US 2010/0296708 A1　Nov. 25, 2010

(30) **Foreign Application Priority Data**

Aug. 12, 2005　(AU) ................................ 2005904375

(51) **Int. Cl.**
*G06K 9/00*　(2006.01)
(52) **U.S. Cl.**
USPC ........................................ **382/119**; 340/5.82
(58) **Field of Classification Search**
USPC ................... 382/115, 119, 155, 159; 356/71; 350/5.2, 5.52, 5.53, 5.8, 5.81, 5.82, 350/5.83; 235/380, 382; 340/5.2, 5.52, 340/5.53, 5.8, 5.81, 5.82, 5.83
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,457,747 | A | 10/1995 | Drexler et al. .................. 380/24 |
| 6,665,601 | B1 | 12/2003 | Nielsen ............................ 701/50 |
| 6,796,492 | B1 | 9/2004 | Gatto ............................ 235/379 |
| 2004/0041690 | A1 | 3/2004 | Yamagishi ........................ 340/5 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CA | 2 412 403 A1 | 5/2003 |
| WO | WO 03/036861 A1 | 5/2003 |
| WO | WO 2004/100053 A1 | 11/2004 |

OTHER PUBLICATIONS

International Search Report dated Oct. 20, 2006.
International Preliminary Report on Patentability dated Nov. 19, 2007.
Supplementary European Search Report dated Aug. 29, 2011 for EPO Application No. EP 06760981.8.

*Primary Examiner* — Andrew W Johns
(74) *Attorney, Agent, or Firm* — Brinks Gilson & Lione

(57)　　**ABSTRACT**

The disclosed Biometric Card Pointer arrangements store (**207**) a card user's biometric signature in a local memory (**124**) in a verification station (**127**) the first time the card user uses the verification station (**127**) in question. The biometric signature is stored at a memory address (**607**) defined by the card information (**605**) on the user's card (**601**). All future uses of the particular verification station (**127**) by someone submitting the aforementioned card (**601**) requires the card user to submit both the card and a biometric signature, which is verified against the signature stored at the memory address defined by the card information (**605**) thereby determining if the person submitting the card is authorized to do so.

**20 Claims, 7 Drawing Sheets**



**ASSA ABLOY Ex. 1001 - Page 265**
**ASSA ABLOY AB v. CPC Patent Technologies Pty Ltd.**
**IPR2022-01094 - U.S. Patent No. 8,620,039**



700
prior art

701 swipe card

***703*** signature used by person
at point of transaction



702
card information detected
by card reader device

**Fig. 1**
prior art

ASSA ABLOY Ex. 1001 - Page 266
ASSA ABLOY AB v. CPC Patent Technologies Pty Ltd.
IPR2022-01094 - U.S. Patent No. 8,620,039



**Fig. 2**
**prior art**

ASSA ABLOY Ex. 1001 - Page 267
ASSA ABLOY AB v. CPC Patent Technologies Pty Ltd.
IPR2022-01094 - U.S. Patent No. 8,620,039



**Fig. 3**

ASSA ABLOY Ex. 1001 - Page 268
ASSA ABLOY AB v. CPC Patent Technologies Pty Ltd.
IPR2022-01094 - U.S. Patent No. 8,620,039



600
biometric card
pointer concept

601 swipe or smart card

605 card information

602
card
type

603
card
range

604
card data -
points to
address of
biometric
signature

606
header - used
to determine
permitted
card set

608

124
local
database

607
memory address
defined by card
data

**Fig. 4**

Appx0269

ASSA ABLOY Ex. 1001 - Page 269
ASSA ABLOY AB v. CPC Patent Technologies Pty Ltd.
IPR2022-01094 - U.S. Patent No. 8,620,039



200
biometric
card
pointer
used for
3rd party
reader
application

**Fig. 5**

ASSA ABLOY Ex. 1001 - Page 270
ASSA ABLOY AB v. CPC Patent Technologies Pty Ltd.
IPR2022-01094 - U.S. Patent No. 8,620,039



from 204 Fig. 5

205
verification
process

Authorise
transaction — 301

Perform transaction
process — *302*

to 201 Fig. 5

## Fig. 6



from 206 Fig. 5

207
enrolment
process

store received
signature at memory
(card data) — 401

authorise
transaction — 402

perform transaction
process — *403*

to 201 Fig. 5

## Fig. 7

ASSA ABLOY Ex. 1001 - Page 271
ASSA ABLOY AB v. CPC Patent Technologies Pty Ltd.
IPR2022-01094 - U.S. Patent No. 8,620,039



Fig. 8



Fig. 9

ASSA ABLOY Ex. 1001 - Page 272
ASSA ABLOY AB v. CPC Patent Technologies Pty Ltd.
IPR2022-01094 - U.S. Patent No. 8,620,039

US 8,620,039 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

## CARD DEVICE SECURITY USING BIOMETRICS

This application is the National Stage of International Application No. PCT/AU2006/001136, filed Aug. 10, 2006, which claims the benefit of priority to Australian Patent Application No. 2005904375, filed on Aug. 12, 2005. All of the foregoing applications are hereby incorporated herein in their entirety in this application.

### FIELD OF THE INVENTION

The present invention relates generally to security issues and, in particular, to security issues associated with use of card devices such as credit cards, smart cards, and wireless card-equivalents such as wireless transmitting fobs.

### BACKGROUND

This description makes reference to various types of "card device" and their associated "reader devices" (respectively referred to merely as cards and readers). The card devices all contain card information that is accessed by "coupling" the card device to an associated reader device. The card information is used for various secure access purposes including drawing cash from an Automatic Teller Machine (ATM), making a purchase on credit, updating a loyalty point account and so on. The card information is typically accessed from the card by a corresponding card reader which then sends the card information to a "back-end" system that completes the appropriate transaction or process.

One type of card is the "standard credit card" which in this description refers to a traditional plastic card **701** as depicted in FIG. **1**. The standard credit card is typically "swiped" through a slot in a standard credit card reader in order to access card information **702** on the card **701**. The card information **702** can alternately be encoded using an optical code such as a bar code, in which case the reader is suitably adapted. The standard credit card **701** also typically has the signature **703** of the card-owner written onto a paper strip on the card **701**. This is used for verification of the identity of the person submitting the card when conducting a transaction using the card **701**.

Another type of card device is the smart card (not shown) that typically has an on-board processor and a memory. The smart card typically has electrical contacts that mate with corresponding contacts on a smart card reader (not shown) when accessing data in the memory of the smart card.

Another type of card device is the wireless "key-fob" which is a small radio transmitter that emits a radio frequency (RF) signal when a button on the fob is pressed. The RF signal can be encoded using the Wiegand protocol, or any other suitable protocol, such as rolling code or Bluetooth™ and can include encryption if desired. The key-fob typically has a processor and memory storing data that is sent via the transmitted signal to a corresponding receiver, which is the "reader device" for this type of card device.

The description also refers to "card user" and "card owner". The card user is the person who submits the card for a particular transaction. The card user can thus be the (authorised) card owner or an (unauthorised) person who has found or stolen the card.

Clearly the signature **703** on the standard credit card **701** in FIG. **1** can be forged. Thus, if the standard card **701** is stolen or lost, an unauthorised user can use the card provided that they can supply a sufficiently accurate version of the signature

**703**. The only recourse available to the card owner is to notify the card issuing company to "cancel" the card.

Current card devices such as the standard credit card, the smart card and the key-fob can have their security enhanced by requiring the card user to provide PIN (Personal Identification Number) information through a keypad to verify their identity prior to completing a transaction. However, PIN information can also be "stolen" by surveillance of the card owner's hands as the card owner operates the keypad.

Biometric verification can also be incorporated into current card systems to enhance security. In FIG. **2** the card user swipes the standard card **701** through an associated card reader (not shown) that accesses the card information **702** on the card **701**. The card user also provides a biometric input **801**, for example by pressing their thumb against a biometric (eg fingerprint) reader **802**. The card information **702** that is read by the card reader (not shown), together with the biometric signature that is read by the biometric (fingerprint) reader **802**, are sent, as depicted by a dashed arrow **803**, a computer network **804**, and a further dashed arrow **805**, to a back-end system including a database **806** and associated processor (not shown).

In this arrangement, the card owner needs to have previously registered their biometric signature **801** and the card information **702** for pre-loading onto the back-end database **806**. Having done so, the back-end processor (not shown) compares the pre-loaded information on the database **806** with the information received at **805**, in order to check that the card holder of the card **701** is the (authorised) card owner and that the card itself is valid, in which case the transaction in question can proceed. Clearly this arrangement requires a central repository (**806**) of card information **702** and biometric information **801**. This is cumbersome and potentially compromises the privacy of the holder of the card **701**. This arrangement also requires complex back-end database management and the communications network **804**. Furthermore, the front-end biometric signature reader **802** requires storage and/or processing capabilities for the biometric signatures. This results in a complex and expensive solution.

Privacy concerns have also been raised against the arrangement of FIG. **2** which involves centralised storage and processing of personal information including biometric information. These concerns have slowed widespread use of biometrics to enhance user verification.

### SUMMARY

It is an object of the present invention to substantially overcome, or at least ameliorate, one or more disadvantages of existing arrangements.

Disclosed are arrangements, referred to as Biometric Card Pointer (BCP) arrangements or systems, which seek to address the above problems relating to secure access and/or secure processes, by automatically storing a card user's biometric signature in a local memory in a verification station comprising a card reader, a biometric signature reader, the local biometric signature memory (preferably in a mechanically and electronically tamper-proof form), an alphanumeric keypad (optional), and a communication module for communicating with back-end system that may be remotely accessible over a network.

The card user's biometric signature is automatically stored the first time the card user uses the verification station in question (this being referred to as the enrolment phase). The biometric signature is stored at a memory address defined by the ("unique") card information on the user's card as read by the card reader of the verification station. Clearly the term

Appx0273

ASSA ABLOY Ex. 1001 - Page 273
ASSA ABLOY AB v. CPC Patent Technologies Pty Ltd.
IPR2022-01094 - U.S. Patent No. 8,620,039

US 8,620,039 B2

3

"unique" means unique in the context of a permitted set of cards associated with the verification station. This is described in more detail in regard to FIG. **8**.

All future uses (referred to as uses in the verification phase) of the particular verification station by someone submitting the aforementioned card requires the card user to submit both the card to the card reader and a biometric signature to the biometric reader, which is verified against the signature stored at the memory address defined by the card information thereby determining if the person submitting the card is authorised to do so.

Each use of the verification station is identical from the card user's perspective, requiring merely input of the card to the card reader, and provision of the biometric signature (eg thumb print or retinal scan etc.) to the biometric reader.

An authorised card user will be automatically verified by the BCP arrangement in the verification station, and the corresponding transaction, be it an ATM cash withdrawal, a credit purchase, a loyalty point update etc. will simply proceed as normal. An unauthorised card user (ie a card user who misappropriated the card after the initial enrolment) will not receive authorisation, and the intended transaction will not proceed. Furthermore, the biometric signature of the unauthorised user will be captured in the verification station, and can be used by the authorities to track the unauthorised user and prove misappropriation of the card.

The disclosed BCP arrangements require little if any modification of the back-end systems or the (front-end) card. The additional administrative overheads associated with the BCP arrangements, above those already required for systems using (standard) cards and back-end systems, are minimal. The BCP arrangements also potentially have a reduced impact on privacy of card users. The biometric signatures stored in the local database of the verification station can be made off limits to anyone, or limited to law enforcement agencies, depending on the administrative environment in which the BCP arrangements are implemented. Users of current card systems can learn to use BCP arrangements without much effort, needing only to provide a biometric signature when asked to do so at the verification station. The difference between the enrolment and verification phases are transparent to users, further reducing the effort in learning how to use the BCP arrangements.

According to a first aspect of the present invention, there is provided a method of enrolling in a biometric card pointer system, the method comprising the steps of:

receiving card information;

receiving the biometric signature; and

storing, if a memory location defined by the card information is unoccupied, the biometric signature at the defined memory location.

According to another aspect of the present invention, there is provided a method of obtaining verified access to a process, the method comprising the steps of:

storing a biometric signature according to the noted enrolment method;

subsequently presenting card information and a biometric signature; and

verifying the subsequently presented presentation of the card information and the biometric signature if the subsequently presented biometric signature matches the biometric signature at the memory location defined by the subsequently presented card information.

According to another aspect of the present invention, there is provided a method of securing a process at a verification station, the method comprising the steps of:

4

(a) providing card information from a card device to a card reader in the verification station;

(b) inputting a biometric signature of a user of the card device to a biometric reader in the verification station;

(c) determining if the provided card information has been previously provided to the verification station;

(d) if the provided card information has not been previously provided to the verification station;

(da) storing the inputted biometric signature in a memory at a memory location defined by the provided card information; and

(db) performing the process dependent upon the received card information;

(e) if the provided card information has been previously provided to the verification station;

(ea) comparing the inputted biometric signature to the biometric signature stored in the memory at the memory location defined by the provided card information;

(eb) if the inputted biometric signature matches the stored biometric signature, performing the process dependent upon the received card information; and

(ec) if the inputted biometric signature does not match the stored biometric signature, not performing the process dependent upon the received card information.

According to another aspect of the present invention, there is provided a verification station for securing a process, the verification station comprising:

a card device reader for receiving card information from a card device coupled to the verification station;

a biometric signature reader for receiving a biometric signature provided to the verification station;

means for determining if the provided card information has been previously provided to the verification station;

means, if the provided card information has not been previously provided to the verification station, for;

storing the inputted biometric signature in a memory at a memory location defined by the provided card information; and

performing the process dependent upon the received card information;

means, if the provided card information has been previously provided to the verification station, for;

comparing the inputted biometric signature to the biometric signature stored in the memory at the memory location defined by the provided card information;

if the inputted biometric signature matches the stored biometric signature, performing the process dependent upon the received card information; and

if the inputted biometric signature does not match the stored biometric signature, not performing the process dependent upon the received card information.

According to another aspect of the present invention, there is provided a computer program product including a computer readable medium having recorded thereon a computer program for directing a processor to execute a method for securing a process at a verification station, said program comprising:

code for determining if card information, provided to a card device reader incorporated into the verification station, has been previously provided to the verification station;

code, if the provided card information has not been previously provided to the verification station, for;

storing a biometric signature, inputted to a biometric signature reader incorporated into the verification station, in a memory incorporated into the verification station, at a memory location defined by the provided card information; and

ASSA ABLOY Ex. 1001 - Page 274
ASSA ABLOY AB v. CPC Patent Technologies Pty Ltd.
IPR2022-01094 - U.S. Patent No. 8,620,039

US 8,620,039 B2

5

performing the process dependent upon the received card information;

code, if the provided card information has been previously provided to the verification station, for;

comparing the inputted biometric signature to the biometric signature stored in the memory at the memory location defined by the provided card information;

if the inputted biometric signature matches the stored biometric signature, performing the process dependent upon the received card information; and

if the inputted biometric signature does not match the stored biometric signature, not performing the process dependent upon the received card information.

According to another aspect of the present invention, there is provided a computer program product including a computer readable medium having recorded thereon a computer program for directing a processor to execute a method of enrolling in a biometric card pointer system, the program comprising:

code for receiving card information;

code for receiving the biometric signature; and

code for storing, if a memory location defined by the card information is unoccupied, the biometric signature at the defined memory location.

According to another aspect of the present invention, there is provided a computer program product including a computer readable medium having recorded thereon a computer program for directing a processor to execute a method of obtaining verified access to a process, the program comprising:

code for storing a biometric signature according to the noted enrolment method;

code for subsequently presenting card information and a biometric signature; and

code for verifying the subsequently presented presentation of the card information and the biometric signature if the subsequently presented biometric signature matches the biometric signature at the memory location defined by the subsequently presented card information.

Other aspects of the invention are also disclosed.

BRIEF DESCRIPTION OF THE DRAWINGS

Some aspects of the prior art and one or more embodiments of the present invention will now be described with reference to the drawings, in which:

FIG. 1 depicts a standard credit card;

FIG. 2 shows the card of FIG. 1 being used together with biometric verification;

FIG. 3 is a functional block diagram of a special-purpose computer system upon which described methods for the BCP arrangements can be practiced;

FIG. 4 illustrates the biometric card pointer concept;

FIG. 5 is a flow chart of a process for using the biometric card pointer arrangement;

FIG. 6 shows the verification process of FIG. 5 in more detail;

FIG. 7 shows the enrolment process of FIG. 5 in more detail;

FIG. 8 shows the card information process of FIG. 5 in more detail; and

FIG. 9 shows an alternate use for the biometric card pointer arrangement.

DETAILED DESCRIPTION INCLUDING BEST MODE

Where reference is made in any one or more of the accompanying drawings to steps and/or features, which have the

6

same reference numerals, those steps and/or features have for the purposes of this description the same function(s) or operation(s), unless the contrary intention appears.

FIG. 3 is a functional block diagram of a system 100 in which the disclosed BCP arrangements can be practiced. The disclosed BCP methods particularly lend themselves to implementation on the special-purpose computer system 100 such as that shown in FIG. 3 wherein the processes of FIGS. 5-8 and 9 may be implemented as software, such as a BCP application program executing within the computer system 100. In particular, the steps of the BCP processes are effected by instructions in the BCP software that are carried out by a verification station 127. The verification station 127 is typically constructed in a tamper-proof manner, both physically and electronically, to prevent unauthorised access to the inner mechanism of the verification station 127. The instructions may be formed as one or more code modules, each for performing one or more particular tasks. The BCP software may also be divided into two separate parts, in which a first part performs the BCP methods and a second part manages a user interface between the first part and the user.

The BCP software may be stored in a computer readable medium, including the storage devices described below, for example. The BCP software is loaded into the verification station 127 from the computer readable medium, and then executed by the verification station 127. A computer readable medium having such software or computer program recorded on it is a computer program product. The use of the computer program product in the computer preferably effects an advantageous apparatus for effecting the BCP arrangements.

The verification station 127 comprises, in the described arrangement, a biometric card pointer reader 125, a keypad 103, and a computer module 101. The biometric card pointer reader is made up of a biometric reader 102, a card device reader 112 and a local database 124.

The computer system 100 consists of a computer module 101, input devices such as a biometric reader 102, a card reader 112, and a keypad 103, output devices including an LCD (Liquid Crystal Display) display device 126 and a loudspeaker 117. The computer module 101 uses a Modulator-Demodulator (Modem) transceiver device 116 for communicating to and from a communications network 120, for example connectable via a telephone line 121 or other functional medium. The modem 116 can be used to obtain access to a back end system including a processor 122 and back-end database 123 over the Internet, and other network systems, such as a Local Area Network (LAN) or a Wide Area Network (WAN).

The computer module 101 typically includes at least one processor unit 105, and a memory unit 106, for example formed from semiconductor random access memory (RAM) and read only memory (ROM). The module 101 also includes a number of input/output (I/O) interfaces including an audio-video interface 107 that couples to the LCD display 126 and loudspeaker 117, an I/O interface 113 for the keypad 103, biometric reader 102 and card reader 112, and an interface 108 for the modem 116. In some implementations, the modem 1116 may be incorporated within the computer module 101, for example within the interface 108.

A storage device 109 is provided and typically includes a hard disk drive 110 and a flash memory 111. The components 105, to 111 and 113 of the computer module 101, typically communicate via an interconnected bus 104 and in a manner that results in a conventional mode of operation of the computer system 100 known to those in the relevant art.

Typically, the BCP application program is resident on the hard disk drive 110 and read and controlled in its execution by

ASSA ABLOY Ex. 1001 - Page 275
ASSA ABLOY AB v. CPC Patent Technologies Pty Ltd.
IPR2022-01094 - U.S. Patent No. 8,620,039

US 8,620,039 B2

7

the processor **105**. Intermediate storage of the program and any data fetched from the network **120** may be accomplished using the semiconductor memory **106**, possibly in concert with the hard disk drive **110**. In some instances, the BCP application program may be supplied to the user encoded on the flash memory device **111**, or alternatively may be read by the computer module **101** from the network **120** via the modem device **116**.

Still further, the software can also be loaded into the computer system **100** from other computer readable media. The term "computer readable medium" as used herein refers to any storage or transmission medium that participates in providing instructions and/or data to the computer system **100** for execution and/or processing. Examples of storage media include floppy disks, magnetic tape, CD-ROM, a hard disk drive, a ROM or integrated circuit, a magneto-optical disk, or a computer readable card such as a PCMCIA card and the like, whether or not such devices are internal or external of the computer module **101**. Examples of transmission media include radio or infra-red transmission channels as well as a network connection to another computer or networked device, and the Internet or Intranets including e-mail transmissions and information recorded on Websites and the like.

As illustrated in FIG. **4**, a standard card **601** has card information **605** typically comprising three fields, namely **602** which is the card type, **603** which is the card range, and **604** which comprises card data specific to the particular card **601**. The card information **605** can be encoded using a magnetic strip, a bar code, or a solid state memory on the card **601**. Alternately, the card device can be implemented as a wireless key fob. In one example of the disclosed BCP approach, the card data **604** acts as the memory reference which points, as depicted by an arrow **608**, to a particular memory location at an address **607** in the local database **124** in the verification station **127** of FIG. **3**. The fields **602** and **603**, which together form a header **606**, can be used by the disclosed BCP system to determine if the card **601** is to be processed according to the disclosed BCP approach or not. This is described in more detail in regard to FIG. **8**. Alternately, any segment of the card information **605** can be used as the memory reference which points to the particular memory location in the local database **124**.

In an initial enrolment phase, the card user couples their card **601** (or key-fob or other card device) to the card reader **112**. The card user is then required to input a biometric signature, such as fingerprint, face, iris, or other unique signature, into the biometric reader **102**. The card data **604** defines the location **607** in the memory **124** where their unique biometric signature is stored.

Thereafter, in later verification phases, the user couples their card **601** to the card reader **112**, after which the card user is required to again present their unique biometric to the biometric reader **102**. This signature is compared to the signature stored at the memory location **607** in the memory **124**, the memory location **607** being defined by the card data **604** read from their card **601** by the card reader **112**. Once verification is confirmed, the card information **605** is transferred from the verification station **127** to the back-end processor **122** for completion of the transaction.

Importantly, the back-end processor **122** does not see the difference between receiving the card information **605** from the verification station **127**, and receiving it from a conventional card reader in the absence of the verification station implementing the disclosed BCP arrangement. This means that back-end processes (depicted by the back-end processor **122** and the back-end database **123**) need no modification when incorporating the BCP arrangement into current card

8

systems. There are additional elements in the verification station **127** (see FIG. **3**) compared to the normal card reader, however this is a relatively simple an inexpensive upgrade compared to the centralised arrangement depicted in FIG. **2**.

FIG. **5** shows a process **200** for normal use of the BCP approach. In a first step **201**, the processor **105** determines if the card **601** has been read by the card reader **112**. If this is not the case, then the process **200** follows a NO arrow back to the step **201**. If, on the other hand, the card **601** has been read by the card reader **112**, then the process **200** follows a YES arrow to a step **202** (see FIG. **8** for more details). In the step **202**, the processor **105** processes the card information **605** that is read from the card **601** by the card reader **112**. In a following step **203** a request is presented to the card holder to provide a biometric signature to the biometric reader **102**. This request can be provided in an audio fashion by means of the audio interface **107** and the speaker **117**, this being driven by suitable software running on the processor **105**. Alternatively or in addition, a suitable message can be displayed on the LCD display **126** by suitable software running on the processor **105**.

In response to the aforementioned request, the holder of the card **601** provides a biometric signature to the biometric reader **102**. After the signature has been received by the step **203**, the process **200** is directed to a step **204** that reads the contents of the local database **124** at an address defined by the card data **604**. If the contents of this memory address match, to a sufficiently high degree of correspondence, the biometric signature received in the step **203** via the biometric reader **102**, then the process follows a YES arrow to a step **205** (see FIG. **6** for more detail). It is noted that if the step **204** returns a YES value, then the biometric signature at the noted memory address was written into the memory **124** in an earlier enrolment phase. It is also noted that the step **204** reads the contents stored at a single memory address defined by the card data **604** and checks these contents against the biometric signature received in the step **203**. There is no need to search the entire database **124** to see if there is a match. Thus the disclosed BCP arrangement provides a particularly simple and fast biometric verification check thereby securing the process associated with the step **205**. Once the step **205** has completed the verification process, the process **200** is directed according to an arrow **209** back to the step **201**.

In an alternate arrangement, the card data **604** can be associated with a group of memory locations, rather than being the address for a specific memory location. This arrangement allows a different biometric signature to be stored in each of the group of memory locations, and in this case, the step **204** reads the contents stored in each memory location in the group defined by the card data **604**, and checks the contents of each memory location in the group against the biometric signature received in the step **203**. If the contents of any member of the group of memory locations matches, to a sufficiently high degree of correspondence, the biometric signature received in the step **203** via the biometric reader **102**, then the process follows a YES arrow to a step **205**. This arrangement allows, for example, two cards having the same card data **604** to be used at the same verification station **127** after each card holder performs their own individual enrolment process.

Returning to the step **204**, if the contents of the local database **124** at the memory address defined by the card data **604** does not match the signature received by the biometric reader **102**, then the process **200** follows NO arrow to a step **206**. In the step **206**, the processor **105** determines if the contents of the memory defined by the card data **604** is empty. If this is the case, then the process **200** follows a YES arrow to

**ASSA ABLOY Ex. 1001 - Page 276**
**ASSA ABLOY AB v. CPC Patent Technologies Pty Ltd.**
**IPR2022-01094 - U.S. Patent No. 8,620,039**

US 8,620,039 B2

9

a step 207 that performs an enrolment process for the card 601 (see FIG. 7 for more detail). The process 200 then follows the arrow 209 back to the step 201.

Returning to the step 206, if the contents of the aforementioned memory location is not empty, then this means that (i) the card 601 and the associated biometric signature of the card holder have previously been used for the enrolment process 207, and (ii) the biometric signature now received in the step 203 does not match the signature stored in the database 124. In this event, the process 200 follows a NO arrow to a step 208 that performs an alert process. The process 200 then follows the arrow 209 back to the step 201. The alert process 208 can include sending an alert message from the verification station 127 to the back end processor 122 for later action, for example by the police. The alert process can also store the (unauthorised) signature for later use by the law enforcement authorities, and can capture the card in the verification station 127, thereby removing the card from the possession of the apparently unauthorised person.

The alert process 208 can send, as part of the alert message, send all or part of the card information 605 that is input to the verification station 127 in the step 201 of FIG. 5.

Although in the above description the step 206 tests if the memory location defined by the card data 604 is "empty", other approaches can be used. Thus when enrolment is performed, resulting in a memory location being used to store a biometric signature (eg see step 401 in FIG. 7), a flag can be set to indicate that the memory location in question is occupied. The term "occupied" in this context means that the memory location in question has been used in the enrolment process for a user, and that the information stored at the memory location in question has not been deleted by a BCP system administrator. If the signature stored in the database 124 at the particular memory location is deleted by a BCP system administrator (as described in regard to FIG. 8) then the flag can be reset to indicate that the memory location in question is no longer occupied.

As noted in regard to FIG. 3, the verification station 127 is constructed in a tamper proof fashion to ensure that the process 200 of FIG. 5, particularly the steps 204-207, are not accessible to unauthorised tampering.

FIG. 6 shows the verification process 205 from FIG. 5 in more detail. The process 205 is entered from the step 204 in FIG. 5, after which a step 301 authorises the transaction. This authorisation step 301 indicates that the biometric signal received by the biometric reader 102 in the step 203 matches the biometric signature previously stored in the local database 124 by a previous enrolment process 207 applied to the card in question.

After the step 301, a step 302 performs the transaction process (which may be viewed as a process of obtaining verified access to a protected resource), whatever that may be. Thus, for example, if the process 200 of FIG. 5 relates withdrawal of cash from an Automatic Teller Machine (ATM) operated by one of a number of service providers, then the step 302 comprises the user specifying the required amount of cash and the relevant account information via the keypad 103 (see FIG. 3), and the provision of a receipt and cash by the ATM (not shown). After completion of the transaction process by to the step 302, the process 205 is directed back to the step 201 in FIG. 5.

FIG. 7 shows the enrolment process step 207 from FIG. 5 in more detail. The process 207 is entered from the step 206 in FIG. 5, after which a step 401 stores the biometric signature received by the step 203 in the memory 124 at a memory address defined by the card data 604 received in the step 202 of FIG. 5. The aforementioned step 401 can store the biomet-

10

ric signature in encrypted form to reduce the probability that the signature can be acquired for unauthorised use, thus helping ensure the privacy of the card owner. The following steps 402 and 403 have the same respective functions as the corresponding steps 301 and 302 in FIG. 6. After completion of the step 403, the process 207 is directed back to the step 201 in FIG. 5.

FIG. 8 shows the step 202 in FIG. 5 that is concerned with the processing of the card information 605 from the card 601 when the card 601 is read by the card reader 112 in the step 202 of FIG. 5. The process 202 is entered from the step 201 in FIG. 5, after which a step 501 reads the card information 605 from the card 601 using the card reader 112. In a following step 502, the processor 105 retrieves predefined "permitted card set" parameters to determine the "permitted card set" for the verification station 127 in question. A separate, or overlapping, permitted card set is defined for each verification station 127. This ensures that a limited population of cards such as 601 undergo the BCP process at any given verification station 127. This has the advantage of ensuring that the local memory 124 does not overflow, and it also provides control over which users make use of which verification stations.

In a following step 503 the processor 105 compares the header 606 against the predefined permitted card set parameters to determine if the card 601 belongs to the set of permitted cards for the verification station 127 in question. If this is the case, then the process 202 is directed by a YES arrow to the step 203 in FIG. 5. If, on the other hand, the card header 606 does not belong to the permitted card set for the particular verification station 127, then the step 202 follows a NO arrow from the step 503 to a step 504. In the step 504, the processor 105 rejects the card that has been entered into the card reader 112. This rejection can take the form of a message displayed on the LCD display 126 and/or a corresponding audio message via the speaker 117. Thereafter, the process 202 is directed back to the step 201 in FIG. 5. It is noted that even if the verification station does not reject the card not belonging to the permitted card set for the verification station 127 in question, the back-end processor 122 can do so.

In addition to the predefined permitted card set, other administrative functions can be provided by the BCP arrangements. Thus, the predefined permitted card set details can be amended and/or the signatures stored in the database 124 can be deleted by a BCP system administrator. Audit trail information is also stored in the verification station 127 and can be downloaded for audit purposes. The audit information typically includes information of which cards have been submitted to the verification station and the time stamps of the card submissions. Biometric signatures are typically not part of the downloadable audit information, and require a greater level of authorisation (such as that associated with law enforcement agencies) for access.

FIG. 9 shows another application 900 to which the BCP arrangement can be applied. In a first step 901a person purchases or hires a verification station implemented in a portable form. A step 901 is performed at a registered supplier premises. Accordingly in a following step 902, the enrolment process is performed in controlled circumstances at the supplier premises. The "controlled conditions" referred to mean that the enrolment process is performed under conditions where the identity of the holder of the card 601 is verified, using a driving licence, passport or equivalent identification document, this ensuring that the enrolment process enrols the true owner of the card in an authorised manner.

In a following step 903, the verification station together with the card 601 can be used for third party transactions. Thus, in one example, the holder of the card 601 can take the

Appx0277

ASSA ABLOY Ex. 1001 - Page 277
ASSA ABLOY AB v. CPC Patent Technologies Pty Ltd.
IPR2022-01094 - U.S. Patent No. 8,620,039

US 8,620,039 B2

11

portable verification station and connect it to his or her personal computer (PC) in order to participate in an on-line casino. This type of application may require that the portable verification station be loaded with a station identification number (which can be the serial number of the portable verification station) at the registered supplier premises. This station identification number is then transmitted to the on-line casino back-end processes together with the card information **605**. This type of application does require some modification of the back-end processes.

In another example, the holder of the card **601** takes the card **601** and the portable verification station **127** to a shop which does not, as yet, have a BCP installation on the premises. In this event, providing that the BCP concept is known, the holder of the card **601** is able to apply the card to the card reader **112**, apply their biometric signature to the biometric reader **102**, and have the verification station **127** output the corresponding card information **605**. The shop assistant in this instance will, providing that they are aware of the BCP concept, know that the holder of the card **601** is the authorised owner.

INDUSTRIAL APPLICABILITY

It is apparent from the above that the arrangements described are applicable to the computer and data processing industries.

Furthermore, the disclosed biometric card pointer arrangements can be used in regard to credit cards, loyalty cards, access cards, ATM and bank or financial cards and others. The BCP arrangements can, in general be used in addition to standard cards for purposes of entry, identification, accessing details pertinent to the user, (i.e. authorisation to be in a specific location based on user data), payment purposes or associated loyalty, club membership applications, motor vehicle or specialist vehicle machinery operations and more.

Thus, for example, the BCP arrangement can be added to ATM machines, wherein the card user is required to enter their biometric signature for verification prior to entering their normal ATM PIN and withdrawing funds, thereby increasing the security of the ATM arrangement with minimal changes to the underlying platform.

Furthermore, the disclosed BCP arrangement can be used for secure access to a hotel room. When a guest registers with the hotel, the hotel issues the guest with a card containing a number defining the room number and planned departure date. After the guest enrols their biometric signature at the verification station (which includes a real time clock to match the actual time against the planned date of departure) mounted at the door of their room using the aforementioned card, the BCP arrangement will give them secure access to their room for the duration of their stay.

In addition to issuing the card, a fingerprint reader can be located at each room in the hotel. When the card is first issued, the guest uses the card to gain entry and change or update the code at the room for their exclusive use during their stay. The card reader can also allocate memory for storage of fingerprints, (any number of fingerprints can be allocated to the new card) which allows the individual and all associated guests to enrol their biometric signatures at this point. The enrolment is simply achieved, for example, by inserting the card and placing a finger on the fingerprint module, for each guest. Following this enrolment stage, the card or the finger can be used to gain access to the room; negating the requirement for guests to carry the room card, plus increasing security and convenience.

12

The benefit of having the card locate the fingerprints memory address is that the time and date of departure can also be added to the same memory location. Therefore, this application also allows other related data to be added to the memory location, enhancing the capability of the BCP arrangement. The ability to associate a memory location with a card number and expiry date can be related to many diverse applications, but utilises the same principle as storage of the fingerprint data.

Another application for the disclosed BCP arrangement is in regard to passport control and customs. The BCP arrangement can be installed at passport control and customs in various countries, and a person can enrol their biometric, after using their existing passport or ID card to pass through customs. The biometric signature is stored in a memory location related to the individual's passport or ID number, and retrieved for comparison as described in relation to FIG. **5**.

The foregoing describes only some embodiments of the present invention, and modifications and/or changes can be made thereto without departing from the scope and spirit of the invention, the embodiments being illustrative and not restrictive.

Thus, for example, although the description has been couched in terms of fingerprint biometric signatures, other biometrics such as facial shape, iris pattern can equally be used.

The claims defining the invention are as follows:

**1**. A method of enrolling in a biometric card pointer system, the method comprising the steps of:
  receiving card information;
  receiving the biometric signature;
  defining, dependent upon the received card information, a
    memory location in a local memory external to the card;
  determining if the defined memory location is unoccupied;
    and
  storing, if the memory location is unoccupied, the biometric signature at the defined memory location.

**2**. A method of obtaining verified access to a process, the method comprising the steps of:
  storing a biometric signature according to the enrolment
    method of claim **1**;
  subsequently presenting card information and a biometric
    signature; and
  verifying the subsequently presented presentation of the
    card information and the biometric signature if the subsequently presented biometric signature matches the
    biometric signature at the memory location, in said local
    memory, defined by the subsequently presented card
    information.

**3**. A method of securing a process at a verification station, the method comprising the steps of:
  (a) providing card information from a card device to a card
    reader in the verification station;
  (b) inputting a biometric signature of a user of the card
    device to a biometric reader in the verification station;
  (c) determining if the provided card information has been
    previously provided to the verification station;
  (d) if the provided card information has not been previously provided to the verification station;
    (da) storing the inputted biometric signature in a
      memory at a memory location defined by the provided
      card information; and
    (db) performing the process dependent upon the
      received card information;
  (e) if the provided card information has been previously
    provided to the verification station;

ASSA ABLOY Ex. 1001 - Page 278
ASSA ABLOY AB v. CPC Patent Technologies Pty Ltd.
IPR2022-01094 - U.S. Patent No. 8,620,039

US 8,620,039 B2

13

(ea) comparing the inputted biometric signature to the biometric signature stored in the memory at the memory location defined by the provided card information;

(eb) if the inputted biometric signature matches the stored biometric signature, performing the process dependent upon the received card information; and

(ec) if the inputted biometric signature does not match the stored biometric signature, not performing the process dependent upon the received card information.

**4**. A method according to claim **3**, wherein the card device is one of:

a card in which the card information is encoded in a magnetic strip;

a card in which the card information is encoded in a bar code;

a smart card in which the card information is stored in a solid state memory on the smart card; and

a key fob adapted to provide the card information by transmitting a wireless signal to the verification station.

**5**. A method according to claim **3**, wherein:

the card information provided in the step (a) comprises a header and card data; and

the steps (c), (d) and (e) are only performed if the header indicates that the card belongs to a set of cards associated with the verification station.

**6**. A method according to claim **3**, wherein the performance of the process in the steps (db) and (eb) comprises outputting at least part of the inputted card information from the verification station.

**7**. A method according to claim **6**, wherein at least one of the steps (db) and (eb) comprise at least one of the further steps of:

inputting information from a keypad to the verification station; and

outputting at least some of the information input from the keypad.

**8**. A method according to claim **7**, wherein the information outputted is communicated to one of:

a service provider for providing a service dependent upon receipt of the outputted information; and

an apparatus for providing access to a service dependent upon receipt of the outputted information.

**9**. A method according to any one of claims claim **6**, **7** and **8** wherein the information outputted is communicated to one of:

a service provider for providing a service dependent upon receipt of the outputted information; and

an apparatus for providing access to a service dependent upon receipt of the outputted information.

**10**. A method according to claim **3**, wherein the step (ec) further comprises outputting information indicating that the user of the card device is not authorised authorized.

**11**. A method according to claim **10**, wherein the information outputted is communicated to one of:

a service provider for providing a service dependent upon receipt of the outputted information; and

an apparatus for providing access to a service dependent upon receipt of the outputted information.

**12**. A method according to claim **3**, comprising the further steps of:

(f) storing the card information provided by successive instances of the step (a); and

(g) outputting the information stored in the step (f) for audit purposes.

**13**. A biometric card pointer enrolment system comprising:

14

a card device reader for receiving card information;

a biometric reader for receiving the biometric signature;

means for defining, dependent upon the received card information, a memory location in a local memory external to the card;

means for determining if the defined memory location is unoccupied; and

means for storing, if the memory location is unoccupied, the biometric signature at the defined memory location.

**14**. A biometric card pointer verified access system comprising:

the biometric card pointer enrolment system of claim **13**; and

means for verifying (i) a subsequent presentation of card information to the card device reader and (ii) a subsequent presentation of a biometric signature to the biometric reader if said subsequently presented biometric signature matches the biometric signature at the memory location, in said local memory, defined by the subsequently presented card information.

**15**. A verification station for securing a process, the verification station comprising:

a card device reader for receiving card information from a card device coupled to the verification station;

a biometric signature reader for receiving a biometric signature provided to the verification station;

means for determining if the provided card information has been previously provided to the verification station;

means, if the provided card information has not been previously provided to the verification station, for:

storing the inputted biometric signature in a memory at a memory location defined by the provided card information; and

performing the process dependent upon the received card information;

means, if the provided card information has been previously provided to the verification station, for:

comparing the inputted biometric signature to the biometric signature stored in the memory at the memory location defined by the provided card information;

if the inputted biometric signature matches the stored biometric signature, performing the process dependent upon the received card information; and

if the inputted biometric signature does not match the stored biometric signature, not performing the process dependent upon the received card information.

**16**. A verification station according to claim **15**, wherein the card device reader is one of:

a reader for a card in which the card information is encoded in a magnetic strip;

a reader for a card in which the card information is encoded in a bar code;

a reader for a smart card in which the card information is stored in a solid state memory on the smart card; and

a receiver for a key fob adapted to provide the card information by transmitting a wireless signal to the verification station.

**17**. A verification station according to claim **15**, wherein the memory is incorporated in a tamper-proof manner in the verification station.

**18**. A non-transitory computer readable medium having recorded thereon a computer program for directing a processor to execute a method for securing a process at a verification station, said program comprising:

ASSA ABLOY Ex. 1001 - Page 279
ASSA ABLOY AB v. CPC Patent Technologies Pty Ltd.
IPR2022-01094 - U.S. Patent No. 8,620,039

US 8,620,039 B2

15

code for determining if card information, provided to a card device reader incorporated into the verification station, has been previously provided to the verification station;

code, if the provided card information has not been previously provided to the verification station, for:

storing a biometric signature, inputted to a biometric signature reader incorporated into the verification station, in a memory incorporated into the verification station, at a memory location defined by the provided card information; and

performing the process dependent upon the received card information;

code, if the provided card information has been previously provided to the verification station, for:

comparing the inputted biometric signature to the biometric signature stored in the memory at the memory location defined by the provided card information;

if the inputted biometric signature matches the stored biometric signature, performing the process dependent upon the received card information; and

if the inputted biometric signature does not match the stored biometric signature, not performing the process dependent upon the received card information.

**19**. A non-transitory computer readable medium having recorded thereon a computer program for directing a processor to execute a method of enrolling in a biometric card pointer system, the program comprising:

code for receiving card information;

code for receiving the biometric signature;

code for defining, dependent upon the received card information, a memory location in a local memory external to the card;

code for determining if the defined memory location is unoccupied; and

code for storing, if the memory location is unoccupied, the biometric signature at the defined memory location.

**20**. A non-transitory computer readable medium having recorded thereon a computer program for directing a processor to execute a method of obtaining verified access to a process, the program comprising:

code for storing a biometric signature according to the enrolment method of claim **19**;

code for subsequently presenting card information and a biometric signature; and

code for verifying the subsequently presented presentation of the card information and the biometric signature if the subsequently presented biometric signature matches the biometric signature at the memory location, in said local memory, defined by the subsequently presented card information.

* * * * *

Appx0280

ASSA ABLOY Ex. 1001 - Page 280
ASSA ABLOY AB v. CPC Patent Technologies Pty Ltd.
IPR2022-01094 - U.S. Patent No. 8,620,039

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.        :  8,620,039 B2                                                    Page 1 of 1
APPLICATION NO. :  12/063650
DATED              :  December 31, 2013
INVENTOR(S)       :  Christopher John Burke

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

On the Title Page:

The first or sole Notice should read --

Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1707 days.

Signed and Sealed this

Twenty-second Day of September, 2015

Michelle K. Lee
*Director of the United States Patent and Trademark Office*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:**  2024-1492, 2024-1493

**Short Case Caption:**  CPC Patent Technologies Pty Ltd. v. Assa Abloy AB

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

[✓] the filing has been prepared using a proportionally-spaced typeface and includes _6,213_ words.

[ ] the filing has been prepared using a monospaced typeface and includes _____ lines of text.

[ ] the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: _05/28/2024_

Signature:  /s/ Steven M. Coyle

Name:  Steven M. Coyle

Save for Filing